| | |
|---|---|
| DISTRICT COURT, PITKIN COUNTY, COLORADO<br>Pitkin County Courthouse<br>530 E. Main St.<br>Aspen, CO 81611 | DATE FILED: July 20, 2021 11:30 PM<br>FILING ID: 9067C2771209A<br>CASE NUMBER: 2021CV30074 |
| Plaintiffs:<br>ANDREW L. QUIAT AND JANE KEENER-QUIAT, as their interests may appear,<br><br>    v.<br><br>Defendants:<br>DIRECT MARKETING GROUP, LLC, a Nevada limited liability company, d/b/a AUTO RENEWAL CENTER LLC; VEHICLE PROTECTION SPECIALISTS, LLC, a Nevada limited liability company, d/b/a/ and a/k/a Vehicle Services and/or Vehicle Service Center; CARGUARD ADMINISTRATION, INC., an Arizona corporation; DANIEL M. LAURENT, individually; TREVOR S. SMITH, individually; CECI HARRIS, individually; VASHTI SALAZAR, individually; JOHN DOE CORPOREAL ENTITIES #1-10; and JOHN DOES #1-10. |  <br><br><br><br><br><br><br><br><br><br><br>▲  COURT USE ONLY  ▲ |
| Attorney for Plaintiffs:<br>Andrew L. Quiat, Atty. Reg. #1286<br>The Law Offices of Andrew L. Quiat, P.C.<br>P.O. Box 2900<br>Aspen, CO 81612<br>Phone: 303.549.9534<br>E-Mail: aquiat@quiatlegal.com | Case Number:<br><br><br>Div.:        Ctrm.: |
| **COMPLAINT** | |

COMES NOW, the Plaintiffs Andrew L. Quiat and Jane Keener-Quiat, as their interests may appear, by and through their attorneys, The Law Offices of Andrew L. Quiat, P.C., and as their Complaint, allege as follows:

1.    The Plaintiffs seek injunctive relief, statutory damages, actual damages, treble damages, pre-judgment interest, pre-judgment and post-judgment attorney's, and additional statutory relief arising from unlawful prerecorded, autodialed and spoofed commercial telemarketing calls in violation of the federal Telephone Consumer Protection Act of 1991 ("TCPA"), as well as two Colorado criminal statutes governing prerecorded messages and/or marketing telephone calls and/or deceptive trade practices which constitute

**EXHIBIT A**

violations of the Colorado Consumer Protection Act ("CCPA"), and the Colorado Organized Crime Control Act ("COCCA").

## I.   JURISDICTION AND VENUE

2.    Jurisdiction is proper in this Court pursuant to the Colorado Constitution, Art. VI, § 9 and 47 U.S.C. § 227(b)(3).

3.    Jurisdiction is proper in this Court as to the Defendants pursuant to C.R.S. §§ 13-1-124(1)(a); 13-1-124(1)(b)(1963), as amended, because the unsolicited prerecorded and/or autodialed calls sent by the Defendants to the Plaintiffs represents: (1) separate and distinct transactions of business in interstate and/or intrastate commerce via telephone lines into and within the state of Colorado; (2) the commission of tortious acts within the state of Colorado under the TCPA, the CCPA, and COCCA; and (3) the causes of action arise directly from the consequences and effects of the transmission of each autodialed, prerecorded commercial telemarketing phone calls into and within the state of Colorado.

4.    Independent of the commission by the Defendants of one or more tortious acts within the state of Colorado, jurisdiction is proper in this Court as to the Defendants because the transmission of the autodialed, prerecorded commercial telemarketing phone call(s) of the Defendants constitute transaction of business within the state of Colorado.

5.    Venue is proper in this Court pursuant to C.R.C.P. Rule 98(c)(1) as to the Defendants because venue is proper in the county designated in the Complaint.

## II.   PARTIES

6.    Plaintiffs Andrew L. Quiat ("ALQ") and Jane Keener-Quiat ("JKQ") are individuals who are citizens of and reside in unincorporated Garfield County, Colorado.

7.    Defendant Direct Marketing Group LLC ("Direct Marketing") is a for-profit Nevada limited liability company, formed on July 23, 2013 by Daniel Laurent ("Laurent"), with a principal office and mailing address of 6789 Quail Hill Parkway, Suite 605, Irvine, California, 92603. It is authorized to do business in Colorado and is registered to do business in various other states across the United States.

8.    Defendant Auto Renewal Center LLC ("Auto Renewal") is an alternate name used by Direct Marketing in Florida and in North Carolina, due to the unavailability of the name Direct Marketing in those states. It is registered as a foreign entity to transact business in the states of Florida and North Carolina, with a principal office and mailing address of 6789 Quail Hill Parkway, Suite 605, Irvine, California, 92603. Auto Renewal registered as a foreign entity in the State of Florida on May 28, 2019 and in the State of North Carolina on June 3, 2019 by Laurent.

9.     Defendant Vehicle Protection Specialists, LLC ("VPS") is a Nevada limited liability company with a principal office and mailing address of 6789 Quail Hill Parkway, Suite 605, Irvine, California, 92603. Vehicle Protection Specialists, LLC is a for-profit, limited liability company that was formed by Laurent on December 30, 2013 and is registered to do business in various states across the United States.

10.     Defendant Vehicle Protection Specialists, LLC, is in the business of providing "extended auto warranties" to consumers. Vehicle Services and/or Vehicle Service Center is each a potential d/b/a or a/k/a of Vehicle Protection Specialists, based on the fact that there is no corporate registry for Vehicle Services and because the website for Vehicle Services is vehicleprotectionspecialist.com.

11.     Defendant CarGuard Administration, Inc. ("CarGuard"), is a for-profit Arizona corporation, with its principal place of business at 6991 E. Camelback Rd. Suite C309, Scottsdale, AZ 85251; and its principal office mailing address at 1776 N. Scottsdale Rd. Unit 2827, Scottsdale, AZ 85252. It maintains places of business located at 4901 W. 136th Street, Leawood, KS 66224 and an additional place of business at 4742 N. 24th Street, Suite 300, Phoenix, AZ 895016. It is authorized to do business in Colorado.

12.     Defendant CarGuard is in the business of providing "auto warranty services" to consumers and serves as the administrator of contracts for extended "auto warranty coverage."

13.     Defendant Daniel M. Laurent ("Laurent"), individually, is a citizen and resident of the state of California with, upon information and belief, an address of 9 MacArthur Place, Unit 2202, Santa Ana, CA 92707. According to corporate registries, Laurent owns and manages Direct Marketing Group LLC, Vehicle Protection Specialists LLC, and Auto Renewal Center LLC.

14.     Defendant Trevor S. Smith ("Smith"), individually, is, upon information and belief, a citizen and resident of Arizona. His current personal address is unknown at this time, but his business address is listed as 4742 N. 24th Street, Suite 300, Phoenix, AZ 85016. Smith at times relevant hereto is or was the principal officer and CEO of Defendant CarGuard Administration Inc.

15.     Defendant Vashti Salazar ("Salazar"), individually, is a citizen and resident of the state of California with, upon information and belief, an address of 130 Adams Avenue, Apt. 29C, Costa Mesa, CA 92626. She has been, at times relevant hereto, a "selling agent" and/or a "senior coverage specialist" and/or a "protection specialist" with CarGuard Administration Inc.

16.     Defendant CeCi Harris ("Harris"), individually, is a citizen and resident of the state of Kansas with, upon information and belief, a business address of 4901 W. 136th Street,

**EXHIBIT A**

Leawood, Kansas 66224 and at times relevant hereto is or was the Chief Operations Officer and/or Claims Manager of CarGuard Administration, Inc.

17.    John Doe Corporeal Entities #1-10 and John Does #1-10  refer to presently unknown persons or entities who may be agents of Defendants Direct Marketing Group, LLC; CarGuard Administration, Inc.; Auto Renewal Center LLC; Vehicle Protection Specialists LLC; and/or individuals who personally performed, directed, authorized, and/or failed to halt the unlawful acts described herein, and therefore may also be liable under the TCPA and/or CCPA and/or Colorado Revised Statutes. John Doe Corporeal Entities #1-10 and John Does #1-10 may also be one or more as of yet unidentified call centers, or employees or agents thereof, who effectuated, and otherwise participated in, an autodialed, prerecorded campaign of robo calls which includes calls discussed herein to the Plaintiffs. Each of the foregoing is, upon information and belief, a part of the racketeering enterprise hereinafter described.

18.    Defendant John Doe #1 is a live hand-off specialist in a recorded robocall between Plaintiff JKQ and Auto Renewal Center. This call was initially transferred to a live operator identifying herself as "Molly Wright" (spelling uncertain). This operator's job was to make a preliminary determination of qualification of JKQ for the services offered by the ultimate beneficiary at the end of the illegal robocall enterprise. The true identity of John Doe #1, and anyone with whom she is or may be affiliated, is yet to be determined, but the existence is known by virtue of a recording of the subject phone call, hereinafter referenced as Call #1.

### III.    THE TCPA

19.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a…cellular telephone service…." *See* 47 U.S.C. § 227 (b)(1)(A)(iii).

20.    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

21.    While "prior express consent" is required for all automated and prerecorded calls, in 2013, the FCC required "prior express written consent" for all such telemarketing calls to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having

4

received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement must be executed as a condition of purchasing any good or service."

*In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

22.    "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *See* 47 C.F.R. § 64.1200(f)(12).

23.    When Congress enacted the TCPA in 1991, it found that telemarketers call more than 18 million Americans every day. *See* 105 Stat. 2394 at § 2(3).

24.    By 2003, due to more powerful autodialing technology, telemarketers were calling 104 million Americans every day. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 F.C.C. Rcd. 14014, ¶¶ 2, 8 (2003).

25.    The numbers dialed by those calling with illegal calls are generally made, upon information and belief, with the use of one or more autodialers that have the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. (See holding of *Facebook v. Druig*, 592 U.S. ____(2021)). This is in addition to each of such calls utilizing artificial or prerecorded voice(s) as prohibited by 47 U.S.C. §§ 227(b)(1)(A).  Upon Information and belief, autodialed calls often give *indicia* thereof, *inter alia*, by pauses and transfers. This is further indicated by multiple calls to and from various numbers as well as hang-up calls designed to test numbers which, in the industry, are autodialed, combined with the sheer volume of calls. Allegations of information and belief throughout this Complaint shall be further developed by discovery.

26.    The problems Congress identified when it enacted the TCPA have only grown exponentially worse in recent years.

27.    Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018 – a 466% increase in three years.

28.    According to online robocall tracking service "YouMail," 5.2 billion robocalls were placed in March 2019 alone, at a rate of 168.8 million per day. YouMail estimated that in 2019 robocall totals would exceed 60 billion.

29.    The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data .

**EXHIBIT A**

30.    "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, Cutting off Robocalls (July 22, 2016), statement of FCC chairman. [a]

31.    "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016). [b]

32.    Each of the calls at issue in this case is symptomatic of and part of a nationwide epidemic of "robocalls" which are of continuing concern to the U.S. Congress, as evidenced by Exhibits 1 to 4 hereto consisting of the following:

   a.    Exhibit 1, FTC prepared statement to U.S. Senate Committee;

   b.    Exhibit 2, Attorney General Shapiro prepared statement to U.S. Senate Committee;

   c.    Exhibit 3, Kevin Rupy of USTelecom prepared statement to U.S. Senate Committee;

   d.    Exhibit 4, Genie Barton of the Better Business Bureau prepared statement to the U.S. Senate Committee.

The Court is requested to judicially notice the foregoing, introduced as part of the record to a U.S. Senate Special Committee on Ageing hearing held on October 4, 2017, as well as the hearing itself, found at https://www.aging.senate.gov/hearings/still-ringing-off-the-hook-an-update-on-efforts-to-combat-robocalls

## IV.    INTRODUCTION TO DANIEL LAURENT AND LAURENT'S EXTENDED CAR WARRANTY ENTITITES

33.    Plaintiffs incorporate prior paragraphs 1 - 32 herein by reference as though fully set forth.

34.    Auto Renewal, Vehicle Services and VPS provide consumers with a so-called extended "car warranty" that provides repair coverage for a vehicle after the manufacturer's car warranty has expired.

---

[a] https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls
[b] https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf

**EXHIBIT A**

35.   Both Vehicle Services [c] and Auto Renewal [d] have a principal office address of 6789 Quail Hill Parkway, Suite 605, Irvine, CA 92603 listed on their respective websites. Upon information and belief, this address is a PO Box located inside a store called AIM Mail Center. [e]

36.   Upon information and belief, Laurent is directly involved in the illegal telemarketing for which his companies are responsible and directs his employees to sell "extended car warranty" plans to consumers who are solicited using prerecorded and/or autodialed telemarketing calls.

37.   To date, Laurent and his extended car warranty companies, affiliates, and agents have been in numerous TCPA-related lawsuits which include:

| Party Name | Case Number | Case Title | Court | Date Filed | Date Closed |
|---|---|---|---|---|---|
| Vehicle Protection Specialists (dft) | 1:2021cv01735 | Torres v. Vehicle Protection Specialists et al | Illinois Northern District Court | 03/31/2021 | 06/14/2021 |
| Vehicle Protection Specialists (dft) | 1:2021cv00369 | Perry v. Vehicle Protection Specialists et al | New York Northern District Court | 04/01/2021 | 05/27/2021 |
| Vehicle Protection Specialists (dft) | 1:2021cv00021 | Alberd v. Vehicle Protection Specialists et al | Tennessee Middle District Court | 04/01/2021 | 05/21/2021 |
| Vehicle Protection Specialists (dft) | 4:2021cv01034 | Gibson v. Vehicle Protection Specialists et al | Texas Southern District Court | 03/30/2021 | 05/27/2021 |
| Vehicle Protection Specialists LLC (dft) | 8:2020cv02248 | Nathan Rowan v. Direct Marketing Group LLC et al | California Central District Court | 11/30/2020 | 01/27/2021 |
| Vehicle Protection Specialists LLC (dft) | 1:2020cv10746 | Barrett et al v. CarGuard Administration, Inc. et al | Massachusetts District Court | 04/16/2020 | 06/05/2020 |
| Vehicle Protection Specialists LLC (dft) | 1:2020cv11487 | Barrett et al v. CarGuard Administration, Inc. et al | Massachusetts District Court | 08/06/2020 | 08/27/2020 |
| Vehicle Protection Specialists, LLC (dft) | 8:2020cv01218 | Jonathan Smith v. Vehicle Protection Specialists, LLC et al | California Central District Court | 07/10/2020 | 09/28/2020 |
| Vehicle Protection Specialists, LLC (dft) | 1:2019cv00523 | Omnisure Group, LLC v. Laurent et al | Illinois Northern District Court | 01/25/2019 | 10/08/2019 |
| Vehicle Protection Specialists, LLC aka Vehicle Service Center (dft) | 4:2019cv00812 | Cunningham v. Vehicle Protection Specialists, LLC aka Vehicle Service Center et al | Texas Eastern District Court | 11/07/2019 | 12/20/2019 |

38.   Despite these lawsuits, Laurent continues to either direct his agents to place prerecorded and/or autodialed solicitation calls to consumers, or Laurent partners with one or more companies that places the prerecorded and/or autodialed solicitation calls on his behalf.

39.   Auto Renewal and Vehicle Services, or an agency working on behalf of these companies, place prerecorded and/or autodialed telemarketing calls to consumers.

40.   These calls are being placed regardless of whether Auto Renewal and/or Vehicle Services have the consent necessary to place prerecorded and/ or autodialed solicitation calls.

---

[c] https://vehicleprotectionspecialist.com/
[d] https://www.autorenewalcenter.com/
[e] https://www.aimmailcenters.com/location/irvine/88

7

**EXHIBIT A**

41.   To make matters worse, consumers are receiving unsolicited calls despite having their phone numbers registered on the national "Do Not Call" registry and/or even despite the requests for the calls to stop. Such persons include the Plaintiffs herein.

## V.   GENERAL FACTS AND ALLEGATIONS

42.   The events described herein relate to unlawful prerecorded, autodialed, and spoofed commercial telemarketing calls to Plaintiffs' cell phones. ALQ has a cell phone number that he has held for seventeen (17) years (since August 13, 2003). JKQ has a cell phone that she has held for nine years (since May 1, 2012).

43.   The unlawful prerecorded, and/or autodialed, and spoofed commercial telemarketing call(s) were received by Plaintiffs ALQ and JKQ within the State of Colorado.

44.   Plaintiffs ALQ and JKQ's respective cell phone numbers have each always been a cellular telephone number, and neither has never been ported from a "landline" number. Publicly available telephone exchange databases clearly identify the area code and prefix of each as being assigned to a cellular carrier.

45.   Plaintiff ALQ's cell phone number has been continuously registered on the federal "Do Not Call" registry since October 9, 2017. Plaintiff ALQ has been on the Colorado state No-Call List since October 8, 2017.

46.   Plaintiff JKQ's cell phone number has been continuously registered on the federal "Do Not Call" registry since August 1, 2015. Plaintiff JKQ has been on the Colorado state No-Call List since September 30, 2015.

47.   Call #1: On September 4, 2020, Plaintiff JKQ received one, as yet to be fully identified, prerecorded, autodialed, two-step live transfer, commercial telemarketing cellular phone call. Plaintiff JKQ was, in stages, live transferred to, upon information and belief, agents, employees, or members of one of the ultimate vendors, Defendant CarGuard. This method of marketing is illegal and violates multiple federal and state statutes. Plaintiffs have an audio recording of the entire proceeding.

48.   The prerecorded message portion of the telemarketing message was in a woman's voice, referred to as "Angela". During the prerecorded message, Plaintiff JKQ also spoke periodically and sometimes simultaneously. The captured prerecorded robocall (identified as "RC") and Plaintiff JKQ's comments are transcribed as follows:

Phone ringing and is answered by JKQ.

JKQ: Hello?

**EXHIBIT A**

RC: Hi! How are you? This is Angela from the warranty department. The reason I'm calling is to remind you that we sent you a final warning …

JQK: (speaking at the same time) This is a prerecorded robocall.

RC: …in the mail and to let you know that the warranty on your vehicle has expired. And this is the final call for you to renew before we close the file. So, would you like to hear your options about getting back under coverage?

JKQ: Yes.

RC: Ok, great. Well, I just need to ask you a few questions to see if we can still get you qualified. Do you have less than 150,000 miles on the car?

JKQ: Yes.

RC: Well, that's excellent to hear because it is always great to have peace of mind with a warranty for your vehicle. So, may I transfer you over to a specialist so they can go over those options with you?

JKQ: Ok.

RC: Thank you. Please hold.

(Long pause while call was transferred to a live person.)

49.    An agent named Molly Wright then came on the line to qualify Plaintiff JKQ's extended car warranty needs.

50.    Once she was qualified, Ms. Wright transferred Plaintiff JKQ to a "Chevrolet Specialist" later identified as Vashti Salazar.

51.    For the sole purpose of identifying the source of the anonymous and unlawful call(s), JKQ investigated by choosing to respond to indicate interest in the proffered offer and was then passed on by live transfers to live voices, as herein otherwise described. JKQ thereby feigned interest and ultimately made a purchase of the proffered auto warranty on her credit card in the amount of $3,775.00. Plaintiff JKQ did this in order to obtain a policy that could be cancelled in order to determine from both the policy and the funds flow via the credit card, the identity and source of the party(ies) making the illegal calls. At that time, the selling agent gave her name as Vashi Salazar and a contact phone number of (844) 273-9727.

52.    The number of (844) 273-9727 is the phone number for Auto Renewal Center and is answered as "Auto Warranty Protection Services".

**EXHIBIT A**

53.     As per Auto Renewal's website (www.autorenewalcenter.com), their customer service phone number is (844) 273-9727.

54.     A copy of the credit card charge of $3,775.00 is attached hereto as Exhibit 5. Upon information and belief, the credit card description of "Vehicle Warranty" with Reference number 24141660250017039385960 is for Vehicle Protection Specialists LLC, as that is how the referenced phone number on the credit card charge, (800) 372-4420, is sometimes answered. Other times it is answered "Warranty Services Overflow" or "Warranty Services Answering Service."

55.     The recording, which contains personal identifying information in the form of Plaintiff JKQ's credit card number, is available subject to entry of a protective order herein.

56.     On September 4, 2020, Vashti Salazar sent an email from "Quotes and Confirmations noreply@pomdriving.com" to JKQ. A copy is attached as Exhibit 6. Attached to the email is a description of JKQ's 2014 Chevrolet Volt and its mileage of 94,877 and VIN ending in 133310, as well as a link stating to "Click Here to View Terms and Conditions." Below that is stated "Auto Renewal Center 6789 Quail Hill Pkwy Suite 605 Irvine, CA 92618 844.273.9727". Upon clicking the link, a document opens that is a form of the policy, other than the declarations page and Colorado specific provisions, and it is attached as Exhibit 7. Also see the hyperlink http://www.pomdriving.com/tc/TCGDPLTX10-sp.pdf.

57.     On September 8, 2020, a package was mailed to JKQ. It was duly received. It was from "193-DMGL2-CARGURD- -CGLTD – 7, Auto Renewal Center, 6789 Quail Hill Parkway, Suite 605, Irvine, CA 92618."

58.     The package contained the complete Service Contract and an initial letter from Vashti Salazar, designated therein as a "Protection Specialist." The document gave "Important Contact Numbers: Claims: (888) 907-0870 and Roadside: (844) 286-4577."

59.     These numbers, upon information and belief, go to other participants in the robocall food chain. A copy of the entire document is attached hereto as Exhibit 8.

60.     On or about September 29, 2020, efforts commenced to cancel the policy in accordance with both its terms and as provided by Colorado law. Plaintiff JKQ provided Notice of Cancellation (a) by voicemail to the number previously provided by Vashti Salazar, and (b) also by email to the address indicated by the CarGuard Website as of September 29, 2020. A copy of the email with the Subject of "Notice of Cancellation of Contract #CGC24413034" is attached hereto as Exhibit 9. The email address, however, blocked receipt of the Notice. A copy of the notice that the recipient address was rejected is attached hereto as Exhibit 10. A recording of the phone call requesting cancellation was made and is available. The person on the other end of the call ended up by hanging up on JKQ rather than providing additional information.

61.    A transcript of the call is attached hereto as <u>Exhibit 11</u>. The transcript discloses, amongst other things, that to reach CarGuard it is necessary to go through Vehicle Protection Services, a/k/a Vehicle Service Center. The calls reflect upon the manner in which the enterprise is conducted. No response of any kind has ever been received, despite assurances that JKQ would be contacted. Cancellation efforts included calls to Vehicle Protection Services, CarGuard, Vehicle Service Center, and Vehicle Protection Services.

62.    Not receiving any form of acknowledgement of the cancellation, certified letters, return receipt requested, were thereafter sent on or about September 30, 2020 to Car Guard Administration, Inc., at both of its address, in Leawood, Kansas and Phoenix, AZ. A copy of those mailings is attached hereto respectively as <u>Exhibits 12 and 13</u>.

63.    The signed return receipts for the certified mailings, one undated and the other dated October 6, 2020 are attached hereto as <u>Exhibit 14</u>.

64.    Plaintiffs JKQ and ALQ have never consented to receiving solicitation calls from any of the Defendants.

65.    Plaintiffs JKQ and ALQ were not looking to solicit the services of any extended "car warranty" companies.

66.    The unauthorized telephone calls made by and on behalf of the Defendants, alleged herein, have harmed Plaintiff JKQ and ALQ, as their interests may appear, in the form of annoyance, nuisance, and invasion of privacy, and disturbed the use and enjoyment of their respective phones, in addition to the wear and tear on the phones' hardware (including the phone's battery) and the consumption of memory on the phone. Plaintiffs have suffered actual damage to their respective personal, property, and businesses interests. Plaintiff JKQ works in a hospital in the Chaplaincy and provides care and palliative care to patients often over matters of life and death and the dying process. She must have her cell phone with her and often received robocalls, including from Defendants, when working and at inappropriate and inopportune times. Plaintiff ALQ is a trial lawyer with cases in both federal and state courts. Much of his work is done via cell phone or Zoom calls, or similar platforms. Such work includes court appearances and/or conferences with judges and/or multiple lawyers. Incoming robocalls during such times, and during preparation, therefore, are particularly disruptive, damaging and break up concentration, analysis, presence to proceedings and disrupts the creative process in an irreparable manner. Defendants' unlawful robocalls wrongfully created a nuisance for Plaintiffs JKQ and ALQ by ringing their respective cell phones which are intended for legitimate calls from family, friends, employees, business partners, and clients.

67.    Over time a number of other robocalls for Auto Warranty have been received by Plaintiffs and continue to be received. These calls are detailed in the following paragraphs. The violations occurring within these calls are detailed on the violation charts attached hereto as <u>Exhibit 15</u>. Many of the calls also have cell phone screenshots showing the times,

**EXHIBIT A**

dates, and phone numbers used by Auto Warranty to make robocalls to Plaintiffs. These screenshots are compiled and attached hereto as Exhibit 16.

68.    Call #2: On September 4, 2020, JKQ received an autodialed, prerecorded robocall to her cell phone at approximately 10:30 a.m. from caller ID identified as "(949) 538-5912, San Juan Capistrano, CA." Screenshots are attached, Exhibit 16. The call disconnected without leaving a voicemail. Upon returning the call the same day, it was answered by a live person as "Auto Warranty – Overflow Department." Upon further investigation, dialing this number still leads to a live person who answers the call as "Auto Warranty – Overflow Department."

69.    Call #3: On September 4, 2020, ALQ received a prerecorded robocall at 2:24 p.m. from phone number (303) 649-9978 which upon answering stated it was Auto Warranty. Upon information and belief, it was autodialed and ALQ hung up upon hearing the recording. A screenshot is attached, Exhibit 16. Upon dialing, the number leads to a Verizon number that is disconnected; in other words, a spoofed number.

70.    Call #4: On September 8, 2020, ALQ received an autodialed, prerecorded robocall from Auto Warranty Services at approximately 11:00 a.m. on his cell phone. The call disconnected without leaving a voicemail when ALQ did not answer. ALQ then returned the call from the number on his caller ID. This call was recorded, and the transcript is as follows.

>    RC: (prerecorded answer) (beginning cut off)…Auto Warranty Services to opt out from our calling list, please press one.
>    ALQ: This was a dialed call 11:00 to 11:10 a.m., September 8, 2020 to my cell phone.
>    RC: (prerecorded answer) We have not received a valid response. Please try again.
>    ALQ: They called and hung-up.

71.    Call #5: On September 25, 2020, at 10:30 a.m., ALQ received an autodialed, prerecorded robocall from phone number (303) 353-0879 on his cell phone. The call disconnected when ALQ did not answer, and no voicemail was left. ALQ then returned the call from the phone number left on his caller ID. A screenshot is attached, Exhibit 16. The call was recorded, and the transcript of the call is as follows.

>    RC: (prerecorded answer) (beginning cut off)…calling Auto Warranty Services. To opt out from our calling list, please press one.
>    ALQ: This is a call I had that hung up when I did not answer it. I dialed the number; this was the recording. 303-35…(trails off)
>    RC: (prerecorded answer) We have not received a valid response. Please try again.

**EXHIBIT A**

Upon further investigation, when phone number (303) 353-0879 is dialed it leads to an automated message from Verizon stating that the "call cannot be completed as dialed." It is a spoofed number.

72.    Call #6: On September 28, 2020, ALQ received an autodialed, prerecorded robocall from "(910) 407-8590, North Carolina" on his cell phone. The call disconnected when he did not answer, and no voicemail was left. A screenshot is attached, Exhibit 16. Below is a transcript of ALQ's recorded return call to that number.

> **RC:** (beginning cut off)…calling auto warranty services. To opt out from our calling list, please press 1.
> **ALQ:** Call back on a hang up call (910) 407-8590 September 28, 2020 at 9:50 a.m.
> **RC:** We have not received a valid response, please try again.

Upon further investigation, when phone number (910) 407-8590 is dialed, it leads to an automated voicemail for "Affordable Health Plans". In other words, it is a spoofed number.

73.    Call #7: On October 12, 2020, ALQ received an autodialed, prerecorded voicemail from "Susie" with the "Vehicle Service Department" from phone number (719) 295-5539 about renewing his auto warranty before they "close the file". The voicemail ("VM") was recorded and transcribed below.

> **ALQ VM:** Next message sent Monday, October 12 at 4:14 PM from 719-295-5539 Duration: 1 min 26 sec
>
> **RC:** (beginning cuts off)…file. If you're interested in renewing your auto warranty now, please press 5 now. Or press 9 to be removed from our list. (long pause)
>
> **RC:** Hi, this is Susie calling with the vehicle service department. We're calling about your vehicle's manufacturer's warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off. And this is a courtesy call to renew your warranty before we close the file. If you are interested in renewing your auto warranty now, please press 5 now. Or press 9 to be removed from our list. (pause) (message repeats)
>
> **RC:** Hi, this is Susie calling with the vehicle service department. We're calling about your vehicle's manufacturer's warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off. And this is a courtesy call to renew your warranty before we close the

13

**EXHIBIT A**

file. If you are interested in renewing your auto warranty now, please press 5
now. Or press 9 to be removed from our list.
Call rejected.
**ALQ VM:** End of message.

Upon further investigation, when dialed the phone number (719) 295-5539 is answered
by an automated message from Verizon stating, "the call cannot be completed as dialed." It
is a spoofed number.

74.    Call #8: On October 22, 2020, ALQ received an autodialed, prerecorded robocall
from phone number (725) 600-6129 on his cell phone. The call disconnected when he did not
answer, and no voicemail was left. A screenshot is attached, <u>Exhibit 16</u>. Below is a transcript
of ALQ's recorded return call to that number.

> **Prerecorded Answer:** Thank you for calling Auto Warranty Services. To opt
> out of our calling list, please press one.
> **ALQ:** Return of a robocall hang up on October 22, 2020 at about 11:10/11:15,
> 725-600-6129.
> **Prerecorded Answer:** We have not received a valid response. Please try
> again.
> (end of call)

Upon further investigation, when phone number (725) 600-6129 is dialed it leads to an
automated recording stating that, "The number you have called is not configured correctly
and cannot receive calls." It is a spoofed number.

75.    Call #9: On November 16, 2020, ALQ received an autodialed, prerecorded
voicemail on his cell phone regarding renewing his auto warranty. This voicemail was
recorded and transcribed below:

> **ALQ VM:** Next message sent Monday, November 16 at 3:19 p.m. from 970-557-
> 2675, duration 14 sec.
> **RC:** (automated message)(beginning cuts off) …close the file. If you are
> interested in renewing your auto warranty now, please press 5 now. Or press 9 to
> be removed from our list.

Upon further investigation, when phone number (970) 557-2675 is dialed, it leads to an
automated message from Verizon stating, "Your call cannot be completed as dialed." It is a
spoofed number.

76.    Call #10: On November 25, 2020, ALQ received a prerecorded message to his
voicemail on his cell phone regarding renewing his auto warranty. This voicemail was recorded
and transcribed below.

**EXHIBIT A**

**ALQ VM:** Sent Wednesday November 25th at 2:19 pm from 970-832-0388 duration 1 minute, 26 seconds. [2 minutes, 5 seconds into voicemails]

**RC:** (automated message)(beginning cut off): …file if you are interested in renewing your auto warranty now, please press 5 now. Or press 9 to be removed from our list.
(long pause)

**RC:** Hi, this is Susie calling with the vehicle service department. We are calling about your vehicle's manufactures warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off. And this is a courtesy call to renew your warranty before we close the file. If you are interested in renewing your auto warranty now, please press 5 now. Or press 9 to be removed from our list.
(long pause, message repeats itself)

**RC:** Hi, this is Susie calling with the vehicle service department. We are calling about your vehicle's manufactures warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off. And this is a courtesy call to renew your warranty before we close the file. If you are interested in renewing your auto warranty now, please press 5 now. Or press 9 to be removed from our list.
**RC**: (automated message): Call rejected.
**ALQ VM:** End of message.

Upon further investigation, when phone number (970) 832-0388 is dialed it leads to a realty office in Durango, Colorado. It is a spoofed number.

77.   Call #11:  On December 8, 2020, ALQ received an autodialed, prerecorded robocall from (475) 212-4746 on his cell phone. The call was disconnected when ALQ did not answer, and no voicemail was left. A screenshot is attached, <u>Exhibit 16</u>.  Below is a transcript of ALQ's recorded return call to that number.

**Auto Warranty VM:** Thank you for calling Auto Warranty Services. To opt out from our calling list, please press one.
**ALQ:** ATDS autodial pre-record hang up 8:55 a.m., December 8, 2020. Screenshot taken.
**Auto Warranty VM:** We have not received a valid response. Please try again.
(end of call)

**EXHIBIT A**

Upon further investigation, when phone number (475) 212-4746 is dialed, it comes back with a "User Busy" message. After re-dialing, the call goes to a message of "Call Failed." It is a spoofed number.

78.    Call #12:  On December 16, 2020, ALQ received an autodialed, prerecorded robocall from phone number (520) 463-7091 on his cell phone. The call disconnected when ALQ did not answer, and no voicemail was left. A screenshot is attached, <u>Exhibit 16</u>.  Below is a transcript of ALQ's recorded return call to that number.

> **Auto Warranty VM:** …calling Auto Warranty Services. To opt out of our calling list, please press one.
> **ALQ:** Auto warranty hang up robocall just after nine o'clock, uh…December 16, 2020, Wednesday just after nine…(cut off)
> **Auto Warranty VM:** We have not received a valid response. Please try again. (end of call)

Upon further investigation, when the phone number (520) 463-7091 is dialed it shows a "User Busy" message. Subsequent calls to the phone number show the message, "Call Failed." It is a spoofed number.

79.    Calls #13 and #14: On January 8, 2021, ALQ received two autodialed, prerecorded robocalls from phone number (585) 479-3752 on his cell phone. Both calls disconnected when he did not answer, and no voicemail was left for either call. Screenshots were taken and are attached, <u>Exhibit 16</u>. Below is a transcript of ALQ's return call to that number.

> **RC:** (automated answer) Thank you for calling Auto Warranty Services. To opt out from our calling list, please press one.
> **ALQ:** January 8, 2021 returning two robocall hang-ups from Auto Warranty from number 585-479-3752
> **RC:** (automated answer) We have not received a valid response. Please try again. (end of call)

80.    Call #15: On January 21, 2021, ALQ received a voicemail on his cell phone from phone number (719) 364-0844 regarding renewing his auto warranty. The voicemail is transcribed as follows.

> **ALQ VM:** Next message sent Thursday, January 21st at 2:20 p.m. from 719-364-0844. Duration 1 minute, 26 seconds.[2 minutes, 26 seconds into voicemails]

16

**EXHIBIT A**

**RC:** (beginning cut off)…the file. If you are interested in renewing your auto warranty now, please press five now. Or press 9 to be removed from our list. (long pause)

**RC:**  Hi, this is Susie calling with the vehicle service department. We are calling about your vehicle's manufacturer's warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off and this is a curtesy call to renew your warranty before we close the file. If you're interested in renewing your auto warranty now, please press five now. Or press 9 to be removed from our list.
(pause)
(message repeats again)
(long pause)

**RC:** Call rejected.
**ALQ VM:** End of message.

Upon further investigation, when the phone number (719) 364-0844 is dialed it leads to an automated message from Verizon stating that, "Your call cannot be completed as dialed." It is a spoofed number.

81.    Call #16: On January 28, 2021, ALQ received a voicemail on his cell phone from phone number (303) 605-7518 regarding renewing his auto warranty. The voicemail is transcribed as follows.

**ALQ VM:** Next message sent Thursday, January 28th at 11:59 a.m. from 303-605-7518, duration 13 seconds. [4 minutes, 17 seconds into voicemails]

**RC:** (beginning cut off)…close the file. If you're interested in renewing your auto warranty now, please press five now. Or press nine to be removed from our list.

**ALQ VM:** End of message.

Upon further investigation, when the phone number (303) 605-7518 is dialed it goes to a personal voicemail. It is a spoofed number.

82.    Call #17: On February 17, 2021, ALQ received a voicemail on his cell phone from phone number (303) 446-0461 regarding renewing his auto warranty. A screenshot is attached, <u>Exhibit 16</u>. The voicemail is transcribed as follows.

**ALQ VM:** First saved voice message…sent Wednesday February 17th at 8:56 a.m. from 303-446-0461, duration 1 minute, 30 seconds.

**RC:** …the warranty before we close the file. If you are interested in renewing your auto warranty now, please press five now. Or press 9 to be removed from our list.
(long pause)

**RC:** Hi, this is Susie calling with the vehicle service department. We are calling about your vehicle's manufacturer's warranty. We sent you several notices in the mail that you have yet to extend your warranty past the factory cut off and this is a curtesy call to renew your warranty before we close the file. If you're interested in renewing your auto warranty now, please press five now. Or press 9 to be removed from our list.
(pause)
(message repeats)

**RC:** Call rejected.
**ALQ VM:** End of message.

Upon further investigation, when the phone number (303) 446-0461 is dialed, it leads to an automated message from Verizon stating, "Your call cannot be completed as dialed." It is a spoofed number.

83.    Call #18: On February 25, 2021, ALQ received a voicemail on his cell phone from phone number (303) 869-5768 regarding renewing his auto warranty. The voicemail is transcribed as follows.

**ALQ VM:** Next message. Sent Thursday February 25th at 2:38 p.m. from 303-869-5768 duration 13 seconds.[2 minutes, 16 seconds into voicemail]

**RC:** (beginning cut off)…the file. If you are interested in renewing your auto warranty now, please press five now. Or press 9 to be removed from our list.
(pause)

Upon further investigation, the phone number (303) 869-5768 leads to a message that says "Call Failed" when dialed. Subsequent calls to this number result in the same message. It is a spoofed number.

84.    Call #19: On March 10, 2021, ALQ received an autodialed, prerecorded robocall from phone number (914) 529-8139 on his cell phone. The call disconnected when he did not answer, and no voicemail was left. A screenshot is attached, Exhibit 16. Below is a transcript of ALQ's recorded return call to that number.

**EXHIBIT A**

**ALQ:** (recording cut off at beginning): 14-529-8139
**RC:** (automated answer): Thank you for calling Auto Warranty Services. To
opt out, please press one.
**ALQ:** Autodialed robocall 914-529-8139 March 10, 2021
**RC:** (automated answer): We have not received a valid response, please try
again.
**ALQ:**  Autodial pre…(cut off at end).

85.    Call #20: On April 2, 2021, ALQ received a voicemail on his cell phone from
phone number (303) 769-3056 regarding renewing his auto warranty. This voicemail is
transcribed below.

**ALQ VM:** Next message. Sent Friday April 2nd at 10:33 a.m. from (303) 769-
3056. Duration 13 seconds. [7 minutes, 21 second into voicemails]

**RC:** (beginning cut off)…the file. If you are interested in renewing your auto
warranty now, please press five now. Or press nine to be removed from our
list.

Upon dialing, a Verizon Wireless recording states the number you have called has been
"changed, discontinued, or no longer in service". In other words, it is a spoofed number.

86.    Call #21: On April 7, 2021, ALQ received a voicemail on his cell phone from
phone number (303) 344-3572 regarding renewing his auto warranty. Screenshot is attached,
Exhibit 16. The voicemail is transcribed below.

**ALQ VM:** Next message. Sent Wed April 7th at 1:07 p.m. from 303-344-3572
Duration 13 seconds. [9 minutes, 56 seconds into voicemails]

**RC:** beginning cut off)…the file. If you are interested in renewing your auto
warranty now, please press five now. Or press nine to be removed from our
list.

Upon dialing, a recording states "Your call cannot be completed as dialed. Please check
the number and dial again." In other words, this is a spoofed call.

87.    Call #22: On April 12, 2021, ALQ received a voicemail on his cell phone from
phone number (970) 859-4670 regarding renewing his auto warranty. Screenshot is attached,
Exhibit 16. The voicemail is transcribed below.

**ALQ VM:** Next message. Sent yesterday, Monday, April 12th at 10:27 a.m.
from 970-859-4670. Duration 13 seconds.[13 minutes, 20 seconds into
voicemails]

**EXHIBIT A**

**RC:** (beginning cut off)…the file. If you are interested in renewing your auto warranty now, please press five now. Or press nine to be removed from our list.

Upon dialing, a Verizon Wireless recording states, "Your call cannot be completed as dialed. Please check the number and dial again." In other words, this is a spoofed call.

88.    Calls #23 and #24: On April 13, 2020, ALQ received two autodialed, prerecorded robocalls on his cell phone from phone number (478) 394-8844. Call #23 was at 1:04 p.m. and Call #24 was at 1:45 p.m. Screenshots are attached, <u>Exhibit 16</u>.  The calls both disconnected when ALQ did not answer, and no voicemail was left either time. Below is a transcript of ALQ's recorded return call to that number.

    a.  Call #23:
        **RC:** (automated answer) Thank you for calling auto warranty services. To opt out from our calling list, please press one.
        **ALQ:** This is a return of an autodialed prerecorded call to (478) 394-8844 on 13th of April at just after 5 o'clock.
        **RC:** (automated answer) We have not received a valid response. Please try again.

    b.  Call #24:
        **RC:** (automated answer) Thank you for calling Auto Warranty Services. To opt out from our calling list, please press one.
        **ALQ:** 478-394-8844 returning autodialed prerecorded call April 13, 2021.
        **RC:** (automated answer) We have not received a valid response, please try again.

Upon further investigation, the phone number (478) 394-8844 leads to a message of "User Busy." Subsequent calls to this number lead to the same message.

89.    Call #25: On April 15, 2020, ALQ received an autodialed, prerecorded robocall on his cell phone from phone number (884) 273-9727. The call disconnected when he did not answer, and no voicemail was left. Screenshots were made and are attached, <u>Exhibit 16</u>. Below is a transcript of ALQ's recorded return call to that number.

    **ALQ:** Calling 884-273-9727
    **Auto Warranty Company:** (live person) Warranty Protection Services…you reached the overflow department.
    **ALQ:** I'm sorry I couldn't understand you. Would you please you say that again?

**EXHIBIT A**

**Auto Warranty Company:** Yes, you called Warranty Protection Services, but you reached the overflow department.
**ALQ:** Oh. (clears throat) oh ok.
**Auto Warranty Company:** ….trying to speak to everyone who is currently on the line.
**ALQ:** Ok. I'll well I'll just…
**Auto Warranty Company:** Um…Do you mind if I just gather some of your information?
**ALQ:** I'll…I'll just try back later.
**Auto Warranty Company:** (intelligible)
**ALQ:** I'll…I'll try back later, thank you.
(end of call)

Upon further investigation, the phone number (884) 273-9727 when dialed leads to an automated message from Verizon that states, "Your call cannot be completed as dialed." It is a spoofed number.

90.     Call #26: On April 29, 2021, ALQ received a prerecorded, autodialed voicemail on his cell phone from phone number (970) 512-7284 regarding renewing his auto warranty. Screenshots are attached as <u>Exhibit 16</u>. Below is a transcript of that voicemail.

**RC:** (beginning is cut off)…file. If you are interested in renewing your auto warranty now, please press five now. Or press nine to be removed from our list.

When ALQ returned the call to the number that had appeared on his caller ID and it, upon information and belief, went to a fax machine. The robocall had used a spoofed number to leave their voicemail. Below is a transcript of the recorded return call.

(fax tone noise throughout recording)
**ALQ:** (speaking over fax tone noise) Call to 970-512-7284 returning a robocall from auto warranty. April 29, 2021 9:59 a.m. Appears to go to a fax tone; a spoofed number. Calling 970…970-512-7284…returning auto warranty robocall…returning auto warranty robocall goes…
(end of recording)

91.     Call #27: On May 28, 2021, ALQ received an autodialed, prerecorded phone call from (970) 718-3681 on his cell phone. The call disconnected when he did not answer, and no voicemail was left. A screenshot was made and is attached as <u>Exhibit 16</u>. Below is a transcript of ALQ's recorded return call to that number.

**RC:** (automated answer) (beginning cut off)…warranty services. To opt out from our calling list, please press 1.

**EXHIBIT A**

**ALQ:** Returning hang up auto warranty robocall from 970-718-3681, Friday May 28th 2021, 10:10 a.m.
**RC:** (automated answer) We have not received a valid response, please try again.

## VI.    CARGUARD'S LIABILITY FOR THE CALLS AT ISSUE

92.    CarGuard is a vehicle service contract administrator.

93.    CarGuard fulfills the extended "car warranty plans" that companies such as those owned by Laurent, including Auto Renewal Center and Auto Services, sell to consumers, as per Plaintiffs' experience.

94.    For twenty-five years the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears the ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

95.    On May 9, 2013, the FCC released a declaratory ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."

96.    In that ruling, the FCC instructed those sellers, such as CarGuard, may not avoid liability by outsourcing the telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

97.    The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls

**EXHIBIT A**

if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

98.   CarGuard is very much aware of the illegal telemarketing practices that are used by its third-party sales vendors to sell extended warranty plans.

99.   CarGuard is paid a fee for the services it provides to third-party sellers, such as Daniel Laurent, and/or any of his entities. This means CarGuard profits from the unlawful telemarketing its third-party sellers engage in to generate business.

100.  Upon information and belief, Auto Renewal Center was contractually required to promote CarGuard products on their telemarketing calls to potentially generate new customers, and do so, as they did with the Plaintiffs.

101.  In fact, CarGuard continued its relationship with Auto Renewal Center despite previously being sued for their violations of the TCPA.

102.  CarGuard was knowingly and actively accepting the business that originated through the illegal telemarketing calls through the issuance of vehicle service contracts.

103.  Moreover, upon information and belief, CarGuard maintained interim control over Auto Renewal Center's actions.

104.  For example, CarGuard had absolute control over whether, and under what circumstances, it would accept a customer.

105.  Furthermore, CarGuard, upon information and belief, had day-to-day control over Auto Renewal Center's actions, including the ability to prohibit it from using prerecorded and autodialed methodologies to contact potential customers of CarGuard.

106.  CarGuard failed to make or issue such instructions to Auto Renewal Center and as a result, is liable for Auto Renewal Center's conduct.

107.  Upon information and belief, CarGuard also gave interim instructions to Auto Renewal Center by providing the volume of calling and leads it would purchase.

108.  Upon information and belief, CarGuard gave further interim instructions to Auto Renewal Center by providing the states that those companies were allowed to make calls into and restricting other states that they could not.

109.  CarGuard has, by its actions and inactions, ratified the illegal acts of Laurent and all other Defendants. Laurent, by his actions, has ratified the illegal acts of all other Defendants.

**EXHIBIT A**

110.  Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships…through discovery, if they are not independently privy to such information." *Id*. at 6592-6593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id*. at 6593 (¶ 46).

## VII.   CLAIMS FOR RELIEF

### COUNT I
### Violations Of The Telephone Consumer Protection Act ("TCPA"), Restrictions On Use Of Automated Telephone Equipment, 47 U.S.C. § 227(b)(3) Initiating Automatically Dialed Or Prerecorded Calls To A Cell Phone

111.  The allegations of paragraphs 1 through 110 are incorporated herein by reference.

112.  Defendants' robocalls described herein were (1) initiated with an automatic dialer to Plaintiffs' cellular telephone service and/or (2) delivered a prerecorded message without Plaintiffs' prior written express consents, and therefore constitutes two (2) violations of CFR § 64.1200(a)(1)(iii) as promulgated under 47 U.S.C.§ 227(b) for each of the 27 calls to date, herein described.

113.  Plaintiffs are entitled as a matter of law to obtain a statutory injunction pursuant to 47 U.S.C. § 227(b)(3)(A) prohibiting Defendant(s), their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed, prerecorded telemarketing cellular phone calls, and from committing further violations of 47 CFR § 64.1200(a)(1 )(iii).

114.  Plaintiffs are entitled to the recovery of the greater of actual damages or $500.00 for each of the two (2) violations for each of the 27 calls herein described to date and as described in ¶112 as prescribed under 47 U.S.C.§ 227(b)(3).

115.  The robocalls to Plaintiffs' cell phone numbers, and the acts and omissions as to those calls described herein were deliberate, intentional, and conscious acts or omissions.

116.  The robocalls to Plaintiffs' cell phone numbers were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC. Therefore, it is within the Court's discretion to award Plaintiffs JKQ and ALQ up to three times the available statutory damages as prescribed under 47 U.S.C. § 227(b)(3).

**EXHIBIT A**

## COUNT II
## Violations Of The Telephone Consumer Protection Act ("TCPA"), Restrictions on Use of Telephone Equipment, 47 U.S.C. § 227(e)(1): Lacking Or Failure To Transmit Accurate Caller ID

117.   The allegations of paragraphs 1 through 116 are incorporated herein by reference.

118.   Many of Defendant(s)' robocalls described herein were initiated with a spoofed caller ID, and therefore constitutes for each such call one or more violations of 47 CFR 64.1601(e) as promulgated under 47 U.S.C. §227(c), and as reflected on Exhibit 15. 47 CFR 64.1601(e) requires a telemarketer to transmit caller identification information that must include (a) a calling party number and (b) the name of the telemarketer or (c) the name of the seller on behalf of which the telemarketing call is placed and (d) the seller's customer service telephone number; (e) the telephone number so provided must permit any individual to make a do-not-call request during regular business hours; and finally, and as a separate violation, (f) any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information. Misleading caller identification numbers, such as arise by using a prepaid phone and allowing its active service to terminate and the number being capable of being reassigned, but the telemarketer continuing to use the number in caller identification, is also actionable according to the FCC. *See Forfeiture Order*, FRN 0027881093, File No.: EB-TCD-17-00024974, FCC 20-149, October 28, 2020.

119.   A "spoofed caller ID" is a false or inaccurate number from which the call in fact was not made, or which otherwise fails to comply with these requirements. Spoofing technology is commonplace and often used by those engaging in the course of conduct described herein.

120.   The spoofed caller ID number showed various caller IDs. Attached as Exhibit 15 is a violation chart detailing the nature and number of spoofed calls and the number of associated violations as described in the within the Complaint.

121.   Plaintiffs ALQ and JKQ are entitled, as a matter of law, to obtain a statutory injunction pursuant to 47 U.S.C. § 227(b)(3)(A) prohibiting Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed, prerecorded telemarketing cellular phone calls, and from committing further violations of 47 CFR § 64.1601(e) and the recovery of the greater of actual damages or $500.00 for each of the violations for each of the 27 spoofed calls described herein to date proscribed by 47 U.S.C. § 227(c)(5).

122.   The robocalls with spoofed Caller ID, and the acts or omissions as to those calls described herein, were deliberate, intentional, and conscious acts or omissions.

**EXHIBIT A**

123.  The robocalls with spoofed Caller ID were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC.

124.  Therefore, it is within the Court's discretion to award Plaintiffs JKQ and ALQ up to three times the available statutory damages as prescribed under 47 U.S.C. §227(c)(3).

## COUNT III
### Violations of the Telephone Consumer Protection Act ("TCPA"), Protection of Subscriber Privacy Rights, 47 U.S.C. § 227(c):
### Initiating a Call for Telemarketing Purposes to a Telephone Number Listed on the National Do-Not-Call Registry

125.  The allegations of paragraphs 1 through 124 are incorporated herein by reference.

126.  Defendants' initiation of each of the telemarketing calls to Plaintiffs JKQ and ALQ respective cell phone numbers listed on the national do-not-call registry since August 1, 2015 and October 9, 2017, respectively, constitute one (1) violation of 47 CFR § 64.1200(c)(2) as promulgated under 47 U.S.C. § 227(c), for each call initiated.

127.  Plaintiffs JKQ and ALQ are each entitled as a matter of law to obtain a statutory injunction pursuant to 47 U.S.C. § 227(b)(3)(A) prohibiting Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed, prerecorded telemarketing cellular phone calls, and from committing further violations of 47 CFR § 64.1200(c)(2), and the recovery of the greater of actual damages or $500.00 for each of the violations of calls to numbers listed on the national Do-Not-Call Registry as proscribed under 47 U.S.C. § 227(c)(5).

128.  Defendants' failure to comply with 47 CFR § 64.1200(c)(2), were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC. Therefore, it is within the Court's discretion to award Plaintiffs JKQ and ALQ up to three times the available statutory damages as prescribed under U.S.C. §227(c)(5)(C).

## COUNT IV
### Violations of the Telephone Consumer Protection Act ("TCPA"), Protection of Subscriber Privacy Rights, 47 U.S.C § 227(c):
### Initiating a Call For Telemarketing Purposes Without an Effective Written Policy Meeting Minimum Standards

129.  The allegations of paragraphs 1 through 128 are incorporated herein by reference.

**EXHIBIT A**

130. No verbal identification of any kind, specifically a company name and an address or telephone number, was provided during the course of the robocall and is a violation for each call.

131. Further, upon information and belief, personnel engaged in telemarketing have not been informed or trained in the existence and use of the do-not-call list. This is a separate violation for each call.

132. The robocalls were initiated for telemarketing purposes as that term is defined at 47 CFR § 64.1200(f)(12).

133. The violations include (a) lack of proper identification disclosures including company name and a mailing address or telephone number which are among the minimum standards enumerated under 47 CFR § 64.1200(d); (b) each robocall was initiated without Defendants, upon information and belief,  having first implemented an effective written policy meeting the required minimum standards; (c) and without the required training of personnel in the existence and use of the do-not-call list. This constitutes two (2) violations of 47 CFR § 64.1200(d) as promulgated under 47 U.S.C. § 227(c) for each call initiated.

134. Plaintiffs ALQ and JKQ are entitled as a matter of law to obtain a statutory injunction pursuant to 47 U.S.C. § 227(b)(3)(A) prohibiting Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed, prerecorded telemarketing cellular phone calls, and from committing further violations of 47 CFR § 64.1200(d), and the recovery of the greater of actual damages or $500.00 for each of the two (2) violations for each call initiated enumerated in paragraph 133 as proscribed under 47 U.S.C. §227(c)(5).

135. Defendants' multiple failures to comply with 47 CFR § 64.1200(d), were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC. Therefore, it is within the Court's discretion to award Plaintiffs JKQ and ALQ up to three times the available statutory damages as prescribed under §227(c)(5)(C).

<div align="center">

**COUNT V**
**Violations Of The Telephone Consumer Protection Act ("TCPA"), Protection Of Subscriber Privacy Rights, 47 U.S.C. § 227 (c)(1) and (2):**
**Initiating An Artificial Or Prerecorded Voice Telephone Message Without (1) Proper Identification Of Caller Identity, (2) Phone Number Of Initiator Of The Call, Or (3) Providing Proper Opt-Out Mechanism**

</div>

136. The allegations of paragraphs 1 through 135 are incorporated herein by reference.

137.  No verbal identification of any kind was made, specifically stating clearly at the beginning of each message the identity of the business, individual, or other entity that is responsible for initiating the respective calls, in violation of 47. C.F.R. § 64.1200 (b)(1).

138.  During or after each call, no statement was made clearly identifying the telephone number (other than that of the alleged autodialer or prerecorded message player that placed the call) of the business, other entity, or individual responsible for initiating each respective call, in violation of 47 C.F.R. § 64.1200(b)(2).

139.  Each of the autodialed or prerecorded voice telephone messages constitute telemarketing and failed to provide an automated, interactive voice and/or key press-activated opt-out mechanism for Plaintiffs ALQ and JKQ to make a do-not-call request, including required instructions within two (2) seconds of providing the identification information required in paragraph (b)(2), in violation of 47 C.F.R. 64.1200 (b)(3).

140.   Plaintiffs ALQ and JKQ are entitled as a matter of law to obtain a statutory injunction pursuant to 47 U.S.C. § 227(b)(3)(A) prohibiting Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed, prerecorded telemarketing cellular phone calls, and from committing further violations of 47 CFR § 64.1200(b ), and the recovery of the greater of actual damages or $500.00 for the three (3) violations with respect to each of the autodialed or prerecorded calls to date, as enumerated in the three (3) paragraphs above, and as proscribed under 47 U.S.C. §227(b)(3).

141.  Defendants' failures to comply with 47 CFR § 64.1200(b), were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC. Therefore, it is within the Court's discretion to award Plaintiffs ALQ and JKQ up to three times the available statutory damages as prescribed under §227b)(3)(A).

### COUNT VI
### Violations Of The Colorado Consumer Protection Act ("CCPA"), Prevention Of Telemarketing Fraud, C.R.S. § 6-1-304, C.R.S § 6-1-303,  C.R.S § 6-1-302 Unlawful Telemarketing Practices, and C.R.S. §6-1-305 Penalties

142.  The allegations of paragraphs 1 through 141 are incorporated herein by reference.

143.  Defendants are in multiple violations of C.R.S § 6-1-304 as the Defendants engaged in an unlawful telemarketing practice when they (a) failed to register with the Colorado attorney general (C.R.S. § 6-1-303) as a commercial telephone seller; and/or (b) engaged in other deceptive trade practiced(s) defined in C.R.S. § 6-1-105 or part 7 of Article 1 of Title 6, i.e., the Colorado Consumer Protection Act.

**EXHIBIT A**

144.   Accordingly, under Count VI, the Defendants are liable for a total of at least two (2) violations for each respective call, a total of 27 calls, under the CCPA private right of action for the foregoing pursuant to C.R.S. § 6-1-113 in the amount of $500 for each violation.

145.   Pursuant to C.R.S. § 6-1-305(1)(c), Plaintiffs are, in addition to the above damages under C.R.S. 6-1-113, liable for consequential damages, court costs attorney fees, and a penalty in the amount of at least three hundred dollars and not more than five hundred dollars for the first offense, and at least five hundred dollars and not more than one thousand dollars a for a second or subsequent offense. At least two offenses are detailed above with respect to each of the illegal telemarketing calls. The variable dollar amount of the penalty is reflected in the Violation Chart for Count VI attached hereto as <u>Exhibit 15</u>.

146.   In addition, Defendants are liable for treble damages for bad faith conduct pursuant to C.R.S. § 6-1-113 (2)(a)(III).

147.   In addition, Defendants are liable for Plaintiff's attorney's fees pursuant to C.R.S. § 6-1-113(2)(b). The Defendants are additionally liable for attorney's fees under C.R.S.§ 6-1-305(1)(c).

## COUNT VII
### Violations Of The Colorado Consumer Protection Act ("CCPA")
### Deceptive Trade Practices, C.R.S § 6-1-105

148.   The allegations of paragraphs 1 through 143 are incorporated herein by reference.

149.   By using spoofed phone numbers with misleading caller identification names and/or numbers tied to various persons, which were not the actual callers, and used to intentionally deceive the Plaintiffs, and conceal the true callers' identity, Defendants engaged repeatedly, with each call, in deceptive trade practices when Defendants (1) knowingly passed off goods, services, or property as those of another; and (2) knowingly made a false representation as to the source, sponsorship, approval or certification of goods, services, or property; and (3) knowingly made a false representation as to its affiliation, connection, or association with or certification by another; and 4) used deceptive representations or designations of geographic origin in connection with goods or services in multiple violations of C.R.S §6-1-105(1)(d).

150.   Further, by engaging in commercial telephone solicitations, each of which constitutes an unlawful telemarketing practice, as defined in C.R.S. §6-1-304, the Defendants have separately and independently repeatedly engaged in a deceptive trade practice pursuant to C.R.S. §6-1-105 (1)(cc).

151.   Accordingly, under Count V, the Defendants are liable for a total of five (5) violations for each such robocall call, a total of 27, under the CCPA pursuant to the CCPA

**EXHIBIT A**

private right of action for the foregoing pursuant to C.R.S. §6-1-113 in the amount of $500 for each violation.

152.  In addition, Defendants are liable for treble damages for bad faith conduct pursuant to C.R.S. §6-1-113 (2)(a)(III).

153.  In addition, Defendants are liable for Plaintiffs' attorney's fees pursuant to C.R.S. §6-1-113(2)(b).

## COUNT VIII
## Conspiracy to Defraud

154.  Paragraphs 1 through 153 are incorporated herein by reference as if fully set forth.

155.  Defendants, members of an enterprise, acted in agreement to accomplish their ongoing course of conduct resulting in (a) an artifice or scheme to defraud by keeping people in continuing receipt of illegal autodialed or prerecorded robocalls resulting in repetitious illegal presentations of enticements to purchase and the ensuing cash flows derived therefrom; (b) concealments and omissions to disclose required source information, contact information, and opt-out information, resulting in the robocalls continuing to be received and enabling the sales program of so-called "auto warranties" to continue; and (c) hindering, delaying, or defrauding multiple creditors.

156.  In furtherance of their course of action, defendants engaged in one or more unlawful acts performed to accomplish their goal(s) or performed one or more lawful acts to accomplish an unlawful goal or goals as referenced in the paragraph above and throughout the Complaint.

157.  Plaintiff has been damaged as a proximate result of such conduct, causing Plaintiffs' actual damages including Plaintiffs' attorney's fees as part of actual damages as provided by Colorado case law.

## COUNT IX
## Violations of the Colorado Organized Crime Control Act (COCCA), Wire Fraud, C.R.S. § 18-17-103(5)(A)

158.  The allegations of paragraphs 1 through 157 are incorporated herein by reference.

159.  Based upon the recordings of the calls, and the multiple live transfers during the phone call resulting in the actual purchase of an auto warranty contract, and the continuing and ongoing course of conduct set forth herein, the Defendants are engaged in a racketeering

**EXHIBIT A**

enterprise and a conspiracy to engage in a racketeering enterprise. As such, each is liable for the conduct of the other.

160.  Actionable Violations of the Colorado Organized Crime Control Act include, but are not limited to:

    a.  Certain violations of the federal Racketeering Influenced and Corrupt Organizations Act as provided at C.R.S. § 18-17-103(5)(a). Each and every of the named Defendants to this action, individually and/or collectively, have committed three or more acts of (1) wire and/or (2) mail fraud pursuant to 18 U.S.C. § 1341 and § 1343 which constitutes a pattern of racketeering activity, each of which occurred within ten (10) years of one another, and the first of which occurred after the effective date of the Colorado Organized Crime Control Act and was used to generate revenues, cash flow, or profits for the enterprise hereinabove described for each of the Defendants to the Plaintiffs' detriment, and/or;

    b.  The Defendants have, through a pattern of racketeering activity, knowingly acquired or maintained, directly or indirectly, interests in and control of the enterprise herein described, in violation of C.R.S. § 18-17-104(2), and/or;

    c.  The Defendants have knowingly received proceeds derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, some part of such proceeds or the proceeds derived from the investment or use thereof in the acquisition of title to, or some right, interest, or equity in, real property or in the establishment or operation of an enterprise, in violation of C.R.S. § 18-17-104(1)(a), and/or;

    d.  The Defendants have knowingly conducted or participated, directly or indirectly, in such enterprise through a pattern of racketeering activity, in violation of C.R.S. §18-17-104(1)(a).

161.  The referenced acts of wire and/or mail fraud constituting a pattern of racketeering activity include without limitation having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

162.  This is evidenced by the fraudulent representations, misrepresentations, and conduct described in paragraphs 1- 157 above and the remaining paragraphs below, including but not limited to illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones, as well as perpetuation of the enterprise through the use of these illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones, coupled with multi-step live

**EXHIBIT A**

hand off services, each designed and intended to aid in concealment and the creation of plausible deniability with respect to both the scheme, the enterprise, and the entire illegal marketing structure. Fraudulent statements and/or fraudulent conduct in perpetuation and pursuit of the enterprise were undertaken by and through the use of the telephones, internet, email, and involve wire fraud and/or mail fraud as defined by statute.

163.   As part of the enterprise, consumers have been approached, solicited, communicated with by the enterprise or its members, in violation of statute. In addition, innocent consumers have, upon information and belief, been harassed, contacted, and inconvenienced by the spoof call practices pursued by Defendants, and as previously found to be objectionable violative practices by the FCC. These innocent consumers each have one or more potential choses in action or claims against Defendants, making each a present or future creditor of Defendants under state law. All of this was and is part of the criminal enterprise and course of racketeering conduct. Use of robocalls, cell phones, and attendant emails or online processing of credit card payments in this fashion constitutes multiple forms of wire fraud. The interstate wire network is used to make robocalls and to process online financial transactions in furtherance of the scheme. Robocalls, the internet, and e-mails have been used as a matter of course to further the scheme of the enterprise.

164.   The above referenced acts and other related acts constituted a continuous pattern of fraud, concealment, and misrepresentation with the purpose of procuring cash flow, revenues, or advances or profits for each of the Defendants and the enterprise and were related to each other, as each was for the purposes of, *inter alia*, (a) hindering, delaying or defrauding present or future creditors of theirs to whom they were creating liability by their actions; and/or (b) improperly obtaining or retaining and using for themselves monies or services for the enterprise controlled by the Defendants for the benefit of the Defendants and at the expense of creditors including the Plaintiffs. Each act had a similar purpose, involved the same or similar participants, and had similar results in affecting Plaintiffs and others. Each and every Defendant was able to engage in this pattern by virtue of their position in or control of the enterprise. Each and every of the Defendants controlled, conducted and/or participated in the management and/or affairs of the enterprise.

165.   The enterprise consists of an association of individuals and corporate and/or other defendants including without limitation all Defendants named in this action, and all defendants whose names are not currently known. The purpose of the enterprise was to promote and derive revenues, cash flow, or profits from illegally making autodialed and prerecorded calls to vulnerable persons perceived to need "protection" and "peace of mind" with respect to future automobile repairs.

166.   There is nothing wrong with providing in proper form, and pursuant to statute and regulation, services involving contracts to pay for automobile repairs, as such. What is objectionable is the illegal robocalling.

**EXHIBIT A**

167.   There is a clear threat of future use of the mails and wires of the interstate telecommunication system, constituting criminal conduct as defined in the Colorado Organized Crime Control Act as referenced to and by 18 U.S.C. §1341 in an illegal manner, which is related to the Defendants' criminal conduct. Future use of the mail or wires of the interstate telecommunication system in a prohibited manner as defined by statute will occur to support and maintain the Defendants' repeated and/or ongoing schemes. This will occur simply on the basis of Defendants' continued making of autodialed and prerecorded calls to the Plaintiffs or other consumers to sell defendants' so-called "auto warranty" protection. It will also occur in the future promotion of additional businesses or activities the enterprise seeks to either undertake and/or conceal.

168.   The (a) proceeds/monies received by Defendants, regardless of by whom paid, whether by any consumer, debtor or creditor, or by a financial institution financing the contract payments for the proffered "extended auto warranty" over a period of time when not paid for in a lump sum, which results from the ongoing wire and/or mail fraud; and (b) payments received by any Defendant or any entity affiliated with Defendants with regard to related or similar transactions; or (c) the securing of the advancement of monies from others similarly situated, amount to a closed period of repeated conduct which shows a series of related predicates extending over a substantial period of time.

169.   As a proximate result of the Defendants' racketeering enterprise and pattern of racketeering activity, Plaintiffs have suffered substantial actual damages to property or their business interests in an amount to be determined at trial but believed to be in excess of $200,000, plus continuing accruals of interest, costs, and the costs of collection. Plaintiffs are also entitled to recover treble damages against defendants and their costs of suit including attorney's fees, as well as all other relief granted by the federal and state racketeering statutes.

170.   Defendants have violated the civil provisions of the Colorado Organized Crime Control Act ("COCCA"), C.R.S. 18-17-101, et seq., including but not limited to prohibitions found at 18 U.S.C. §§1961 (1)(A), (1)(B), (1)(C) and (1)(D).

171.   Plaintiffs expressly reserve the right to amend this Complaint and further plead racketeering based upon the federal Racketeering Influences and Corrupt Organizations Act ("RICO").

## COUNT X
### (Civil Theft)

172.   The allegations of paragraphs 1 through 172 are incorporated herein by reference.

173.   The FCC has determined that spoofing constitutes intent to:

**EXHIBIT A**

…wrongfully obtain anything of value. The items of value include, but are not limited to, …(1) increased sales, (2) avoidance of detection by law enforcement, and (3) escape from potential consumer litigation…[T]he misdirection [Defendants] created by [Defendants] by using misleading or inaccurate caller ID numbers (some of which [upon information and belief, Defendants] had no valid right to use at all) allowed [D]efendants to also hide from potential civil actions brought by aggrieved individuals. The Commission has previously found that the avoidance of culpability, whether involving government enforcement actions or private lawsuits, is a benefit that qualifies as a thing of value – one with an ascertainable dollar value. Relevant valuation includes penalty amounts of up to $20,489 per unlawful telemarketing call made in violation of the Commission's Do Not Call rules, and up to $43,280 in civil penalties for each violation of the Telemarketing Sales Rule….

*Forfeiture Order, supra* at ¶¶ 53 and 54.

174.   Further, [Defendants' ] actions deprived consumers of their right to determine a caller's identity before answering [Defendants'] telemarketing call. Moreover, as a result of [their] intentional acts, [Defendants] stood to gain by expanding [their] potential customer base while also evading detection by law enforcement or plaintiffs pursuing civil suits. *Id.* at ¶ *55.*

175.   The FCC is in a unique position by virtue of The Hobbs Act, 28 U.S.C. § 2342, which leaves one in the position where the FCC's pronouncements are absolutely binding on all trial courts. The only recourse is a jurisdictional issue involving appeal to the United States Courts of Appeals. This can be and should generally be preceded by a petition to the FCC itself internally. Thus, it becomes a jurisdictional issue for the trial courts.

176.   Actual damages occur by interference with Plaintiffs' rights and by hindering, delaying, and defrauding Plaintiffs and, in the words of the FCC, "Innocent Consumers," who become part of the pool of actual and future creditors being hindered, delayed, and defrauded by Defendants.

177.   Defendants knowingly obtained, and exercised control over "anything of value" of Plaintiffs without authorization and by deception, intending to deprive Plaintiffs permanently of the use or benefit of the thing of value.

178.   Defendants knowingly intended to deprive Plaintiffs permanently of the use or benefit of the thing of value.

179.   Defendants knowingly concealed the thing of value in such a manner as to deprive Plaintiffs permanently of its use or benefit.

180.   Defendants used and concealed the things of value intending that such concealment deprive Plaintiffs permanently of their use or benefit.

**EXHIBIT A**

181. Plaintiffs have a possessory and/or proprietary interest in (a) the wrongful deprivation of Plaintiffs' rights of privacy and ability to identify calls before answering them; (b) the right to pursue consumer litigation to vindicate the violation of their rights and to put a stop to such practices by Defendants, including Plaintiffs' choses in action; and (c) the monetary and other relief available to them on account of Defendants illegal actions and course of continuing conduct.

182. Defendants have intended and intend to permanently deprive Plaintiffs of the use and benefit of said possessory, proprietary, and property interests.

183. Defendants concealed, exercised control over and retained said possessory, proprietary, and property interests in such a manner as to permanently deprive Plaintiffs of the use and benefit of those possessory, proprietary, and property interests.

184. Defendants actions have caused and will cause damages to Plaintiffs as set forth on the Violation Charts attached hereto <u>Exhibit 15</u> as provided by C.R.S. §18-4-405 and the annotations thereto.

185. Further, Defendants' actions were and are attended by circumstances of bad faith, fraud, malice, or willful and wanton conduct, entitling Plaintiffs to an additional award of treble damages, costs, and attorney's fees, to be further pleaded and claimed pursuant to C.R.S. §13-21-102.

## COUNT XI
### (Personal Liability)
### Personal Liability As To Defendants Daniel Laurent, Trevor Smith, CeCi Harris, and Vashti Salazar

186. The allegations of paragraphs 1 through 185 are incorporated herein by reference.

187. Pursuant to 47 U.S.C. § 217 (1934), the act, omission, or failure of any officer, agent, or other person acting for or employed by the Defendants and acting within the scope of their employment constitutes the act, omission, or failure of the Defendants as well as the officer, agent, or other person.

188. Defendants Laurent, Smith, Harris, and Salazar's respective acts, omissions, or failure to act in connection with Defendants Direct Marketing Groups LLC, Vehicle Protection Specialists, and CarGuard Administration, Inc's illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones resulted in the commission of multiple tortuous acts in the state of Colorado for which they are jointly and severally liable.

189. Defendants Laurent, Smith, Harris, and Salazar's personal involvement in the illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones resulted in the commission of multiple tortuous acts in the state of Colorado.

EXHIBIT A

190.  Defendants Laurent, Smith, Harris, and Salazar's and other officers, employees, agents, or other persons participated personally and directly in the transmission of the illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones; and/or

191.  Defendants Laurent, Smith, Harris, and Salazar's authorized and/or ratified the transmission of the illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones; and/or

192.  Defendants Laurent, Smith, Harris, and Salazar sanctioned and/or ratified the transmission of the illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones; and/or

193.  Defendants Laurent, Smith, Harris, and Salazar had prior notice that the transmission of the illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones was unlawful and Defendants Laurent, Smith, Harris, and Salazar's failed to take affirmative steps to prevent the unlawful conduct; and/or

194.  Defendants Laurent, Smith, Harris, and Salazar were personally involved in the implementation of the marketing and advertising strategies of Defendants Direct Marketing Groups LLC, Vehicle Protection Specialists, and CarGuard Administration, Inc's to promote the sale of their goods or services and said marketing and advertising strategies included the unlawful transmission of illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones in violation of the TCPA and CCPA.

195.  Pursuant to C.R.S. § 7-108-402 (1998), because Defendants Laurent, Smith, Harris, and Salazar were personally involved in the implementation of the marketing and advertising strategies of Defendants Direct Marketing Groups LLC, Vehicle Protection Specialists, and CarGuard Administration, Inc's to promote the sale of its/their goods or services, and said marketing and advertising strategies included the transmission of illegal, autodialed, prerecorded commercial telemarketing calls to cellular phones in violation of the TCPA and CCPA, Laurent, Smith, Harris, and Salazar are each personally liable, jointly and severally, for any and all damages attributed to Defendants Direct Marketing Groups LLC, Vehicle Protection Specialists, and CarGuard Administration, Inc' under at least Counts I-V of the Complaint.

196.  Defendants Laurent, Smith, Harris, and Salazar are further personally liable by participating in a conspiracy to defraud, as well as violations of the Colorado Organized Crime Control Act, under Counts VI through IX.

**EXHIBIT A**

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully requests that the Court enter judgment in their favor and against the Defendants. The Plaintiffs pray for the following relief:

A.  Pursuant to Count I:

   i.  As provided for under 47 U.S.C. § 227(b)(3)(A), and 47 C.F.R. §1200(a)(1)(iii), grant an injunction enjoining the Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful transmission of autodialed or prerecorded telemarketing cellular phone calls.

   ii.  As provided for under 47 U.S.C. §227(b)(3)(B), award the Plaintiffs statutory damages of $500.00 for each of the two (2) violations in each call under 47 U.S.C.§227(b)(3), for each automatically dialed, and each prerecorded phone call to a cellular phone, without Plaintiffs' express written consent.

   iii.  As provided for under 47 U.S.C. §227 (b)(3), Plaintiffs are entitled, in the Court's discretion, to treble damages on this Count I.

B.  Pursuant to Count II:

   i.  As provided for under 47 U.S.C. § 227(b)(3)(A), and 47 C.F.R. §1200(a)(1 )(iii), grant an injunction enjoining the Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful failure to provide accurate caller identification information.

   ii.  As provided for under 47 U.S.C. § 227(b)(3), award the Plaintiffs statutory damages of $500.00 for each of the violations as set forth in <u>Exhibit 15</u> for each call lacking an accurate and otherwise compliant caller ID under 47 U.S.C. § 227(c)(5), and 47 C.F.R. 64.1601(e) for Defendants failure to transmit an accurate caller ID and using a spoofed caller ID instead.

   iii.  As provided for under 47 U.S.C. § 227 (b)(3), Plaintiffs are entitled, in the court's discretion, to treble damages on this Count II.

C.  Pursuant to Count III:

   i.  As provided for under 47 U.S.C. § 227 (c)(5) and 47 C.F.R. § 64.1200 (c)(2) award the Plaintiffs statutory damages of $500.00 for each of the robocalls as violative of the National Do-Not-Call Registry.

**EXHIBIT A**

D.    Pursuant to Count IV:

    i.    As provided for under 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d), award the Plaintiffs statutory damages for each of the two (2) violations in each robocall involving lack of required identification disclosures, effective written policy meeting minimum standards, and failure to inform and train personnel in the existent use of the do-not-call list.

E.    Pursuant to Count V:

    i.    As provided for under 47 U.S.C. § 227(b)(3)(A), and 47 C.F.R. §1200(a)(1)(iii), grant an injunction enjoining the Defendants, their officers, successors, and assigns, and all persons or entities in active concert or participation with the Defendants, from engaging in the unlawful initiating of a prerecorded voice telephone message without (1) proper identification of caller identity, (2) phone number of the initiator of the call, and (3) providing proper opt-out mechanism.

    ii.    As provided for under 47 U.S.C. §227(b)(1)(A)(iii), award the Plaintiffs statutory damages of $500.00 for each of the three (3) violation(s) contained in each call under 47 U.S.C. §227(b)(3), for initiating a prerecorded voice telephone message without (1) proper identification of caller identity, (2) phone number of the initiator of the call, and (3) providing proper opt-out mechanism.

    iii.    As provided for under 47 U.S.C. §227(b)(3), Plaintiffs are entitled, in the Court's discretion, to treble damages on this Count II.

F.    Pursuant to Count VI:

    i.    as provided under C.R.S.§ 6-1-113, award the Plaintiffs statutory damages of $500.00 for each of the two (2) violations in each call under C.R.S. 6-1-304 for unlawful telemarketing practices.

    ii.    Pursuant to C.R.S. §6-1-305(1)(c), Defendants are, in addition to the above damages under C.R.S. §6-1-113, liable for consequential damages, court costs, attorney fees, and a penalty in the amount of at least three hundred dollars and not more than five hundred dollars for the first offense, and at least five hundred dollars and not more than one thousand dollars a for a second or subsequent offense. At least two offenses are detailed above with respect to each of the 27 robocalls.

    iii.    In addition, Defendants are liable for treble damages for bad faith conduct pursuant to C.R.S. §6-1-113 (2)(a)(III).

**EXHIBIT A**

    iv. In addition, Defendants are liable for Plaintiffs' attorney's fees pursuant to C.R.S. §6-1-113(2)(b). The Defendants are additionally explicitly liable for attorney's fees under C.R.S. §6-1-305(1)(c).

G.    Pursuant to Count VII:

    i. As provided under C.R.S. §6-1-113, award the Plaintiffs statutory damages of $500.00 for each of the four (4) violations in each of the robocalls under C.R.S. §6-1-105(1)(d) plus the one (1) violation in each of the 27 robocalls under C.R.S. §6-1-105(1)(cc). for deceptive trade practices, for a total of five (5) violations per call.

    ii. In addition, Defendants are liable for treble damages for bad faith conduct pursuant to C.R.S. §6-1-113 (2)(a)(III).

    iii. In addition, Defendants are liable for Plaintiffs' attorney's fees pursuant to C.R.S. §6-1-113(2)(b). The Defendants are additionally explicitly liable for attorney's fees under C.R.S. §6-1-305(1)(c).

H.    Pursuant to Count VIII:

    i. As provided under C.R.S. § 18-17-103(5)(a), award the Plaintiffs statutory treble damages in an amount to be determined at trial, plus pre-judgment interest, costs, and attorney's fees.

I.    Pursuant to Count IX, entry of:

    i. A monetary judgment for treble damages, costs, pre-judgment and post-judgment interest, and pre-judgment and post-judgment attorney's fees in favor of Plaintiffs and against each defendant jointly and severally,

    ii. A judgment ordering divestment of any interest in any enterprise, including real property,

    iii. A judgment imposing restrictions upon the future activities and/or investments of each Defendant, including, but not limited to, prohibiting any Defendant from engaging in the same type of endeavor as the enterprise in which he, she, or it has engaged in violation of COCCA,

    iv. A judgment ordering the dissolution or reorganization of the enterprise,

    v. A judgment ordering the suspension or revocation of any license, permit, or prior approval granted to any enterprise by any agency of the state,

**EXHIBIT A**

vi. A judgment ordering the forfeiture of any charter of a corporation organized under the laws of this state or the revocation of any certificate authorizing a foreign corporation to conduct business within the state,

vii. A judgment ordering civil forfeiture to the state of all property, real or personal, including money, used in the course of, intended for use in the course of, derived from, or realized through conduct in violation of the provisions of COCCA, as provided by statute,

viii. As to any real property, entry of a judgment of permanent order of abatement, directing the sheriff to sell such property and the ground upon which it is situated, as provided by statute,

ix. Entry of judgment applying proceeds of civil forfeiture for benefit of Plaintiffs as provided by C.R.S. §18-17-106.

J.   Pursuant to Count X:

i. All damages occasioned by violation of Plaintiffs' rights as set forth on all violation charts attached hereto.

ii. Treble damages for civil theft.

iii. Treble damages for exemplary damages, as provided by statute.

iv. Attorney's fees and costs, pre-judgment, and post-judgment interest according to Colorado law, including consideration of moratory interest.

K.   Pursuant to Count XI:

i. As provided under 47 U.S.C. § 217 (1934), entry of judgment against individual Defendants personally liable, jointly and severally, for any damages attributed to Defendants Direct Marketing Groups LLC, Vehicle Protection Specialists, and CarGuard Administration, Inc. under Counts 1-V of the Complaint.

L.   Pre-judgment interest as damages as provided by statute;

M.   Post-judgment interest as provided by state statute and costs; and

N.   Grant such further relief as the Court finds just and equitable under the circumstances.

## JURY DEMAND

Plaintiffs request a jury trial.

**EXHIBIT A**

Respectfully submitted this 20th of July, 2021.

Signed Original on File at Office of Plaintiffs' Attorney

By: /s/ *Andrew L. Quiat*
    Andrew L. Quiat, #1286

**EXHIBIT A**

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074

**Prepared Statement of**
**The Federal Trade Commission**

**Before the**
**United States Senate**
**Special Committee on Aging**

**on**

**Still Ringing off the Hook: An Update on Efforts to Combat Robocalls**

**Washington, DC**
**October 4, 2017**

**EXHIBIT 1**

Chairman Collins, Ranking Member Casey, and members of the Committee, I am Lois Greisman, Associate Director of the Division of Marketing Practices, Bureau of Consumer Protection at the Federal Trade Commission ("Commission" or "FTC").[1]  I appreciate the opportunity to appear before you today to discuss the Commission's initiatives to fight illegal robocalls, including those that target seniors.[2]

In 2003, the FTC responded to enormous public frustration with unsolicited sales calls and amended the Telemarketing Sales Rule ("TSR") to create a national Do Not Call Registry.[3] The Registry, which includes more than 226 million active telephone numbers,[4] has been tremendously successful in protecting consumers' privacy from the unwanted calls of tens of

---

[1]     The views expressed in this statement represent the views of the Commission.  My oral presentation and responses to questions are my own and do not necessarily reflect the views of the Commission or any individual Commissioner.

[2]     *See, e.g., FTC v. Life Management Services of Orange County, LLC*, 6:16-CV-982-Orl (M.D. Fla. June 8, 2016) (FTC alleged defendants bombarded consumers with illegal prerecorded calls fraudulently pitching interest rate reduction and debt elimination schemes, in some instances targeting seniors), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3216/life-management; *FTC v. Lifewatch Inc.,* 1:15-cv-05781 (N.D. Ill. June 20, 2015) (FTC and Florida Attorney General alleged defendants used blatantly illegal and fraudulent prerecorded calls to trick older consumers into signing up for medical alert systems with monthly monitoring fees), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3123/lifewatch-inc; *FTC v. All Us Marketing LLC,* 6:15CV1016-0RL-28GJK (M.D. Fla. June 29, 2015) (FTC and Florida Attorney General alleged defendants engaged in massive prerecorded call campaigns designed to defraud consumers, often seniors, into paying significant up-front fees for worthless credit card interest rate reduction programs), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3256/all-us-marketing-llc-formerly-known-payless-solutions-llc.

[3]     68 Fed. Reg. 4580 (Jan. 29, 2003); 16 C.F.R. Part 310.  The FTC issued the TSR pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108. *See generally* The Telemarketing Sales Rule, 16 C.F.R. Part 310.

[4]     *See* National Do Not Call Registry Active Registrations and Complaint Figures.  National Do Not Call Registry Data Book FY 2016 at 4 (Dec. 2016), *available at* https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2016.

**EXHIBIT A**

thousands of legitimate telemarketers who subscribe to the Registry each year.[5]  More recently, changes in technology led to a new source of immense frustration – the blasting of prerecorded messages that primarily rely on Voice over Internet Protocol ("VoIP") technology.[6]  In 2008, the Commission responded by amending the TSR to prohibit the vast majority of prerecorded sales calls.[7]

Illegal robocalls remain a significant consumer protection problem because they repeatedly disturb consumers' privacy and frequently use fraud and deception to pitch goods and services, leading to significant economic harm.  Illegal robocalls are also frequently used by criminal impostors posing as trusted officials or companies.  Consumers are justifiably frustrated—in 2016 the FTC received more than 3.4 million robocall complaints and in 2017 the FTC received more than 3.5 million robocall complaints just between January and August.[8]  The FTC is using every tool at its disposal to fight these illegal calls.[9]  This testimony describes the Commission's efforts to stop telemarketer violations, including our aggressive law enforcement, initiatives to spur technological solutions, and robust consumer and business outreach.

---

[5]      For example, in fiscal year 2016, more than 17,000 telemarketers accessed the Do Not Call Registry.  National Do Not Call Registry Data Book FY 2016 at 8 (Dec. 2016), *available at* https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2016.

[6]      *See* Section II(A), *infra*.

[7]      73 Fed. Reg. 51164 (Aug. 29, 2008); 16 C.F.R. § 310.4(b)(1)(v).

[8]      Total unwanted-call complaints for the first eight months of 2017, including both robocall complaints and complaints from consumers whose phone numbers are registered on the Do Not Call Registry, exceed 5.5 million.  On average, over 400,000 of these complaints each month are about robocalls.

[9]      *See* FTC Robocall Initiatives, http://www.ftc.gov/robocalls.

**EXHIBIT A**

## I.      Law Enforcement

Since establishing the Do Not Call Registry in 2003,[10] the Commission has fought vigorously to protect consumers' privacy from unwanted calls.  Indeed, since the Commission began enforcing the Do Not Call provisions of the TSR in 2004, the Commission has brought 131 enforcement actions seeking civil penalties,[11] restitution for victims of telemarketing scams, and disgorgement of ill-gotten gains against 429 corporations and 345 individuals.  From the 124 cases that have been resolved thus far, the Commission has collected over $120 million in equitable monetary relief and civil penalties.

### A.      Robocall Law Enforcement

On September 1, 2009, TSR provisions went into effect prohibiting the vast majority of robocalls selling a good or service.[12]  The robocall provisions cover prerecorded calls to all

---

[10]      In 2003, two different district courts issued rulings enjoining the Do Not Call Registry. *See* Press Release, FTC Files Motion to Stay Pending Appeal in Oklahoma DNC Ruling (Mar. 24, 2003), *available at* https://www.ftc.gov/news-events/press-releases/2003/09/ftc-files-motion-stay-pending-appeal-oklahoma-dnc-ruling; Press Release, Statement of FTC Chairman Timothy J. Muris (Sept. 26, 2003), *available at* https://www.ftc.gov/news-events/press-releases/2003/09/statement-ftc-chairman-timothy-j-muris.  Congress addressed the first decision in summary fashion by enacting HR 3161 in one day.  *See* "HR 3161 (108th) Do-Not-Call-Registry bill," http://www.govtrack.us/congress/bills/108/hr3161; Press Release, Statement of FTC Chairman Timothy J. Muris (Sept. 25, 2003), *available at* https://www.ftc.gov/news-events/press-releases/2003/09/statement-ftc-chairman-timothy-j-muris-0.  The 10th Circuit reversed the second district court decision on February 17, 2004.  *See* Press Release, Appeals Court Upholds Constitutionality of National Do Not Call Registry (Feb. 17, 2004), *available at* https://www.ftc.gov/news-events/press-releases/2004/02/appeals-court-upholds-constitutionality-national-do-not-call.

[11]      As is true of all TSR violations, telemarketers who violate the Do Not Call provisions are subject to civil penalties of up to $40,000 per violation.  15 U.S.C. § 45(m)(1)(A); 16 C.F.R. § 1.98(d).

[12]      Like the other provisions of the TSR, the robocall provisions do not apply to non-sales calls, such as calls placed by charities to its members and prior donors or those calls that are purely political, informational, or survey calls.  *See generally* "Complying with the Telemarketing Sales Rule" (June 2016), *available at* https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule.  Limited exceptions exist for calls that deliver a healthcare message made by an entity covered by the Health Insurance Portability and Accountability Act, 16 C.F.R. § 310.4(b)(1)(v)(D), and for certain calls placed by telemarketers who solicit charitable contributions, 16 C.F.R. § 310.4(b)(1)(v)(B).

**EXHIBIT A**

consumers, including those who have not registered their phone number on the Do Not Call Registry. The Commission has been aggressive in enforcing prohibitions against robocalls, filing 45 cases against 163 companies and 121 individuals responsible for *billions of illegal robocalls*.[13] From the 41 cases that have concluded thus far, the Commission has collected more than $29 million in civil penalties, redress, or disgorgement. Set forth below are details regarding several of our enforcement actions in this area.

### 1. Historic Victory in Dish Network

The FTC and our law enforcement partners recently achieved an historic win in the fight against unwanted calls and robocalls. On June 5, 2017, a federal district court in Illinois issued an order imposing the largest penalty ever issued in a Do Not Call case: $280 million against Dish Network.[14] The *Dish* litigation began in 2009 when the Department of Justice brought an action on behalf of the FTC with the states of California, Illinois, North Carolina, and Ohio alleging millions of violations of the Telemarketing Sales Rule, the Telephone Consumer Protection Act ("TCPA") and various state Do Not Call laws.[15] The litigation centered on allegations that Dish and its telemarketers made tens of millions of calls—often robocalls[16]—to

---

[13]    The FTC filed 12 of the 45 cases before the rule change went into effect on September 1, 2009.

[14]    *See U.S. v. Dish Network, LLC*, No. 3:09-cv-03073 (C.D. Ill. June 6, 2017) *available at* https://www.ftc.gov/news-events/press-releases/2017/06/ftc-doj-case-results-historic-decision-awarding-280-million-civil.

[15]    *U.S. v. Dish Network, LLC*, No. 3:09-cv-03073 (C.D. Ill. Mar. 25, 2009), *available at* https://www.ftc.gov/news-events/press-releases/2009/03/ftc-charges-dish-network-formerly-known-echostar-multiple-do-not.

[16]    When the *Dish* case was filed in March of 2009, the robocall provision of the TSR was not yet in effect, thus the complaint reached Dish's unlawful use of robocalls through a count alleging violations of the TSR's abandoned call provisions. Since October 1, 2003, telemarketers have been prohibited from abandoning an outbound telephone call, and sellers are prohibited from causing a telemarketer to do so in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iv). An outbound telephone call is

**EXHIBIT A**

telephone numbers on the Do Not Call Registry and called consumers who previously asked Dish and its telemarketers to stop calling.[17]   In January 2015, the Court found that Dish and its telemarketers had engaged in more than 66 million violations of the TSR and that Dish was responsible for calls made by its retailers.[18]   The $280 million penalty against Dish includes $168 million to the United States for violations of the TSR and $112 million to the states for violations of the TCPA and various state laws.   The order also imposed strong injunctive relief that, among other provisions, requires Dish to hire a monitor to ensure that Dish and its retailers comply with telemarketing laws.[19]   The tireless efforts of DOJ and our state co-plaintiffs were invaluable in securing an outcome that takes a strong stand against companies who invade a consumer's privacy through unwanted calls and robocalls.

### 2.   Strategic Targeting of Robocall Violators

In response to growing consumer complaints about illegal robocalls, the FTC engages in strategic targeting to maximize impact, prioritizing targets that are causing the most harm to consumers.   For example, in January 2017, the Commission filed two lawsuits, *FTC v. Justin Ramsey* and *FTC v. Aaron Michael Jones*, that shut down operations responsible for *billions* of

---

abandoned if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv).   The use of robocalls, where a sales pitch to a live consumer begins with or is made entirely by a pre-recorded message, violates the TSR's abandoned call prohibition because the telemarketer is not connecting the call to a sales representative within two (2) seconds of the person's completed greeting.

[17]      *Id.*

[18]      *U.S. v. Dish Network, LLC*, No. 3:09-cv-03073 (C.D. Ill. Jan. 21, 2015), *available at* https://www.ftc.gov/news-events/press-releases/2015/01/court-grants-partial-summary-judgment-ftc-case-against-dish.

[19]      *See U.S. v. Dish Network, LLC*, No. 3:09-cv-03073 (C.D. Ill. June 6, 2017) *available at* https://www.ftc.gov/news-events/press-releases/2017/06/ftc-doj-case-results-historic-decision-awarding-280-million-civil.

**EXHIBIT A**

illegal robocalls.  The *Ramsey* and *Jones* defendants bombarded consumers with pitches for home security systems and extended auto warranties and compounded their illegal robocalls by dialing more that 70 million phone numbers that were registered on the Do Not Call Registry.[20]

In June 2016, as part of the FTC's work targeting telemarketers that use robocalls to defraud consumers, the FTC and the Florida Attorney General brought an action to shut down a company that allegedly blasted consumers with illegal robocalls touting bogus credit-card interest rate reduction and debt relief services.[21]  The FTC alleged that this scheme bilked consumers out of more than $23 million since 2013.[22]  In some instances, the defendants allegedly tailored their debt elimination pitch to consumers over age 60.[23]

Over the past two years the FTC, often in conjunction with its law enforcement partners, initiated nine new actions targeting defendants we alleged are responsible for billions of illegal robocalls hawking home security systems, free vacations, medical alert devices, energy savings, and credit card interest rate reductions.[24]  Many of the defendants in these cases are now banned

---

[20]      *FTC v. Justin Ramsey*, 9:17-cv-80032-KAM (S.D. Fl. Jan. 13, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/132-3254/justin-ramsey; *FTC v. Michael Aaron Jones*, 8:17-cv-00058 (M.D. Fla. Jan. 13, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3152/allorey-inc.  Evidence reviewed by FTC staff in connection with the *Ramsey* case indicated that a portion of the unlawful telemarketing calls targeted "distressed seniors."

[21]      *See FTC v. Life Management Services of Orange County, LLC*, 6:16-CV-982-Orl (M.D. Fla. June 8, 2016), https://www.ftc.gov/enforcement/cases-proceedings/152-3216/life-management.  We alleged that the defendants used fake company names that deceived consumers into thinking that the defendants had a relationship or affiliation with the consumers' credit-card issuers.

[22]      *See FTC v. Life Management Services of Orange County, LLC*, 6:16-CV-982-Orl (M.D. Fla. May 1, 2017), D.E. #163.

[23]      For example, one consumer stated that the telemarketer claimed to be offering "a program to help senior citizens eliminate their debt."  *FTC v. Life Management Services of Orange County, LLC*, 6:16-CV-982-Orl, Plaintiff's Exhibit 7 (M.D. Fla. June 8, 2016).

[24]      *FTC v. Justin Ramsey*, 9:17-cv-80032-KAM (S.D. Fla. Jan. 13, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/132-3254/justin-ramsey; *FTC v. Michael Aaron*

**EXHIBIT A**

from robocalling or telemarketing.[25]

### 3. Reaching Violators Attempting to Avoid Detection

Increasingly, the perpetrators behind these abusive and often fraudulent calls take steps to avoid detection, either by operating through a web of related entities, "spoofing" their Caller ID information, or hiding overseas. The FTC uses every investigative and litigation tool at its disposal to cut through these deceptions. For example, the defendants in the *Jones* and *Ramsey* cases operated through a tangle of related individuals and entities to avoid detection by law

---

*Jones*, 8:17-cv-00058 (M.D. Fla. Jan. 13, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3152/allorey-inc; *U.S. v. Consumer Education.info, Inc.*, 1:16-cv-02692 (D. Col. Nov. 1, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3081/consumer-educationinfo-inc; *FTC v. Life Management Services of Orange County*, *LLC*, 6:16-CV-982-Orl (M.D. Fla. June 8, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3216/life-management; *U.S. v. Lilly Management and Marketing, LLC*, 6:16-cv-485-Orl (M.D. Fla. Mar. 17, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3115/usa-vacation-station; *U.S. v. KFJ Marketing Inc.*, 2:16-cv-01643 (C.D. Cal. Mar. 10, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3166/kfj-marketing-llc; *FTC v. Lifewatch Inc.*, 1:15-cv-05781 (N.D. Ill. June 20, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3123/lifewatch-inc; *FTC v. All Us Marketing LLC*, 6:15CV1016-0RL-28GJK (M.D. Fla. June 29, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3256/all-us-marketing-llc-formerly-known-payless-solutions-llc; *FTC v. Caribbean Cruise Line, Inc.*, 0:15-cv-60423 (S.D. Fla. Mar. 4, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/122-3196-x150028/caribbean-cruise-line-inc.

[25]      *See, e.g., FTC v. Michael Aaron Jones*, 8:17-cv-00058 (M.D. Fla. May 31, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3152/allorey-inc (final orders permanently banning Jones and related companies from all telemarketing activities, including initiating robocalls, calling numbers on the Do Not Call Registry, and selling data lists containing consumers' phone numbers and other information); *FTC v. All Us Marketing LLC*, 6:15CV1016-0RL-28GJK (M.D. Fla. May 22, 2017, June 8, 2016 and Nov. 1, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3256/all-us-marketing-llc-formerly-known-payless-solutions-llc (multiple final orders permanently banning most defendants from robocalling, telemarketing, and providing debt relief services); *FTC v. Justin Ramsey*, 9:17-cv-80032-KAM (S.D. Fla. Apr. 11, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/132-3254/justin-ramsey (stipulated order banning Ramsey and his company from placing robocalls to individuals to sell goods or services, initiating sales calls to numbers listed on the Do Not Call Registry, and selling data lists containing phone numbers listed on the Registry); *FTC v. Caribbean Cruise Line, Inc.*, 0:15-cv-60423 (S.D. Fla. Feb. 17, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/122-3196-x150028/caribbean-cruise-line-inc (final stipulated order banning the Pacific Telecom defendants from robocalling and illegal telemarketing, as well as helping anyone else make such calls).

**EXHIBIT A**

enforcement.  In addition, defendants in four of our recent robocall cases routinely hid their true name or phone number to deceive consumers and evade detection by law enforcement and the Commission included counts in its suits targeting this unlawful Caller ID spoofing.[26]

The perpetrators behind many unlawful calls also seek to evade law enforcement by operating overseas.  When consumers are victimized by fraudulent calls from international call centers, the Commission finds ways to stymie the scammers by cracking down on their U.S. enablers.  In one recent case, the Commission filed suit against individuals and entities in the U.S. who were collecting money on behalf of telemarketers at India-based call centers operating government impostor scams that conned consumers into paying hundreds or thousands of dollars for taxes they did not owe, or fees for services they did not receive.[27]  In another recent case, the Commission brought suit against the U.S. operators of a scam that relied on Peruvian call centers and sophisticated Caller ID spoofing to pressure Spanish speaking U.S. consumers into purchasing English-language learning materials of little value—and then posing as government officials to threaten and harass uninterested consumers into "purchasing" their products.[28]

---

[26]     *See U.S. v. KFJ Marketing Inc.*, 2:16-cv-01643 (C.D. Cal. Mar. 10, 2016), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3166/kfj-marketing-llc; *FTC v. Lifewatch Inc.,* 1:15-cv-05781 (N.D. Ill. June 20, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3123/lifewatch-inc; *FTC v. All Us Marketing LLC,* 6:15CV1016-0RL-28GJK (M.D. Fla. June 29, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/142-3256/all-us-marketing-llc-formerly-known-payless-solutions-llc; *FTC v. Caribbean Cruise Line, Inc.,* 0:15-cv-60423 (S.D. Fla. Mar. 4, 2015), *available at* https://www.ftc.gov/enforcement/cases-proceedings/122-3196-x150028/caribbean-cruise-line-inc.  In each case, the FTC alleged that defendants failed to transmit complete and accurate Caller ID information in violation of 16 C.F.R. § 310.4(a)(8).  In addition, the complaint in *FTC v. Jones*, alleged that the defendants assisted and facilitated others engaged in illegal spoofing.  *FTC v. Michael Aaron Jones*, 8:17-cv-00058 (M.D. Fla. Jan. 13, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3152/allorey-inc.

[27]     *FTC v. PHLG Enterprises LLC*, 8:17-cv-00220-RAL-AEP (M.D. Fla. Jan. 27, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3245-x170019/phlg-enterprises-llc.

[28]     *FTC v. ABC Hispana Inc.*, 5:17-cv-00252-JGB-DTB (C.D. Cal. Apr. 19, 2017), *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3108/abc-hispana-inc-et-al.

**EXHIBIT A**

**B.      Coordination with Law Enforcement Partners**

As the law enforcement challenges associated with illegal telemarketing have increased, the FTC's relationships with other agencies have become increasingly important.  The Commission has robust, collaborative relationships with state law enforcers, including through the National Association of Attorneys General Do Not Call working group.  In addition, the FTC regularly works with the Federal Communications Commission ("FCC"), the Department of Justice, the Internal Revenue Service ("IRS"), the U.S. Treasury Inspector General for Tax Administration ("TIGTA"), the U.S. Postal Inspection Service, and U.S. Attorneys' Offices across the country.  The Commission also coordinates with its counterparts in other countries on particular cases and broader strategic matters such as Caller ID spoofing.  The FTC's collaboration with its partners takes many forms, including sharing information and targets, assisting with investigations, and working collaboratively on long-term policy initiatives.

The Commission also coordinates with various partners to bring law enforcement actions. Seven of the nine most recent robocall enforcement actions the FTC has led involved collaboration with the Department of Justice or our state partners.[29]  The FTC also leads robocall law enforcement "sweeps"—coordinated, simultaneous law enforcement actions—in conjunction with state and federal partners.[30]  Most recently, the FTC led a multinational robocall sweep announced in June 2016 that took action against operations estimated to be

---

[29]      *See supra* n. 24.

[30]      *See, e.g.,* Press Release, FTC Leads Joint Law Enforcement Effort Against Companies that Allegedly Made Deceptive "Cardholder Services" Robocalls (Nov. 1, 2012), *available at* https://www.ftc.gov/news-events/press-releases/2012/11/ftc-leads-joint-law-enforcement-effort-against-companies.

**EXHIBIT A**

responsible for billions of illegal robocalls.[31]  The June 2016 sweep included thirty-nine actions

taken by the FTC, the Canadian Radio-television and Telecommunications Commission (CRTC),

the United Kingdom's Information Commissioner's Office (ICO), as well as DOJ, the FCC and

the attorney generals' offices of Colorado, Florida, Indiana, Kansas, Mississippi, Missouri, North

Carolina, Ohio, and Washington State, and the Tennessee Regulatory Authority.

## II.     Policy and Market Stimulation Initiatives

Despite the 2009 prohibition of unauthorized robocalls and the Commission's vigorous

enforcement efforts, technological advances have permitted law-breakers to make more robocalls

for less money with a greater ability to hide their identity.  For example, at the end of 2009, the

FTC received approximately 63,000 complaints about illegal robocalls each month.[32]  That

number has now more than quadrupled—so far in 2017 the FTC has received an average of

400,000 robocall complaints per month.[33]

### A.     Understanding the Landscape of the Robocall Problem

Recognizing that law enforcement, while critical, is not enough to solve the problem,

FTC staff has aggressively sought new strategies in ongoing discussions with academic experts,

telecommunications carriers, industry coordinating bodies, technology and security companies,

---

[31]      *See* Press Release, FTC, Florida Attorney General Take Action Against Illegal Robocall Operation (June 14, 2016), *available at* https://www.ftc.gov/news-events/press-releases/2016/06/ftc-florida-attorney-general-take-action-against-illegal-robocall and https://www.ftc.gov/system/files/attachments/press-releases/ftc-florida-attorney-general-take-action-against-illegal-robocall-operation/160614robocallenforcementactions.pdf (listing actions comprising the coordinated enforcement crackdown).

[32]      National Do Not Call Registry Data Book FY 2010 at 5 (Nov. 2010), *available at* https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2010.  Since that time, the FTC began separately tracking Do Not Call complaints and robocall complaints based on information provided by the consumer.

[33]      *See supra* n. 8.

**EXHIBIT A**

consumers, and counterparts at federal, state, and foreign government agencies.  The

Commission ramped up these efforts in October 2012, when the Commission hosted a public

summit on robocalls to explore these issues (the "Robocall Summit").[34]  Since then, as discussed

below, the Commission has spurred the creation of specific groups of experts and industry

members to work together and with international law enforcers to tackle this vexing consumer

protection issue.

Speakers at the Robocall Summit made clear that convergence between the legacy

telephone system and the Internet has allowed robocallers to engage, at very little cost, in

massive, unlawful robocall campaigns that cross international borders and hide behind spoofed

Caller ID information.  As a result, it is not only much cheaper to blast out robocalls; it is also

easier to hide one's identity when doing so.

### 1.    New Technologies Have Made Robocalls Extremely Inexpensive

Until relatively recently, telemarketing required significant capital investment in

specialized hardware and labor.[35]  Now, robocallers benefit from automated dialing technology,

inexpensive international and long distance calling rates, and the ability to move internationally

and employ cheap labor.[36]  The only necessary equipment is a computer connected to the

Internet.[37]  The result: law-breaking telemarketers can place robocalls for a fraction of one cent

---

[34]     *See generally* FTC Workshop, *Robocalls: All the Rage* (Oct. 18, 2012), *available at*
https://www.ftc.gov/news-events/events-calendar/2012/10/robocalls-all-rage-ftc-summit.  A transcript of
the workshop (hereinafter "Tr.") is available at
https://www.ftc.gov/sites/default/files/documents/public_events/robocalls-all-rage-ftc-summit/robocallsummittranscript.pdf.

[35]     Herrmann, Tr. at 58-59; Schulzrinne, Tr. at 24.

[36]     Schulzrinne, Tr. at 24.

[37]     Herrmann, Tr. at 59-61.

**EXHIBIT A**

per minute.  In addition, the cheap, widely available technology has resulted in a proliferation of entities available to perform any portion of the telemarketing process, including generating leads, placing automated calls, gathering consumers' personal information, or selling products.[38] Because of the dramatic decrease in upfront capital investment and marginal cost, robocallers—like email spammers—can make a profit even if their contact rate is very low.[39]

### 2.    New Technologies Have Made It Easier for Robocallers to Hide

Technological changes have also affected the marketplace by enabling telemarketers to conceal their identities when they place calls.  First, direct connections do not exist between every pair of carriers, so intermediate carriers are necessary to connect many calls.  Thus, the typical call now takes a complex path, traversing the networks of multiple VoIP and legacy carriers before reaching the end user.[40]  Such a path makes it cumbersome to trace back to a call's inception.[41]  All too often, this process to trace the call fails completely because one of the carriers in the chain has not retained the records necessary for a law enforcement investigation.[42]

Second, new technologies allow callers to easily manipulate the Caller ID information that appears with an incoming phone call.[43]  While "Caller ID spoofing" has some beneficial uses,[44] it also allows telemarketers to deceive consumers by pretending to be an entity with a

---

[38]    Schulzrinne, Tr. at 20-21; Maxson, Tr. at 95-98.

[39]    Schulzrinne, Tr. at 21; Bellovin, Tr. at 16-17.

[40]    Panagia, Tr. at 130-32; Bellovin, Tr. at 17.

[41]    Schulzrinne, Tr. at 24-25; Maxson, Tr. at 100; Bash, Tr. at 104.

[42]    Panagia, Tr. at 160-61; *see also id*. at 132-133; Schulzrinne, Tr. at 21.

[43]    Schulzrinne, Tr. at 24-26.

[44]    *See, e.g.,* Panagia, Tr. at 129 (AT&T allows the third party that performs AT&T's customer service to "spoof" AT&T's customer service line).

**EXHIBIT A**

local phone number or a trusted institution such as a bank or government agency.[45]  In addition, telemarketers can change their phone numbers frequently in an attempt to avoid detection.[46]

Finally, new technologies allow robocallers to operate outside of jurisdictions where they are most likely to face prosecution.[47]  Indeed, the entities involved in the path of a robocall can be located in different countries, making investigations even more challenging.

### B.  Need to Stimulate Technological Solutions

#### 1.  Robocall Contests

Recognizing the need to spur the marketplace into developing technical solutions that protect American consumers from illegal robocalls, the FTC led four public challenges to help tackle the unlawful robocalls that plague consumers.  In 2012-2013, the FTC conducted its first Robocall Challenge[48], and called upon the public to develop a consumer-facing solution that blocks illegal robocalls, applies to landlines and mobile phones, and operates on proprietary and non-proprietary platforms.  In response, we received 798 submissions and partnered with experts in the field to judge the entries.  One of the winners, "NomoRobo," was on the market and available to consumers by October 2013—just 6 months after being named one of the winners.

---

[45]        Schulzrinne, Tr. at 21-22.

[46]        *Id.* at 24-26; Maxson, Tr. at 97; Bash, Tr. at 103.  Under the Truth in Caller ID Act, it is generally illegal to transmit misleading or inaccurate Caller ID information with intent to defraud.  *See* Truth in Caller ID Act, 47 U.S.C.§ 227(e); *cf.* 16 C.F.R. § 310.4(a)(8) (the Telemarketing Sales Rule requires that sellers and telemarketers transmit or cause to be transmitted the telephone number and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's seller, the name of the seller.  Under this provision, it is not necessary to prove intent to defraud.).

[47]        Schulzrinne, Tr. at 21; Bellovin, Tr. at 16-17.

[48]        For more information on the first FTC Robocall Challenge, *see* https://www.ftc.gov/news-events/press-releases/2013/04/ftc-announces-robocall-challenge-winners.

**EXHIBIT A**

To date, "NomoRobo," which reports blocking over 279 million calls, is being offered directly to consumers by a number of telecommunications providers and is now available as an app on iPhones.[49]

The following year the FTC launched its second challenge—Zapping Rachel[50]—which called upon information security experts to help create a robust robocall honeypot.  Sixty teams and individuals signed up for one or more phase, and FTC staff obtained new insights that improved current robocall honeypot designs and connected new partners and stakeholders.

In June 2015, the FTC sponsored its third challenge, DectectaRobo[51], in which it called upon the public to analyze call data to create algorithms that could predict which calls were likely robocalls.  Nineteen teams from all over the U.S. participated.  Later in 2015, the FTC challenged information security experts to create tools people could use to block and forward robocalls automatically to a honeypot as part of the Robocalls: Humanity Strikes Back challenge.[52]  Contestants built and submitted robocall solutions to the judges and finalists, then competed to "seed" their solutions and collect the highest number of robocalls.

Each of the four challenges provided the Commission with an opportunity to promote industry dialogue and innovation in combatting illegal robocalls, develop industry partnerships,

---

[49]     *See* https://www.nomorobo.com/ (last visited Sept. 22, 2017) and Robocall Strike Force, Robocall Strike Force Report at 17-18 (April 28, 2017), https://www.fcc.gov/file/12311/download ("*Strike Force Report II*") at 17-18.

[50]     A robocall honeypot is an information system designed to attract robocallers and help investigators and academics understand and combat illegal calls.  For more information on the Zapping Rachel challenge *see* https://www.ftc.gov/news-events/contests/zapping-rachel.

[51]     For more information on the Detectarobo challenge *see* https://www.ftc.gov/news-events/contests/detectarobo.

[52]     For more information on the Robocalls: Humanity Strikes Back challenge, *see* https://www.ftc.gov/news-events/contests/robocalls-humanity-strikes-back.

**EXHIBIT A**

and refine its understanding of the robocall problem and potential solutions.  More importantly, the challenges contributed to a shift in the development and availability of technological solutions in this area, particularly call-blocking and call-filtering products.  A number of voice service providers now offer call-blocking or call-filtering products to some or all of their customers.[53]  In addition, there are a growing number of free or low-cost apps available for download on wireless devices that offer call-blocking and call-filtering solutions.[54]

### 2.   Coordinating with Technical Experts, Industry, and Other Stakeholders

The FTC provided input to support the industry-led Robocall Strike Force, which is also working to deliver comprehensive solutions to prevent, detect, and filter unwanted robocalls.[55] In tandem with this effort, the FTC worked with a major carrier and federal law enforcement partners to help block IRS scam calls that were spoofing well-known IRS telephone numbers.

---

[53]     For example, in late 2016 AT&T launched "Call Protect", which is a product available to many AT&T wireless customers that blocks fraud calls and flags others as potential "spam."  *See* http://about.att.com/story/att_call_protect.html.  T-Mobile offers its wireless customers two free products, "Scam ID" and "Scam Block", that flag and block unwanted calls.  *See* http://explore.t-mobile.com/callprotection (last visited Sept. 22, 2017).  Verizon offers a product called "Caller Name ID" to its wireless customers that also attempts to flag and block unwanted calls.  *See* https://www.verizonwireless.com/solutions-and-services/caller-name-id/.  In addition, a number of carriers make Nomorobo available to their VoIP or cable line customers.  *See, e.g.,* https://www.fcc.gov/consumers/guides/stop-unwanted-calls-texts-and-faxes (listing available call blocking resources from a number of wireline providers) (last visited Sept. 22, 2017).

[54]     The Cellular Telecommunications Industry Association (CTIA) maintains a list of some of the available call blocking apps, both for iOS devices: https://www.ctia.org/consumer-tips/robocalls/ios-robocall-blocking and for Android devices: https://www.ctia.org/consumer-tips/robocalls/android-robocall-blocking (last visited Sept. 22, 2017).

[55]     The Robocall Strike Force developed in response to a call from the FCC to make better call blocking solutions available to consumers, quickly, and free of charge.  *See* Robocall Strike Force, Robocall Strike Force Report at 1 (2016), https://transition.fcc.gov/cgb/Robocall-Strike-Force-Final-Report.pdf.  The FTC has long been a proponent of call blocking services as a critical tool to reduce unwanted calls and robocalls and strongly supports the Strike Force's efforts.  *See e.g.,* FTC Staff, Comments Before the Federal Communications Commission on Public Notice DA 14-1700 Regarding Call Blocking, CG Docket No. 02-278; WC Docket No. 07-135 (Jan. 23, 2015), *available at* https://www.ftc.gov/policy/policy-actions/advocacy-filings/2015/01/ftc-staff-comment-federal-communications-commission.

**EXHIBIT A**

The Strike Force expanded this effort and it contributed to a drop in IRS scam calls at the end of 2016.[56]

The Strike Force also found that, while several providers and third parties offered call-blocking products, there was no widespread call-blocking solution spanning the networks.  In order to provide proactive call-blocking services to customers, the Strike Force sought clarification from the FCC that "blocking presumptively illegal calls is one of the tools carriers are permitted to use to provide consumers additional relief."[57]  In response, this spring the FCC issued a Notice of Proposed Rule Making and Notice of Inquiry that seeks to expand the categories of calls that voice service providers are authorized to block and invites comment on what types of standards should govern providers engaged in call blocking.[58]  The FTC filed a comment in response, supporting the NPRM's efforts to expand the categories of calls that voice service providers are authorized to block and encouraging the FCC to allow for some provider flexibility when considering standards to govern provider-based blocking of presumptively-illegal calls.[59]

---

[56]       *See* Robocall Strike Force, Robocall Strike Force Report at 32-33 (2016), https://transition.fcc.gov/cgb/Robocall-Strike-Force-Final-Report.pdf.

[57]       *See id*. at 40.

[58]       Specifically, the FCC's NPRM sought input on rulemaking proposals that would authorize two categories of provider-based call blocking: 1) when the subscriber to a particular telephone number requests that telecommunications providers block calls originating from that number; and 2) when the originating number is invalid, unallocated, or unassigned.  *See* Advanced Methods to Target and Eliminate Unlawful Robocalls, Notice of Proposed Rulemaking and Notice of Inquiry, CG Docket No. 17-59, FCC 17-23 (released Mar. 23, 2017), *published in* 82 Fed. Reg. 22625 (May 17, 2017).

[59]       *See* Comment of the FTC to the Federal Communications Commission, Advanced Methods to Target and Eliminate Unlawful Robocalls, Notice of Proposed Rulemaking and Notice of Inquiry, CG Docket No. 17-59, FCC 17-23 (July 3, 2017), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-federal-communications-commission-supporting-fccs-proposed-expansion-provider/ftc_comment_to_fcc_re_nprm_noi_call_blocking_07032017.pdf.  As call-blocking technology

**EXHIBIT A**

The FTC also has engaged with technical experts, academics, and others through industry groups, such as the Messaging, Malware and Mobile Anti-Abuse Working Group ("M$^3$AAWG"). M$^3$AAWG is a consortium of industry, regulators, and academics focused on developing solutions to mitigate various forms of messaging abuse such as email spam.[60]  After discussions with the FTC and others, M$^3$AAWG leadership formed the Voice and Telephony Abuse Special Interest Group ("VTA SIG") in 2014, a subgroup formed to apply M$^3$AAWG's expertise on messaging abuse to voice spam, such as robocalls.[61]

Through the VTA SIG, the FTC coordinates with experts working on industry standards that will combat Caller ID spoofing by enabling the authentication of VoIP calls, such as the Internet Engineering Task Force's working group called "STIR"—Secure Telephone Identity Revisited.[62]  The FTC further promotes technical advancements by collaborating with its counterparts in other countries, through its leadership in the Unsolicited Communications Enforcement Network ("UCENet") an international syndicate of government agencies and private sector representatives focused on international spam enforcement cooperation.[63]

---

gains momentum, the FTC is mindful about concerns that bad actors may place telemarketing calls while spoofing an innocent consumer's telephone number as the outbound caller ID number in an effort to evade detection or that the inadvertent blocking of legitimate calls may occur.  These concerns were also raised by the FCC and addressed in the FTC's Comment.

[60]    *See* M$^3$AAWG, Activities, https://www.m3aawg.org/ (last visited Sept. 22, 2017).

[61]    *See* M$^3$AAWG, Voice and Telephony Abuse Special Interest Group, https://www.m3aawg.org/voice-and-telephony-abuse-sig (last visited Sept. 22, 2017).

[62]    *See* Internet Eng'g Task Force, Secure Telephone Identity Revisited (STIR), https://datatracker.ietf.org/wg/stir/charter/ (last visited Sept. 22, 2017).

[63]    *See* https://www.ucenet.org/ (last visited Sept. 22, 2017).

**EXHIBIT A**

### 3.  Data Initiatives

The Commission also engages in information sharing to help facilitate technological solutions such as call blocking and has taken steps to increase the quality and quantity of shared information.  To that end, on September 28, 2016, the FTC updated its Do Not Call complaint intake process to provide a drop-down list of possible call categories for consumers to choose from to make it easier for consumers to report the subject of the call and to help the Commission identify trends.  The top six categories selected to date by consumers are the same for Do Not Call complaints and robocall complaints:

Reducing your debt (credit cards, mortgage, student loans)

Dropped call or no message

Vacation & timeshares

Warranties & protection plans

Calls pretending to be government, businesses, or family and friends

Medical & prescriptions

In addition to refining our complaint intake process, the FTC recently began a new initiative to help facilitate industry call-blocking solutions by increasing the amount and frequency of consumer complaint data that we make publicly available.[64]  Beginning in August of this year, when consumers report Do Not Call or robocall violations to the FTC, the phone numbers consumers report are released each business day.  The FTC is also releasing the following consumer-reported data: the date and time the unwanted call was received, the general subject matter of the call (such as debt reduction, energy, warranties, home security, etc.), and

---

[64]     *See* https://www.ftc.gov/news-events/press-releases/2017/08/ftc-escalates-fight-against-illegal-robocalls-using-consumer.  The complaint data is available at:  https://www.ftc.gov/site-information/open-government/data-sets/do-not-call-data.

**EXHIBIT A**

whether the call was a robocall.[65]  By making our available data more up-to-date and more robust, the FTC seeks to help telecommunications carriers and other industry partners that are implementing call-blocking solutions for consumers that choose to use a call-blocking service or feature.

The Commission is committed to continuing to work with industry and government partners to improve information sharing to combat illegal calls.

### III.    Consumer Education

Public education is also an essential tool in the FTC's consumer protection and fraud prevention work.  The Commission's education and outreach program reaches tens of millions of people a year through our website, the media, and partner organizations that disseminate consumer information on the FTC's behalf.

The FTC delivers practical, plain language information on numerous issues in English and in Spanish.  The Commission also uses law enforcement announcements as opportunities to remind consumers how to recognize a similar situation and report it to the FTC.  In the case of robocalls, the FTC's message to consumers is simple:  if you answer a call and hear an unwanted recorded sales message—hang up.  Period.  Other key messages to consumers include how to place a phone number on the Do Not Call Registry, how and where to report illegal robocalls,[66] available call blocking solutions,[67] and how to identify common scams.[68]    The FTC

---

[65]        In the past, the Commission released a bi-weekly report that published only the telephone numbers that consumers complained about in their Do Not Call and robocall complaints.

[66]        *See, e.g.,* National Do Not Call Registry, http://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry.

[67]        *See, e.g.,* FTC Consumer Information Blocking Unwanted Calls https://www.consumer.ftc.gov/articles/0548-blocking-unwanted-calls.

**EXHIBIT A**

disseminates these tips through articles,[69] blog posts,[70] social media,[71] infographics,[72] videos,[73] audio,[74] and campaigns such as "Pass It On"—an innovative means of arming older consumers with information about scams that they can "pass on" to their friends and family members.[75]

## IV.   Next Steps and Conclusion

The Do Not Call Registry continues to help protect consumers against unsolicited calls from legitimate telemarketers.  But, as technology continues to develop and fraudsters exploit those developments, we must remain agile and creative.  The Commission will continue its multifaceted efforts to fight illegal robocalls, including the following actions:

- Continue Aggressive Law Enforcement

  - We will maintain our enforcement efforts, in coordination with state, federal, and international partners, to target high-volume offenders and pursue robocall gatekeepers in order to stop the largest number of illegal calls.

---

[68]    *See, e.g.,* FTC Consumer Information Scam Alerts, https://www.consumer.ftc.gov/scam-alerts.

[69]    *See, e.g.,* FTC Robocall Microsite, http://www.consumer.ftc.gov/features/feature-0025-robocalls.

[70]    *See, e.g.,* FTC Consumer Information Blog, Looking to Block Unwanted Calls? https://www.consumer.ftc.gov/blog/looking-block-unwanted-calls.

[71]    *See, e.g.,* FTC Robocalls Facebook Q&A Transcript (Oct. 25, 2012), https://www.ftc.gov/sites/default/files/attachments/ftc-facebook-chats/1210robocallchallenge-fb.pdf.

[72]    *See, e.g.,* FTC Robocalls Infographic, https://www.ftc.gov/sites/default/files/documents/public_events/robocalls-all-rage-ftc-summit/pdf-0113-robocalls-infographic.pdf.

[73]    *See, e.g.,* FTC Video and Media, http://www.consumer.ftc.gov/media.

[74]    *See, e.g.,* FTC Consumer Information Audio, "Hang Up on Robocalls," http://www.consumer.ftc.gov/media/audio-0045-hang-robocalls.

[75]    *See* Pass It On, http://www.consumer.ftc.gov/features/feature-0030-pass-it-on#identity-theft.

**EXHIBIT A**

- o We will work with the telecommunications industry, encouraging carriers to be proactive in monitoring for illegal robocalls, blocking illegal calls, and securing the information necessary for prosecutions.

- Spur Innovation

  - o We will work with industry leaders and other experts to further stimulate the development of technological solutions to protect consumers from illegal robocalls.

  - o We will continue to encourage industry-wide coordination to create and deploy VoIP standards that incorporate robust authentication capabilities. Such coordination is the only way to ensure a future phone system with accurate and truthful calling information.

- Engage in Ongoing Consumer Education

  - o We will continue our broad outreach to consumers regarding the Do Not Call Registry as well as illegal robocalls and how best to fight them.

Thank you for the opportunity to share some of the highlights regarding the FTC's battle against illegal robocalls. We look forward to working with you on this important issue.

**EXHIBIT A**

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074



**Pennsylvania Attorney General Josh Shapiro**

Testimony before the United States Senate Special Committee on Aging

October 4, 2017

Exhibit
2

1

**EXHIBIT A**

**Introduction**

Chairman Collins, Ranking Member Casey, and members of the Committee, I am Josh Shapiro, Attorney General for the Commonwealth of Pennsylvania. Thank you for inviting me to speak with you today about what my office is doing to keep senior citizens safe from scam artists and financial predators and what steps the Federal government can take to further protect the elderly from financial exploitation.

The well-being of our nation's 47 million seniors is an important issue. As an elected official from Pennsylvania, it is particularly important to me. Pennsylvania has one of the highest populations of seniors over the age of 65 in the country: there are 2.2 million seniors in Pennsylvania—the fifth highest number in the U.S.—accounting for over 17 percent of our total population. And our population of seniors is only expected to grow, increasing by 25 percent by 2020.

As the chief law enforcement officer of the Commonwealth of Pennsylvania, I am responsible for protecting all Pennsylvanians in their roles as consumers. My responsibilities range from antitrust to home improvement contractors, from civil rights to managing our state's Do Not Call list. Protecting vulnerable seniors from unscrupulous scammers is one of my most important duties.

In my testimony today, I would like to cover three main topics: (1) seniors' vulnerability to scams and the impact scams have on them; (2) IRS impersonation scams; and (3) Pennsylvania's Do Not Call registry, which complements the federal system, and its effect on robocalls.

**Seniors' vulnerability to scams**

Senior citizens are specifically targeted for fraud and scams more than any other age group. Many of the most common scams are tailor-made for their specific life circumstances, including those involving Medicare, prescription drugs, funerals, anti-aging products, and grandparent scams. Understanding why seniors are vulnerable, and why they're being targeted, is necessary to developing solutions to better protect them.

*Why seniors are more vulnerable*

Seniors are now easier to reach than ever: according to a recent study from Pew Research Center, 67 percent of seniors have some form of internet access; 74 percent live in homes with computers; 51 percent access the internet through high-speed connections; and 34 percent of seniors who use the internet use social media (such as Facebook), making them even easier for scammers to locate and contact. Compounding this is seniors' comfort with conducting financial transactions online. Whereas 15 years ago, online financial transactions were relatively rare and viewed by the general public with skepticism, a recent study indicates that today 41 percent of seniors bank online, 26 percent pay their bills online, and 21 percent file their taxes online.

This is also the wealthiest generation of seniors perhaps ever. According to Nielsen, they have a median net worth of $241,333. That's 34 percent more than the

2

**EXHIBIT A**

"War Babies" generation (born 1936 -1945) and 39 percent more than "Depression Babies" (born 1926-1935). In the words of the AARP, a scammer would "have to be an idiot to turn [their] back on this humongous market."

*Impact*

The combination of scammers' greed and seniors' vulnerability has resulted in significant financial losses for America's elderly. Over a third of seniors have experienced some form of financial abuse, including scams. Victims lose an average of $36,000. While it is difficult to calculate, our best estimates indicate that American seniors lose over $3 billion each year to scams and abuse. Two-thirds of seniors report having been victimized online: 38 percent have been targeted for online scams, and 28 percent have mistakenly downloaded a virus.

Discussing the impact of these scams in terms of billions of dollars or percentages of victims obscures the real impact on individuals. The loss of even a few thousand dollars can be devastating to a senior citizen. Nearly a million seniors in the United States have been forced to skip meals because they lost money to a scammer.

*NAAG focus*

Protecting seniors from scams and fraud is an important issue in every state, and attorneys general are making it a top priority. In August, the new president of the National Association of Attorneys General (NAAG), Kansas Attorney General Derek Schmidt, announced that NAAG will spend the next year focusing on "strengthening efforts nationwide to combat elder abuse." To quote Attorney General Schmidt, "There is no partisan divide on the commitment of state attorneys general to protecting seniors and combating elder abuse in all its forms."

*OAG's efforts*

The Pennsylvania Office of Attorney General (OAG) dedicates significant resources to consumer protection. Of our nearly 20,000 complaints from consumers each year, one third come from seniors in our Commonwealth. OAG receives and investigates complaints from seniors regarding:

- Purchase of goods and services (*e.g.* automobiles, pets, and insurance)
- Deceptive trade practices (*e.g.* false advertising or odometer tampering)
- Health care (*e.g.* health insurance service denials)
- Home improvement contractor scams
- Identity theft

In addition to this reactive work, OAG conducts proactive educational outreach to prevent seniors from becoming victimized in the first place. We have a dedicated Office of Public Engagement that manages this programming. Examples of some of our presentations most of interest to seniors are:

- Scams, fraud and identity theft education

3

**EXHIBIT A**

- Senior Crime Prevention University, a specialized series of educational sessions for seniors to identify and avoid scams
- Cyber security for seniors

Finally, OAG manages Pennsylvania's Do Not Call list, which guards against unwanted marketing calls.

Throughout these various efforts, the most common complaints we receive from seniors are about violations of the Do Not Call list, including robocalls. The next most frequent complaints are about telecommunications and broadcast issues (including television and internet service providers), home improvement contractor issues, and scams like IRS impersonation.

**IRS impersonation scams**

IRS impersonation scammers call people and falsely claim to represent the Internal Revenue Service. The callers will claim that back taxes are owed by the recipient, threaten to have them arrested, and demand payment (usually via wire transfer). Last year, my office received 881 complaints about and IRS impersonation scams, 62 percent of which were from seniors.

Fortunately, most Pennsylvanians are able to recognize these calls as fraudulent. In the past, it helped to know that the IRS did not call people about their taxes, and that they only sent letters; however, as of April, Congress authorized the IRS to begin contracting out some of its debt collection work to private debt collectors who do make phone calls, which takes this defensive knowledge away. While there are some safety measures in place, like a passcode sent by mail that the caller must provide to a senior, I fear that ending the simple rule that the IRS will not call opens the door to more successful scams by sophisticated con artists.

*John's story*

In May of this year, agents in my office received a complaint from a man from the Pittsburgh area. I will call him "John" to protect his identity, as this investigation is ongoing. John received a call from a 1-866 number who claimed to be an IRS employee. The caller said that an arrest warrant had been issued for John because he sends money to his wife and child in a foreign country. The purported IRS employee said that John would soon receive a call from the local police department and instructed him on how to merge the calls. Shortly thereafter, John received a call from a number that his caller ID showed as coming from Pennsylvania State Police Headquarters.

The callers threatened John and said that his only way out of the situation was to send money to help pay for the investigation to clear his name. The money, they said, would be refunded to John after the investigation was complete.

John believed them, since they appeared to be calling from legitimate phone numbers. He was instructed to send six different payments from four different locations—Walmart, CVS, Western Union, and Rite Aid—over two days. In total, he lost

4

**EXHIBIT A**

$13,500 because he truly believed he was speaking with tax authorities and wanted to clear his name. John's story demonstrates just how manipulative and devastating IRS impersonation scams can be.

*OAG's efforts – grassroots education*

Unfortunately, cases like John's can be difficult to prosecute. Anonymous criminals hiding behind spoofed phone numbers using shady financial transactions leave little for law enforcement to work with. That's why one of the best approaches to battling scams like this is preventative education.

My office takes a grassroots approach to educating seniors on how to identify and avoid scams like the IRS impersonation scam. Each year, we hold around 250 events all across Pennsylvania, reaching 14,000 seniors. Additionally, we hold 50 events on identify theft for people of all ages that reach approximately 5,000 additional seniors. These presentations teach seniors about a wide variety of scams and how to recognize and avoid them. We have also begun to incorporate materials on how to be safe while using the internet, as more and more seniors go online each year.

Many seniors are aware of the most well-known scams. As a result, these scams have very low success rates. This Committee estimated that last year one million Americans were targeted with the IRS impersonation scam, yet only 5,000 were victimized—a 0.5 percent success rate. However, many scams are not well-known, and new scams are popping up on a regular basis. So during our info sessions, we focus on communicating two crucial strategies for avoiding scams.

The first is an easy way to remember how to recognize a scam. Our agents have developed a pneumonic around the word "scam" itself: Sudden Contact, Act now, Money or information required. We tell seniors that if they are suddenly contacted by someone that they weren't expecting, and that person is demanding that they act immediately by sending money or information, then it is likely a scam.

The second is a simple, yet effective technique. If you don't recognize a phone number that's calling you, let it go to voicemail or your answering machine. Especially for seniors with diminished mental faculties, taking the time to listen to a message a couple of times, think about it, and even ask someone else for their advice can be the difference between avoiding a scam and losing thousands of dollars to a criminal.

**Pennsylvania's Do Not Call list and robocalls**

Under Pennsylvania's Telemarketer Registration Act, my office administers a free Do No Call list service for both landlines and mobile phones. Pennsylvanians can sign up by completing a simple form on our website. We collect those numbers into a list that businesses must reference before placing solicitation calls.

There are currently 3.5 million Pennsylvanians registered on the Do Not Call list out of a population of 12.5 million, nearly 30 percent. The list contains 2.8 million phone

5

**EXHIBIT A**

numbers. The number of registered numbers is lower than registered individuals because multiple people from the same household can register the same phone number.

Despite the wide use of Pennsylvania's Do Not Call list, we receive thousands of complaints each year alleging unlawful telemarketing, robocalls, and scam calls. Last year, we received over 7,000 complaints, nearly 4,000 of which were from seniors. Many seniors that we talk to feel that the Do Not Call list is ineffective because they still receive unwanted marketing calls.

The Do Not Call list is not a panacea. While nearly every business complies with its restrictions, there continue to be a handful of bad actors who ignore it. There are also some major exceptions to the restrictions: political campaigns and nonprofits are not subject to the Do Not Call list, and any business that has had a business relationship with an individual in the last 12 months may disregard their placement on the Do Not Call list. Scammers also ignore the Do Not Call list; after all, it's often the least of the many crimes they're committing.

Still, the fact is that the Do Not Call list drastically reduces the number of unwanted calls that seniors receive and makes it easier for them to ignore calls from unknown numbers.

Again, our office recommends that seniors let any unknown number go to voicemail. This strategy lets them assess the validity of the call. Answering a call also lets the company calling know that the number is still active, and they'll keep it on their list to call again. Devices that screen calls automatically are also helpful in reducing seniors' vulnerability to scams.

*OAG's efforts*

In 2016, my office received 4,473 consumer complaints specifically relating to the Do Not Call list. Since then, my office has issued 2,141 subpoenas to phone carriers to try to locate calling parties. However, this resulted in only four legal actions, highlighting how difficult it is to pursue these cases. When we are able to build a complaint, though, we can build strong cases and obtain meaningful relief for those affected.

For example, last year my office took action against a man from Oregon named Richard Paul, alleging violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law and Pennsylvania's Telemarketer Registration Act. Our office alleged that Mr. Paul obtained telephone numbers for the purposes of conducting marketing calls. Many of the people he called were on Pennsylvania's Do Not Call list; our office received several complaints about his conduct as a result, including from seniors. This case is still pending; we are currently seeking remittances of $100 per affected consumer and civil penalties of $1,000 per violation or $3,000 per violation against a senior.

6

**EXHIBIT A**

**Steps the Federal Government can take to protect seniors**

*Prevent IRS private debt collectors from calling*

As mentioned earlier, we used to be able to tell seniors that if someone was calling claiming to be from the IRS, then it was a scam—period—because the IRS does not call anyone. However, with the IRS's new private debt collection practices that began in April, it is possible for people to receive legitimate calls seeking to collect on debts to the IRS. This is causing confusion in our communities, and has removed a crucial method of self-defense.

Congress should look closely at the effects of permitting debt collectors working on behalf of the IRS to make telephone calls to people from whom they are collecting debt. The IRS has used other means for decades and never felt the need to turn to phone calls. I believe their debt collectors should adhere to the same practices.

*Give telephone companies the tools to block scammers*

According to the *Consumer Sentinel Network Data Book for January-December 2015*, 75 percent of consumers who filed fraud-related complaints and reported how the fraud was perpetrated indicated they were contacted by telephone. This is more than nine times the number reporting fraud initiated by e-mail (eight percent) and more than 12 times the number of those reporting fraud triggered by the internet (six percent). This statistic reveals that the telephone remains a potent instrument for criminals who are intent upon defrauding consumers.

I appreciate and applaud the efforts of the telecom industry to try to stop scammers in their tracks. I recognize the difficult balance that they must achieve between maintaining free and open lines of communication for all Americans and closing off avenues for harassment and scams. As is the nature of nearly every criminal activity, it is a constant battle to keep up with new methods and new technologies used by bad actors to circumvent the systems in place to protect us.

That's why the federal government needs to give telephone service providers the ability to block several kinds of "spoofed" calls (in which scammers mimic the phone numbers of legitimate businesses on the receiving party's caller ID). In July, I joined a bipartisan coalition of 29 attorneys general from across the country to submit a formal comment to the Federal Communications Commission asking them to allow telephone companies to block certain robocalls and spoofed calls.

As we said in our FCC comment, telephone companies should be able to block calls originating from "spoofed" or invalid numbers, unallocated numbers, and numbers whose owners have requested be blocked. For example, phone providers would be able to block a scammer that is using a telephone number that clearly can't exist because it hasn't been assigned. Legitimate businesses do not need to use any of these spoofing methods to contact consumers. Allowing providers to block these calls would stymie scammers without burdening businesses.

7

**EXHIBIT A**

I know Senator Casey shares my views on this issue. He and I are sending a joint letter to the FCC today to implement their proposed rule without further delay. It has been nearly eight months since the FCC first proposed the rule. During that time, it is likely that 19 billion calls have been placed using robocalling technology. We need the FCC to help us put a stop to these harassing and predatory calls.

**Conclusion**

Thank you Chairman Collins, Ranking Member Casey and all the members of this committee for holding this hearing and highlighting the issue of scams and fraud against our seniors. This is a top priority for my office and I appreciate your focus on it here in Washington. I look forward to answering any questions you may have.

8

**EXHIBIT A**

NEW REPORT: U.S. Leads Europe in Broadband Deployment, Adoption, Investment and Competition

Learn

More

X

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074



AUTHOR ———

Kevin Rupy

HOME  >  ARTICLES

# USTelecom Testifies Before Senate on Robocalls

**APRIL 18, 2018**

On April 18th I testified before the U.S. Senate Committee on Commerce, Science, and Transportation this week on the issue of robocalls.  During the testimony, I emphasized the increasing number of tools available to consumers to label and block robocalls, including many deployed by USTelecom's member companies.

**Testimony of Kevin Rupy, Vice President, Law and Policy, USTelecom**

**before the**

**EXHIBIT 3**

## The U.S. Senate Committee on Commerce, Science, and Transportation

### "Abusive Robocalls and How We Can Stop Them" April 18, 2018

Chairman Thune, Ranking Member Nelson, Members of the Committee, thank you for giving me the opportunity to appear before you today.

My name is Kevin Rupy, and I serve as Vice President of Law and Policy at USTelecom.  Over the last several years, USTelecom and our member companies have been tremendously focused on the robocall issue, and we share the Committee's concern about the problems associated with phone-based impostor scams targeting consumers.  Scammers can use Caller ID spoofing to mask their identity and location, giving their target a false sense of confidence about who is calling.

In this ongoing battle against criminal robocallers, there have been four important developments over the last year that are particularly significant.

First, the industry-led, ecosystem-wide Robocall Strike Force issued its report to the Federal Communications Commission on October 26, 2016.  Comprehensive follow-up reports by the industry groups continuing the work started by the Strike Force were delivered to the FCC last year on April 28, 2017.  These reports, taken together, catalogue industry's substantial efforts to advance the battle against illegal robocalls.  These reports hold a significant amount of good news for consumers.  For example, the reports note that the SHAKEN/STIR standards development for the next generation of robocall mitigation tools that the industry had initiated prior to the Robocall Strike Force, were accelerated by six months.  These standards, which incorporate caller-ID authentication capabilities into the network and consumer

**EXHIBIT A**

devices, have entered the industry testing phase.  In addition, the North
American Numbering Council (NANC) – a Federal Advisory Committee
that counsels the FCC on numbering issues – is nearing completion of its
recommendation to the FCC on the SHAKEN governance framework.
Some of the initial testing of the SHAKEN standard is expected to
complete later this year, with potential deployments anticipated later this
year and in 2019.

The reports also highlight the increasing number of tools that are being
developed and actively deployed to consumers, by a growing number of
national voice and device providers.  Finally, the reports detail the efforts
of USTelecom's Industry Traceback Group, which is comprised of a broad
range of network providers from the cable, wireline, wireless and
wholesale industries, who are working collaboratively in order to identify
the origin of these calls at their source.  Industry's strong commitment to
this effort can be seen its significant growth over the last year, from just 3
carriers in July, 2016, to 22 providers as of today.

Second, the  reports shows that USTelecom member companies,
independent application developers and a growing number of diverse
companies offer services today that can help older Americans reduce
unknown and potentially fraudulent calls.  For example, AT&T has
launched its 'Call Protect' service that allows customers with iPhones
and HD Voice enabled Android handsets to automatically block
suspected fraudulent calls.  AT&T also offers AT&T Digital Call Protect for
IP wireline phones.  Verizon's new Spam Alerts service provides its
wireline customers who have Caller ID – whether they are on copper or
fiber – with enhanced warnings about calls that meet Verizon's spam
criteria by showing the term "SPAM?" before a caller's name on the
Caller ID display.  And on the wireless side, Verizon has deployed and
continues to expand robocall mitigation features as part of its Caller
Name ID service, including a spam filter that automatically forwards to

**EXHIBIT A**

voicemail any calls corresponding to the spam risk level selected by the customer.

And various carriers have worked with Nomorobo to facilitate their customers' ability to use that third-party blocking service, such as Verizon's "one click" solution that simplifies customers' ability to sign up for the service.  In fact, at a recent joint FCC and FTC robocall workshop, it was noted that since 2016, there has been a 495% increase in smartphone applications alone for addressing robocalls.

Third, the FCC recently adopted rules allowing voice providers to block certain types of calls.  USTelecom supported adoption of the rules and participated fully in the proceeding.  One issue the FCC raised is what protections legitimate callers should have if their calls are blocked due to the inappropriate scoring of their call.  That is an important topic both for situations where voice providers block numbers directly, and for blocking services that consumers may opt into in order to block or filter potentially unwanted calls.  It is an issue USTelecom and its members, and other parts of the robocall labeling/scoring ecosystem, have been wrestling with for years, and this fall we hosted a workshop aimed at helping develop "best practices" for the scoring and labelling of calls.  A follow-up workshop is scheduled next month.

Finally, we applaud our federal government partners in the robocall fight, who have engaged in a series of enforcement actions against bad actors that have reinvigorated efforts to curb this illegal activity.  For example, the FCC last year initiated enforcement actions against three entities that have resulted in more than $200 million in proposed fines targeting perpetrators of illegal robocalling.  The FTC also continues to engage in a series of complementary enforcement actions that target the worst of the worst bad actors in this space.  These civil enforcement actions brought by both agencies send a strong and powerful message to illegal robocallers that they will be located and brought to justice.  USTelecom and its industry partners stand ready to further assist in these efforts to

**EXHIBIT A**

bring this bad actors to justice.  Indeed, the ultimate goal of USTelecom's Industry Traceback Group is to identify the source of the worst of these illegal calls, and further enable further enforcement actions by federal agencies.

While current federal enforcement efforts are laudatory, they are mostly limited to civil enforcement.  We believe there is an acute need for coordinated, targeted and aggressive criminal enforcement of illegal robocallers at the federal level.  As a result, bad actors currently engaged in criminal robocall activities are – at most – subject only to civil forfeitures.  Given the felonious nature of their activities, criminal syndicates engaged in illegal robocalling activity should be identified, targeted and brought to justice through criminal enforcement efforts.  We believe, in particular, that U.S. Attorneys' offices across the country should prioritize enforcement where federal statutes, such as the Truth in Caller ID Act, are implicated, and should work closely with the FCC and FTC and international partners in enforcement cases, particularly when the calls originate outside of the United States.  While a holistic approach is essential to broadly address the issue of robocalls, robust enforcement efforts targeting illegal robocallers are most effective since they address the activity at the source. For example, consumer-centric tools may stop a series of calls from reaching tens of thousands consumers, whereas root-cause removal stops millions of calls from ever being sent.

All these recent developments further demonstrate the essential commitment from a broad range of stakeholders that will be necessary to effectively mitigate and defeat these scammers.  Indispensable industry stakeholders from a wide range of companies – including cable, wireline, wireless, and wholesale providers, as well as standards organizations, equipment manufacturers and apps developers – have advanced a concerted, broad-based, effort focused on developing practices, technologies and methods for mitigating phone-based attacks

**EXHIBIT A**

and scams.  This coalition has also expanded its cooperation with equally important stakeholders within the federal government and with consumer groups.  While our partners in government play a crucial enforcement role, our partners in consumer organizations are vital to raising awareness about the tools available to consumer to help mitigate illegal robocalls.

Industry efforts to address the illegal robocall issue remain ongoing and extremely energized.  Importantly, these efforts are being undertaken by the necessary broad range of industry stakeholders, including representatives from the wireline, wireless, wholesale, cable and app developer community, as well as critically important standards organizations.  The results of these comprehensive industry efforts are detailed in the industry-led Strike Force report submitted to the Federal Communications Commission in April of last year.  The collaborative efforts outlined in the report are highly detailed, extremely comprehensive and warrant more than a brief summary.  In order for the Committee to gain a better and complete understanding of these efforts, USTelecom is submitting the April Strike Force Report as an addendum to this written testimony.

In closing, let me again thank the Committee for holding this timely hearing.  We share the Committee's concerns, and we look forward to our continued work together to address this constantly evolving challenge.

# RELATED NEWS

**EXHIBIT A**

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074

PREPARED STATEMENT

*of*

Genie Barton
President
BBB Institute for Marketplace Trust

*Hearing on*
Robocall Scams

*Before the*
United States Senate Special Committee on Aging

Wednesday, October 4, 2017



EXHIBIT
4

**EXHIBIT A**

Chairman Collins, Ranking Member Casey, Members of the Committee, thank you for giving me the opportunity to appear before you today.

My name is Genie Barton, and I serve as President of the BBB Institute for Marketplace Trust (BBBI).

I appreciate the opportunity to describe for the Committee BBBI's ongoing work to fight scams. In the United States, 50 billion dollars are lost to scams every year.[1] Data collected through our new, crowd-sourced BBB Scam Tracker tool has greatly enhanced our understanding of the nature of this intractable problem and how to combat it. In this testimony, I will summarize our recent work, including relevant insights from our research and reports, and provide data focused on scams that prey on seniors, including scams initiated by robocalls.

BBBI is the 501(c)3 educational arm of the Council of Better Business Bureaus, the national umbrella organization of the more than 100 local Better Business Bureaus serving communities across North America. BBBI partners with and leverages the reach of the BBB network. Every BBB in North America participates in Scam Tracker, reviewing and screening each consumer report before it is entered in the central data base, which is powered by BBBI.[2] BBBI then publishes the reports.

BBBI equips BBB staff with resources and training programs that help them to better serve their communities, particularly seniors. Grassroots senior educational programs have long been an important focus of BBB educational outreach, with scams being a major part of this outreach. Local BBB offices often have relationships with state agencies working to address the interests of seniors and relationships with senior centers in their communities. For example, the BBB located in Pittsburgh, Pennsylvania works through the Pennsylvania Department of Aging, and many of its over 90 presentations last year took place at senior community centers in its service area. BBBs power BBB Scam Tracker by reviewing each scam report, and they routinely field inquiries and share data with state and local law enforcement, especially Offices of State Attorneys General.

For more than 100 years, BBB has been working to build a trustworthy marketplace where consumers and responsible businesses can prosper. In the United States, 50 billion dollars are lost to scams every year.[3] There is, we believe, no greater threat to consumers and legitimate businesses than the fraud perpetrated by con artists.

---

[1] Martha Deevy and Michaela Beals, *The Scope of the Problem: An Overview of Fraud Prevalence Measurement*, Financial Fraud Research Center, 2013.   http://longevity.stanford.edu/wp-content/uploads/2016/07/Scope-of-the-Problem-FINAL_corrected2.pdf at 28.
[2] The over 100 BBBs in North America vet the scam reports that originate in their service area, using both software and staff review to determine whether the consumer is reporting an event that a reasonable person would consider to be a scam or fraud. Only those reports are passed on to BBBI for publication in BBB Scam Tracker. Please note that we are not able to investigate and independently verify that an actual fraud has occurred, only that the *allegations* of fraud appear well-founded.
[3] Martha Deevy and Michaela Beals, *The Scope of the Problem: An Overview of Fraud Prevalence Measurement*, Financial Fraud Research Center, 2013.   http://longevity.stanford.edu/wp-content/uploads/2016/07/Scope-of-the-Problem-FINAL_corrected2.pdf at 28.

**EXHIBIT A**

It not only robs both consumers and legitimate businesses, but it does far more harm. It humiliates the individual scam victim. It damages the reputation of ethical businesses whose identities scammers assume. Finally, scams erode consumer trust and engagement in the marketplace.

**BBB Scam Tracker**

BBB Scam Tracker (www.bbb.org/scamtracker) gave BBB a crowd-sourced, digitally powered, 21st-century tactical weapon to fight the age old battle against fraud and deception. Launched throughout the U.S. and Canada in September 2015, BBB Scam Tracker is an interactive tool for consumers to report scams and fraud and warn others of malicious activity. Consumer reports capturing the scam in the consumer's own words are collected online and presented in a searchable online "heat map," showing consumers the number and types of scams reported in their communities. The tool provides a window on the scam landscape, enabling data-driven consumer alerts and tips based on current information. Reports are shared with the Federal Trade Commission for inclusion in its Consumer Sentinel database, with the National Cyber Forensics and Training Alliance, and with law enforcement agencies on request for investigative purposes.

Scam Tracker is well-positioned to operate as the pre-eminent consumer reporting tool about scams. Respondents to our 2016 survey of more than 2,000 individuals said they were more likely to turn to BBB to report scams than to anywhere else (including the police). A subsequent study by FINRA Foundation and Stanford Center for Longevity also found that BBB is the first organization the public thinks of to report a scam, providing independent verification.[4] To date, approximately 83,000[5] scam reports have been published, and the rate of reporting per day has increased by 54% from 2016 to the end of September this year.

BBB Scam Tracker's crowd-sourced approach taps the altruistic impulse that frequently motivates consumer reporting activity of scams and fraud. When consumers are asked what would drive them to report a scam, nearly 50% indicate that they would do so to help make sure it did not happen to someone else.[6] When the report is published, the consumer who has reported the scam often feels empowered by having taken action and less like a mere "victim". The consumer narratives drive home an important lesson—ordinary people like me get scammed. All of us are vulnerable. The impact of this reporting in warning others is amplified by our ability to connect reporters with individuals who are willing to be interviewed about their experiences.

---

[4] *Findings From a Pilot Study to Measure Financial Fraud in the United States*, at 22, http://162.144.124.243/~longevl0/wp-content/uploads/2017/02/SCL-Fraud-Report-Feb-2017_Draft2.pdf.

[5] *See generally*, Better Business Bureau, *BBB Scam Tracker*, https://www.bbb.org/scamtracker/us (last visited Sep. 27, 2017).

[6] Cracking the Invulnerability Illusion: Stereotypes, Optimism Bias, and the Way Forward for Marketplace Scam Education at 5, https://www.bbb.org/globalassets/shared/media/truth-about-scams/bbb-scamprogram-whitepaper-08-digital-0630.pdf

**EXHIBIT A**

**Figure 1:** Motives for Reporting a Scam



The data and stories we gather and share through BBB Scam Tracker also have given us the power to fight scams through new evidence-based research. This research gives us insight to better target and message our outreach to the general public and engages national and local media, boosting our effectiveness in raising public awareness. The reach and searchability of the Scam Tracker database also provides valuable assistance to law enforcement and regulators, and spurs academic researchers to add to our body of knowledge about scams.

Our 2016 study, *Cracking the Invulnerability Illusion: Stereotypes, Optimism Bias, and the Way Forward for Marketplace Scam Education*, shattered previous stereotypes about vulnerability to scams. In the study we demonstrated that that negative stereotypes around scam victimization predominate. When asked to describe a scam victim, consumers' responses were dominated by pejorative adjectives such as "naïve," "stupid," "gullible," "uninformed," and "old." We found that 83% percent of respondents believed that they were less at risk of being scammed than others.

Unfortunately, the belief that scams only happen to other people poses one of the biggest personal risks of all. Those who believe that it can't happen to them are less likely to heed warnings about scam activity and are not alert to the possibility that a seemingly legitimate phone call or email was actually from a scammer. One proof point is that the age group most likely to fall for a scam is actually millennials, a fact not widely recognized before this study. However, while on the whole seniors recognize their vulnerability and are therefore more cautious, when they are scammed they are most likely to suffer the largest financial loss.

While a number of studies have sought to understand the scope of the problem and the behavioral or psychological markers that distinguish scam victims, less has

**EXHIBIT A**

been done to identify the knowledge and information that might be effective in preventing scam targets from becoming scam victims. With this in mind, our research was crafted to explore the contours of what a successful education and awareness campaign might look like. Nearly 80% respondents cited general knowledge of scam tactics and scam types as being most important in avoiding scams.[7] The insights about scam victimization that Scam Tracker provides are helping us to better focus educational efforts to more effectively alert consumers.

In speaking to millennials and seniors alike, we strive to counter negative stereotypes with stories of real people that collectively convey the message that this can happen to anyone. We are *all* at risk and, by talking about our experiences, we help protect others with essential information about scam tactics and types. We empower ourselves, and we begin to chip away at some of the shame and stigma surrounding this issue.

The statistical insights we have derived from Scam Tracker data are important, but the value of individual stories is immeasurable, as they make the problem real and convey the critical message that this can happen to anyone. These reports also help us to understand what messaging will be most likely to best alert consumers to common traps.

## BBB Risk Index

In March of last year, BBBI release its first annual report of data gathered through BBB Scam Tracker, the *2016 BBB Scam Tracker Annual Risk Report*.[8] With this report we introduced the BBB Risk Index, a new, more nuanced conceptualization of risk. Prior to the introduction of the Index, attempts to compare scam types by relative risk, including by BBB, have generally consisted of simple rankings by frequency of exposure. This volume-based approach failed to acknowledge the multifaceted nature of scam risk. In fact, the risk posed to a given population by a particular scam type can best be understood by considering three dimensions: exposure, susceptibility, and monetary loss. By combining all three, as we have done with the BBB Risk Index, we are able to gain a far more meaningful measure of the relative risk of a given scam type. In our *Risk Report*, we applied the Index formula to various subgroups, including seniors, to identify the scams that present the greatest risk to each group.

To better understand the rationale for the Index, consider the broad spectrum of techniques employed across the scam landscape. On one end of the spectrum, a fraudster may employ a "wide net" approach. Robocalls, the subject of the hearing today, are an example of this technique. A scammer can inexpensively utilize robocalling technology to reach perhaps hundreds of thousands of individuals to find those few who would succumb to the ploy. While these scams reach a wide swath of the population, the susceptibility of those exposed is typically quite low.

---

[7] *Id* at 12.

[8] *2016 BBB Scam Tracker Annual Risk Report: A New Paradigm for Understanding Scam Risk* www.bbb.org/riskreport.

**EXHIBIT A**

At the other end of the spectrum is the far more intensive "high-touch" approach, as is commonly seen with romance and investment scams. These scams reach fewer individuals, but those exposed are often more likely to be successfully conned. Monetary loss is a final critical element. A con that separates mere pennies from its victims may do tremendous overall harm if it impacts a large portion of the population, while a scheme with relatively few victims may be of even greater concern if median losses are extremely high. The Index captures these real-world elements by representing the intersection of exposure, susceptibility, and monetary loss.

No law enforcement or regulatory agency has the resources to fight every scam. The Risk Index can help establish policy priorities and suggest resource allocation. The Risk Index can determine what are the greatest risks to a particular cohort of interest. In this testimony, we use the Risk Index to define the top 10 riskiest scams for seniors.

Approximately 16% of reports to BBB Scam Tracker are from individuals over the age of 65.[9] By applying the BBB Risk Index discussed earlier, we are able to identify the following scam types as being the top 10 most risky for this cohort.

1. Family/Friend emergency
2. Tech Support
3. Sweepstakes/Lottery/Prizes
4. Travel/Vacations
5. Investment
6. Nigerian/Foreign Money Exchange
7. Home Improvement
8. Online Purchase
9. Tax Collection
10. Fake Check/Money Order

---

[9] Data reported in this testimony is based on U.S. reports submitted to BBB Scam Tracker and published from the inception of Scam Tracker on February 13, 2015 through September 27, 2017, a period of approximately 20 months, except where otherwise indicated. These data updates result in statistics that differ from data reported in the *2016 BBB Scam Tracker Annual Risk Report*.

**EXHIBIT A**

**Figure 2** –Chart representing susceptibility, loss and exposure for top 10 risky scam types for the 65+ age category.



For seven out of these top ten scam types, the method of initial contact was a telephone call. In fact, 71% of *all* scams reported by seniors age 65+ began with a call. However, when we only look at reports that involved a monetary loss (i.e., where the target avoided the con), just 33% were initiated by telephone. This variance reflects the relatively low susceptibility levels common with telephone scams, particularly telephone scams that tend to be high-volume. For example, only 1 in 278 reports by seniors of the tax collection scam involved a dollar loss. Nonetheless, these scams are among the most risky to seniors due to high exposure levels and serious monetary losses.

Our data show that when a senior loses money to a scam, the dollar loss is typically nearly 56% greater than losses incurred by younger individuals. The median reported loss by seniors is $390, while the median loss reported by those under the age of 65 is $250. The harm to retirees is further exacerbated because they are likely living on a fixed income.

**EXHIBIT A**

**Robocall Data**

While we ask individuals reporting a scam to indicate if the scam was initiated by telephone, we do not currently ask if a robocall was involved. We are therefore unable to provide precise information on the percentage of all scams reported to us that were initiated by robocalls. We will consider revising this question to shed greater light on the impact of scams initiated by robocalls.

Fortunately, we do have the ability to search by keyword and have done so with respect to robocalls. The more than 400 mentions of the keyword "robocall" in consumer narratives about their experiences serve as a marker to help us understand which scams are most common among those perpetrated using this technology. The distribution of keyword "robocall" across scam types is represented in Figure 3.

**Figure 3** – Scam type distribution of reports with keyword "robocall" during the period of January 1st 2016 to June 20th 2017.



There were no reports of the "family and friend emergency" scam that included the word "robocall," and tech support scams were grouped in the "other" category as just five of these reports included this keyword. These two common and high-risk telephone scams thus appear to be infrequently perpetrated using robocall technology.

However, we caveat this conclusion based on the fact that a high number of scams are initiated by telephone and not all consumers will highlight the fact that some form of autodialer may have been used to initiate contact.

IRS Tax Collection Scam

**EXHIBIT A**

Given that seniors are more vulnerable to the tax scam as compared to other demographics and tend to suffer greater financial losses, I would like to expand here on the information available to us on this scam type as gathered through BBB Scam Tracker reports.

In 2016, approximately 27% of all scams reported to us by seniors and 16% of scams across all age groups were classified as tax collection scams. The police raid on a call center in Mumbai, India in October 2016 resulted in an immediate 95% drop in reports of tax collection scams to BBB Scam Tracker, a decrease that continued through December of 2016, as shown in Figure 4. By January of 2017, reports of the tax scam were on the rise again, but much more slowly than in 2016. The steep drop in reports in fall 2016 is suggestive of a correlation.  Today, our volume of tax scam reports has risen but is approximately 30% of the volume seen at the peak in 2016. While our data cannot explain why reports have not risen to 2016 highs, our ability to immediately detect these shifts shows the power and sensitivity of BBB Scam Tracker to take the pulse of the scam marketplace.

**Figure 4:** Evolution of Reports of Tax Collection Scams from January 2015 to September 2017.



As was set forth in Figure 3 above, we estimate that the IRS scam represents 20% of all robocall scams. While susceptibility levels are low, median losses are very high relative to other scam types. The median loss reported by seniors is more than $3,000. Payment is typically collected by directing victims to read the numbers from prepaid cards, often iTunes cards, or to wire funds. Scammers often provide specific instructions about retail locations to complete these transactions, and are known to direct consumers to move from one location to another to reduce the risk of intervention by agents of the wire transfer services.

The statistical data we are able to derive from BBB Scam Tracker yield valuable insights. In addition, consumer narratives are highly instructive and help us to

EXHIBIT A

understand the way scammers are working, how consumers are "falling for" the scam, and what educational approaches might be helpful. The following is an account reported to BBB Scam Tracker by a senior in Indiana who lost $10,000:

*"I received a phone call from a man claiming to be with IRS stating that I owed money. If I didn't pay they would send me to prison. He stated I would need to go to Walmart (4 different locations) to send money to them. I did wire money to them as requested. I figure that I sent approx. $10,000 total via wire transfer. I sent the money . . . I did this because I didn't want to go to prison. I thought they were honest people. I now know this was a scam."*

BBB has found simple, unambiguous consumer fraud prevention messages to be the most effective. For years BBB had a simple message for consumers: the IRS will never call to demand immediate payment. However, in light of the fact that now that the IRS is using four private collection agencies (PCAs) to call consumers about outstanding debt, BBB has retooled our consumer fraud messaging to focus instead on pressure techniques and payment methods. We now emphasize that the IRS or its representatives will never ask you to pay over the telephone and that payments can be made in only one of two ways: Online at IRS.gov or by check or money order made out to the U.S. Treasury. We also make sure that consumers know that the IRS will never threaten them with arrest.[10]

Fraud prevention messages emphasizing that the IRS or its PCA representatives will never call you without first sending at least two letters are less helpful and may be problematic because individuals who receive these letters may also receive tax scam calls. Consumers who did not receive letters may assume that the letters simply got lost in the mail. We also know that scammers have learned to reference letters, even using the identifying codes for legitimate IRS notices, as we see in this recent report from a woman in New York who lost nearly $11,000:

*"'Agent Teresa Moss' and 'Agent Richard Watson' called me and told me I had a warrant for my arrest for tax evasion . . . . they were the IRS and had sent me letters (which I never received). They asked me if I lived at my address (I confirmed that they had the correct address), but I told them I was certain I never received these notices (they called them the 'CP 200 notice,' and the 'CP 11A notice') . . . . throughout the day they instructed which stores around my home I could visit to purchase $50 and $100 iTunes gift cards. I was then to immediately scratch off the sticker on the back and recite the serial code to them. I was to buy only a few at a time and not attract suspicion within the various stores . . . For eight hours I walked around and purchased these gift cards."*

The threat of arrest is a common intimidation tactic and is characteristic of many of the IRS scam reports where consumers suffered a monetary loss. Therefore anti-fraud messaging that states that the IRS or PCAs acting on behalf of the IRS will never threaten you with arrest may also be useful and may help prevent consumers from getting rattled and panicking.

---

[10] BBB runs scam alerts on the Scam Tracker website and also provides consumer tips on scams, including the IRS scam. *See, e.g.* BBB tips explaining the tax scam in the U.S. and Canada at https://www.bbb.org/taxscam/.

**EXHIBIT A**

"Can you hear me?" Scam

Beginning in early 2017, BBB began to receive large numbers of reports involving interactive robocalls where consumers are asked "Can you hear me?" or some variant apparently intended to solicit a "yes" response. A staggering one third of all published reports to BBB Scam Tracker this year to June 30th, 2017 can be classified as "Can you hear me?" calls.[11] As shown in Figure 3, 34% of all reports with keyword "robocall" are "Can you hear me?" calls. Often, these calls terminate immediately following a response. In other instances, the calls continue with additional recorded content and questions. Some are transferred to a live operator. The purported intent of these calls varies, and includes free vacations, sweepstakes, and government grants. Interestingly, only a tiny fraction of these reports (fewer than 1 in 1,000 reports) relate to tax collection. We believe the volume of reports is, at least in part, attributable to significant media coverage around this problem, but it also suggests a concerning trend toward more sophisticated uses of interactive robocall technology by con artists.

The example of a report below shows an individual who reported a $199 dollar loss due to a Robocall scam scenario.

*"[T]hey call you saying that you have been approved for a loan. they are going to ask if you are able to hear them, say no...do not say yes. they more then [sic] likely have all your information already. they [sic] will go through all that with you. and then they tell you that they are not able to use your accounts due to fees, and say that they can western union the money to you as long as you pay the fees first. if [sic] you decided to cancel your decision, they will say that you now owe them $199 cancellation fees. and they will take it directly from your account"*

The example of a report below shows an individual who encountered a robocall scam scenario but did not incur a financial loss.

*"I received a call asking if I wanted to follow up on an inquiry for employment. Seeing as I've been applying for jobs, and honestly a bit desperate for one being a college student, I immediately fell into "interview mode" and said "yes" only for them to hang up. Nothing has actually happened yet, however with the sheer amount of scammers going around I felt like others should know about this method in case something does happen. I already had anxiety about answering the phone for numbers I'm not familiar with, and this is only making it much worse."*

Of the nearly 10,000 published "Can you hear me?" reports, fewer than 20 involve a reported dollar loss, and those losses cannot be definitively connected to a "yes" response. We remain uncertain as to precisely what is the endgame of these scams. Cramming may be one possible outcome, but it is also possible that the "Can you hear me?" question is intended simply to confirm a live person has answered. The information we have on the volume and substance of these calls suggests an intent

---

[11] "Can you hear me?" is not one of the 30 scam types used in BBB Scam Tracker. The vast majority of these reports are classified as "phishing" or "travel/vacations." For purposes of Figure 3, we have reclassified reports as needed to create a "Can you hear me?" category.

**EXHIBIT A**

to perpetrate a scam, but there are a large number where the caller simply disconnects, perhaps suggestive of a nasty, annoying prank.

**Conclusion**

In conclusion, we stand ready to assist this Special Committee, other congressional committees, the FTC, the IRS, the FBI, and any federal, state, or local agency with efforts to protect consumers from scams. As we have learned through our data collection and through our research, everyone is at risk. Everyone is vulnerable. We believe that government, media, consumer stakeholder groups, industry associations, and individual businesses both large and small, all have a role to play to fight back effectively against scams. BBB offers tools to help empower consumers to identify the common tactics and to learn to recognize the "red flags" that indicate a scam. We welcome the opportunity to share our data, our messaging, and our outreach capabilities to help put a halt to this immense problem.

Thank you very much for inviting me to be here today, and I would welcome the opportunity to answer any questions you may have.

**EXHIBIT A**

# CHASE ●
Printed from Chase Personal Online

## CREDIT CARD

$3,775.00

Sale

Sep 4, 2020
Transaction date

Sep 7, 2020
Posted date

DATE FILED: July 21, 2021 11:50 AM
FILING ID: BE6BD5EFE8AB7
CASE NUMBER: 2021CV30074

VEHICLE WARRANTY
(800) 372-4420

|  |  |
|---|---|
| Description | VEHICLE WARRANTY |
| Also known as | VEHICLE WARRANTY |
| Method | Online, mail or phone |
| Card number | |
| Category | Bills & utilities |
| Reference number | 24141660250017039385960 |

Rewards earned with this transaction

| | |
|---|---|
| + 1 mile per $1 spent on all purchases | 3,775.00 |
| Total MileagePlus® Miles | 3,775.00 |

Transaction details may be preliminary or incomplete and may not match the transaction as it appears on your periodic statement, which is the official record of your account activity.

JPMorgan Chase Bank, N.A. Member FDIC          ©2020 JPMorgan Chase & Co.          Equal Opportunity Lender

**Exhibit 5**

**EXHIBIT A**

From: **Quotes and Confirmations** noreply@pomdriving.com
Subject: A Message From Auto Renewal Center
Date: September 4, 2020 at 3:27 PM
To: keener.quiat@gmail.com





Your Purchase Confirmation

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074

peace of mind
for that next bump in the road...

Jane Keener Quiat
470 Wooden Deer Rd
Carbondale, CO 81623

***Congratulations on your intelligent decision to activate your vehicle protection plan while you still qualify.*** Statistics show that your decision to protect your vehicle will most likely save you more money than any other form of insurance you currently have. In about 10-14 days, your application will be processed and you should receive your plan in the mail. You will enjoy the peace of mind knowing that your finances will not be disturbed whenever a repair may be necessary.

## Important Benefits*

Claims paid by credit card directly to the repair facility.
Honored at the licensed repair facility of your choice.
Parts and Labor coverage included.
Rental and Towing coverage is included on most plans.
Increased vehicle resale value by offering to transfer the warranty to the new owner.

* not applicable for all plans

I am happy to answer any questions and I am looking forward to your call.

**Vashti Salazar**
**844-273-9727**

EXHIBIT
6

EXHIBIT A

## Vehicle



**2014 CHEVROLET VOLT**
**Current odometer reading: 94,877**
**VIN: \*\*\*\*\*\*\*\*\*\*\*\*\*133310**

## Coverage Plan

**60 Months / 50,000 Miles**
**Platinum Deluxe**
**Expires: 10/03/2025 or 145,877 whichever occurs first**
**Deductible: $ 100**

## Plan Cost

| | |
|---|---|
| Subtotal: | $3775.00 |
| Tax: | 0.00 |
| Total: | 3775.00 |
| $ Down: | 3775.00 |
| # Payments: | 0 |
| Monthly Payment: | 0.00 |

**Please call me when you receive your paperwork so that I can answer any questions you may have.**

**Click Here to View Terms and Conditions**



Auto Renewal Center | 6789 Quail Hill Pkwy, Suite 605 Irvine, CA 92613 | 844-273-9727

**EXHIBIT A**

The purchaser acknowledges that the Application Page, containing the Purchaser Information, Seller Information, Vehicle Information, Payment Plan Information, and Service Contract Information; the Coverage/Contract Identification Card; and the Terms and Conditions contained herein constitute the entire **Vehicle Service Contract** between CarGuard Administration, herein "the Company" and the Customer. The components, parts, and exclusions listed under the Terms and Conditions and Coverage Details section constitute the entire Terms and Conditions of this contract, and shall be used in adjudicating any and all claims arising under this contract. **The customer agrees** to maintain the **Vehicle** in accordance with the Terms and Conditions, The Required Maintenance Section contained in the Terms and Conditions of the Vehicle Service Contract, and follow all of the manufacturer's recommended maintenance requirements.

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074

In the event of a breakdown and/or repair, the customer <u>must obtain prior authorization of the Company</u> by following the instructions listed in the "Filing a Claim" section of Terms and Conditions of the Vehicle Service Contract.

This **Contract** is neither an insurance policy nor a seller's warranty. This **Contract** may run concurrently with and is secondary to any manufacturer's warranty still active on the vehicle.

After thirty days from the date of purchase of this Service Contract as stated on the Application Page, if the Customer has not contacted the Company or the Selling Agent to cancel this Vehicle Service Contract, the customer hereby agrees to all of the terms and conditions of this Vehicle Service Contract. The Customer agrees that they have reviewed and understand all of the time and mileage limitations, coverage, exclusions, and that the repair of non-covered components are excluded from **Coverage** under the Vehicle Service Contract. All of the "add-on" options as marked on the Application Page are clearly marked above. The customer agrees that he or she has read and understand the **Platinum Deluxe Service Contract** in its entirety, and fully understands all of the terms and conditions therein. Further, the customer agrees that they have read the "Responsibilities of this Contract" section of the Terms and Conditions. The customer further agrees that he, she, or they have received this contract, and all of the information contained on the Application Page is correct. The Customer understands it is his, her, or their responsibility to contact the Company to update or correct any inaccurate information contained on the Application Page. **THE CUSTOMER UNDERSTANDS AND HEREBY AGREES TO ALL OF THE ABOVE, AND THAT THIS CONTRACT WILL BE BY AND BETWEEN THE ADMINISTRATOR (CARGUARD ADMINISTRATION, INC)** and the Applicant.

CGA-Exclusionary PT Hybrid WIC
Form Number 10-1102 WIC          Page 2          Rev. 040120

**EXHIBIT 7**

# Platinum Deluxe Service Contract

## SECTION I. DEFINITIONS

The following definitions apply to words frequently used in this contract:

**Agreement, Service Agreement, Service Contract, Vehicle Service Contract, or Contract** means this **Platinum Deluxe Service Contract** that is by and between **You and Us.**

Administrator means **CarGuard Administration, INC,** whose principal place of business is **4742 N. 24th St. Suite 300, Phoenix, AZ 85016 ,** which is the entity that is obligated to perform hereunder.

**Authorized Repair Facility** means any dealership, local mechanic repair facility, or other vehicle repair facility that is certified to perform mechanical repairs on motor vehicles from the National Institute for Automotive Service Excellence (ASE) located in the United States or Canada.

**Breakdown** and/or **Mechanical Failure** means the failure of an original or replacement part covered by this **Agreement** to perform its function as it was originally designed to work in normal service with required maintenance due to material failures, mechanical failures, or defects outside the manufacturer's tolerance.

**Commercial Use** means **Vehicles** used for farming, ranching, route work, job-site activities, service or repair work, and delivery of goods. Usage must not exceed the manufacturer's ratings and/or limitations. In order for commercial use vehicles to be covered under this contract, **the Commercial Use surcharge** box must be checked on the original **Application Page.** If this is not checked, it is your responsibility to contact us to add the surcharge.

**Coverage** means the component protection **You** selected as shown in this **Contract** and on your **Identification Card.**

**Covered Part(s)** or **Covered Repairs** means the parts listed under "Section IV. Coverage" of this Contract and any parts listed on section "VII. Add On Coverage Options" of this Contract if those "add ons" are selected on the Application Page of this Contract.

**Deductible** means the amount of money **You** are required to pay as selected on the Application Page for covered **Breakdown** claims. The **deductible** will be due and owing each visit to a repair facility for covered **Breakdown** claims. Once a Covered part is repaired or replaced under the terms of this **Contract,** there will be no **Deductible** for future repairs to that part.

**Dealership** means the original venue where **Your** car was purchased.

**Effective Date and Mileage** means the date **You** purchased **Your Contract** and the odometer mileage on **Your** vehicle at the time **You** purchased this **Contract.** This is indicated as the Effective Date and Contract Expiration Mileage on the Application Page of this Contract.

**EXHIBIT A**

**Expiration Date and Mileage** means the date and/or mileage when **Your Contract** is no longer in force. **Your Contract Expires** once the **Contract Expiration Date or Contract Expiration Miles** are reached as defined **on the Application Page of this Contract.** Once either of these two conditions are met, this Contract shall no longer be in force.

**Finance Agent** or **Payment Plan Provider** means the company that is providing the payment plan or financing for this **Contract.** The Finance Agent or Payment Plan Provider places a lien against any refunds due on this contract until they have been repaid by **You** in full.

**Identification Card** means the card that was sent to you, which becomes part of this **Contract.** It gives information about **You, Your Vehicle, Coverage** chosen and other significant information, including your **Contract Number.**

**Contract Number** is the number **We** use to identify this **Contract** on **Your Vehicle.**

**Pre-Existing Condition** means a condition, breakdown, or mechanical issue that within all probability occurred before **Your** purchase of this **Service Contract.**

**Selling Agent, or Seller** means the company that sold this **Contract** to **You.** The identity of the selling agent is listed on the Application Page.

**Vehicle** means the **Vehicle** which is listed on the Application Page.

**Waiting Period** means the period of time and mileage that must transpire before a claim may be filed hereunder. Unless otherwise indicated on the Application Page of this Contract, the waiting period is equal to thirty days **of the Effective Date** and **one-thousand (1,000)** miles from the **Effective Mileage** of this Contract. If a different Waiting Period is indicated on the **Application Page** of this Contract, then the period of time and mileage as indicated on the Application Page of this contract must transpire from the **Effective Date and Effective Mileage** of this Service Contract before a claim may be filed. **The waiting period time and mileage shall be added to the end of the contract term.**

**We, Us, Our** means the entity who is obligated to perform under this **Contract** ("the obligor"). The obligor of this **Contract** is **CarGuard Administration, INC** at **4742 N. 24th St. Suite 300, Phoenix, AZ 85016**.

**Wear and Tear** means the gradual reduction of performance of a part beyond the manufacturer's specified tolerances that occur naturally under normal operating conditions, which ultimately results in the failure of that part.

**You, Your** means the **Contract** Purchaser (or purchasers) shown on the Application Page, **or the person or persons** to whom this **Contract** is transferred in accordance with the Terms and Conditions of this Contract.

## SECTION II. TERMS AND CONDITIONS

**Nature of Agreement:** This is a Vehicle Service Contract between **You** (Contract Holder) and **Us. You** agree and understand that this **Contract** is a Vehicle Service Contract and not an insurance policy.

**EXHIBIT A**

**Entire Agreement:** This **Contract,** including the Application Page, Terms and Conditions, Identification Card, limitations, exclusions, exceptions, and definitions, together with any endorsements, if any, constitute the entire **Contract.** No one other than the parties hereto, by mutual agreement, may change this **Contract** or waive any of its provisions. This **Contract** gives the Contract Holder specific rights. **You** may have other contract rights, which may vary from state to state in the United States, or between province to province in Canada. Please see the" State-Specific Requirements" of this contract for specific information pertaining to your individual state or province.

This **Contract** covers mechanical **Breakdowns** that are expressly covered under this Contract**,** and is for the sole benefit of the Contract Holder named herein, and only applies with respect to the **Vehicle** described on the Application Page.

**This Contract shall be invalidated** if there has been a tampering, inaccuracy, or alteration to the odometer mileage of the **Vehicle** so that the **Vehicle's true and actual mileage** is not shown on the odometer and cannot be determined. **In the event the odometer becomes inoperable during the term of this Contract, You must immediately contact Us within thirty (30) days of the odometer becoming inoperable** and provide us with documentation to show the odometer has been repaired properly. Failure to notify us or provide this documentation may result in us cancelling this Vehicle Service Contract.

This Vehicle Service Contract provides benefits for **Breakdown** of **Covered Parts** installed by the **Vehicle** manufacturer, as those terms are defined above.

**Coverage Period: Coverage** under this **Contract** begins upon expiration of the **Waiting Period** and will expire on the **Expiration Date or Mileage** measured from the **Effective Date and Mileage,** whichever occurs first, as shown on this Application Page, and/or when the **Limits of Liability** have been reached.

**Breakdown:** In the event of a **Breakdown** of any of the **Covered Repair(s)** listed below for Coverage, that are covered under this **Contract, We** will pay directly to **the Authorized Repair Facility** any pre-authorized reasonable expenses incurred for the repair or replacements of the part(s), less any Deductible, as stated in this Contract. Reasonable expenses shall include, but not be limited to, the parts, components, or units, which are not to exceed the manufacturer's suggested retail price (MSRP), which are necessary to repair or replace the failed covered part; the repair facility's labor rates, which are not to exceed the average market value for labor rates in the area that the **Authorized Repair Facility** is located in (area shall be defined as a fifty-mile [50] radius), which shall be multiplied by the amount of reasonable time in hours or sections of hours it may take to repair the part and/or vehicle (reasonable time shall be determined by data in the national labor time guide); and any reasonable tear-down or diagnostic expenses to investigate the cause of failure in the event the repair is a Covered Repair (reasonable tear-down or diagnostic expenses shall be determined by the market rates within the area within a fifty-mile [50] radius). Replacement of **Covered Parts** that have experienced a **Breakdown** may be made with original equipment manufacturer parts, non-original equipment manufacturer parts, re-manufactured parts, or used parts at the **Administrator's** discretion.

CGA-Exclusionary PT Hybrid WIC                 Page 5                       Rev. 040120
Form Number 10-1102 WIC

**EXHIBIT A**

**Deductible:** In the event of a **Breakdown** of any **Covered Part(s)** listed below, **You** may be required to pay a **Deductible.** The amount stated in the **Application Page** of this **Contract** shall be the deductible that will be paid by **You** upon each visit to the **Authorized Repair Facility,** for **Covered Repairs.** If that amount is equal to zero ("0"), **you will not be required to pay a deductible on any Covered Repair(s)** as long as this contract is active. Should a covered **Breakdown** require more than one visit to repair, **You** will only have to pay the deductible once for the **Breakdown.**

**Limit of Liability:** The aggregate limit of liability will be the greater of the average trade-in value of the Vehicle as provided by the NADA Guidelines as of the date of a filed claim, or $12,500.00. Once the maximum limit of liability has been reached, as defined above, this contract, its transfer and cancellation rights terminate.

**Labor Rates and Parts: We shall only be required to pay the prevailing labor rate for all repairs. Further in the event of a covered repair, We shall only be required to repair the Vehicle with parts and/or components that we select, Including the use of used, remanufactured, refurbished, or reconditioned parts and/or components. At the administrator's request the vehicle may be moved to another repair facility.**

**Incidental and Consequential Damage Limit of Liability: Our liability of incidental and consequential damages including, but not limited to, personal injury, physical damage, property damage, loss of use of Your Vehicle, loss of time, loss of wages, inconvenience, and commercial loss resulting from the operation, maintenance, or use of Your Vehicle is expressly excluded.**

## SECTION III. CONTRACT HOLDER'S RESPONSIBILITIES

**Contract Holder's Maintenance Requirements: You** must have **Your Vehicle** checked and serviced in accordance with the manufacturer's recommendations, as outlined in the Owner's Manual. **Your Vehicle's Owner Manual** lists different servicing recommendations based on **Your** individual driving habits and climate conditions. **You** are required to follow the maintenance schedule that applies to **Your** driving habits and climate conditions. Failure to follow these recommendations may result in the denial of claims.

**Oil Changes and Verifiable Receipts:** In the event of a **Breakdown, We** may request oil change and/or service records to verify that maintenance has been properly done. If **You perform your own maintenance and/or service, You** must retain all receipts that show the purchase of materials used in the **Vehicle** maintenance process.

**Filing a Breakdown Claim:** If **Your Vehicle** incurs a **Breakdown, You must take the following steps to file a claim:**

1.  **Prevent Further Damage-** Immediately take action to prevent further damage to **Your Vehicle.** The operator of **Your Vehicle** is responsible for observing **Vehicle** warning lights, gauges, and sensory items that indicate a potential **Breakdown.** Upon this observation, you must immediately arrange for the vehicle to be diagnosed. **Failure to properly** take this action may result in the denial of claims.

**EXHIBIT A**

2. Take your vehicle to the Authorized Repair Facility- If **Your** Vehicle incurs a **Breakdown,** take **Your Vehicle** to any **Authorized Repair Facility.** As stated in the "Definitions" section of **this Contract,** an **Authorized Repair Facility** is any dealership, repair facility, or other business that is certified to repair motor vehicles by the National Institute for Automotive Service Excellence (ASE) in the United States or Canada.

3. **Obtain Authorization from the Administrator.** Once **You** have taken **Your** vehicle to the **Authorized Repair Facility,** give them your **Contract Number**. **The Authorized Repair Facility must then contact Us at (888) 907-0870 and obtain authorization to proceed with the claim.** Any claim for repairs **without prior authorization from Us may** be denied, with the exception of **Emergency Repairs** as defined in this section of **the Contract.** The amount authorized by **Us** will be the maximum amount that will be paid for repairs covered under the terms of this **Contract.** Any additional amount must obtain **additional approval from Us** by contacting the same number as stated above.

4. **If applicable, Authorize Tear-Down and/or Inspection-** In some cases, **You** may need to authorize the licensed repair facility to inspect and/or tear down **Your Vehicle** in order to determine the cause of failure and cost of the repair. **We will pay this fee, up to the maximum market rate amount;** if the breakdown is a **Covered Repair.** The repair facility **must get prior authorization to begin the** teardown by calling the claims number as stated above.

5. **Review Coverage-** After **We** have been contacted, review with the service manager what will be covered under this **Contract.**

6. **Pay any Deductible (If Applicable)- You** must pay to the **Authorized Repair Facility** any required **Deductible,** as stated in "Terms and Conditions" section of this **Contract.** As stated in the "Terms and Conditions" section of this **Contract,** we will pay for the amount of the **Breakdown** on a **Covered Repair** less the deductible. In the event there is no deductible as stated on the Application Page, **you will not be required to pay a deductible.** All repair orders, requested documentation, and invoices from the **Authorized Repair Facility** must be submitted to **Us** within thirty (30) days (three hundred sixty- five [365] days in Wisconsin) to be eligible for payment.

**Emergency Repairs:** Should an emergency occur which requires a repair of a **Breakdown** to be made at a time when **Our** office is closed, **and failure to repair the Breakdown immediately will either 1) render Your Vehicle unsafe to drive, 2) result in further damage to Your Vehicle or, 3) cause other components on Your Vehicle to fail,** follow the claim procedures above without authorization, **and We** will make reimbursement to **You** or the **Authorized Repair Facility** in accordance with the provisions of this **Contract** if the **Breakdown** is a **Covered Repair.** You must contact **Us** within three (3) business days from the date of repair to determine if the repair is a **Covered Repair. No Emergency Repairs will be reimbursed without authorization in excess of $500.00 per occurrence.**

<u>**For claims assistance, please contact Us, the Administrator, CarGuard Administration, INC at (888) 907-0870, NO CLAIMS WILL BE PAID UNLESS THE STEPS ABOVE ARE FOLLOWED.**</u>

**EXHIBIT A**

## SECTION IV. COVERAGE

**Platinum Deluxe Coverage** provides for the payment or reimbursement of costs authorized by **Us, the Administrator,** to repair or replace a **Breakdown** of **ALL OF YOUR VEHICLE'S PART(S) OR COMPONENTS,** including seals and gaskets, except those parts, components, and conditions listed in the section of **this Contract labelled "V. Exclusions- What is Not Covered",** less **Your Deductible, in** accordance with all terms and conditions of this **Contract** until your **Vehicle** has an odometer reading of 125,000 miles.

**Once Your Vehicle surpasses 125,000 total miles on Your Vehicle's odometer, We will provide for the payment or reimbursement of costs authorized by Us, the Administrator,** to repair or replace **a Breakdown of the following parts from the time Your vehicle surpasses 125,000 total miles on Your Vehicle's odometer until this coverage expires:**

**ENGINE (GAS/DIESEL)-** The following parts are covered: pistons, piston rings, crankshaft and main bearings, connecting rods and rod bearings, camshaft and camshaft bearings, timing chain and timing gears, intake and exhaust valves, valve springs, oil pump, push rods, rocker arms, hydraulic lifters, rocker arm shafts and water pump. The engine block and/or cylinder heads are also covered if the above-listed parts cause a Breakdown of the engine block and/or cylinder heads.

**TURBO/SUPERCHARGER:** (Factory installed only) All internally lubricated parts of the factory installed turbocharger/supercharger. The turbocharger/ supercharger housing is covered if the internally lubricated parts cause a Breakdown of the turbocharger/supercharger housing.

**TRANSMISSION/TRANSAXLE:** All internally lubricated parts of Manual or Automatic Transmissions, including oil pump, drums, planetaries, sun gear and shell, shafts, bearings, side gears, carrier pinion gear, ring gear, shift rail, forks, synchronizers, and Torque Converter. Breakdown of the Transmission/ Transaxle case is covered only if caused by the failure of an internally lubricated covered part.

**DRIVE AXLE:** All internally lubricated parts. Drive axle housing is also covered if damage is caused by Breakdown of an internally lubricated part.

**TRANSFER CASE:** All internally lubricated parts of the 4 x 4 Transfer Case. Breakdown of the Transfer Case is covered if caused by the failure of an internally lubricated part.

**SEALS & GASKETS:** Seals and gaskets are only covered when required in connection with the replacement or repair of a covered part.

**EXHIBIT A**

Once Your Vehicle surpasses 125,000 total miles on Your Vehicle's odometer, any parts not listed in this section for coverage are not covered by this Contract, with the exception of "Add On" parts as selected on the Application Page of this Contract and defined in "Section VII. Add On Coverage Options".

## SECTION V. EXCLUSIONS – WHAT IS NOT COVERED

**Coverage** is not provided under this **Contract** for any of the following **Exclusions:**

**Pre-Existing Condition(s): Any Vehicle found not to be in good mechanical order at the time this Contract is placed on the Vehicle, or any failure that occurred prior to the purchase of this Contract. Any breakdown and/or failure, whereby the cause of failure occurred due to a condition that pre-dated the purchase of this Contract shall also be expressly excluded from coverage.**

**Any Breakdown that occurs during waiting period of this Contract.**

**For damage to a covered part caused by the failure of a part that is not listed as covered under this Agreement.**

**When the responsibility for the repair is covered by an insurance policy, or any warranty from the manufacturer, such as extended drive train, major component or full coverage warranties (regardless of the remaining manufacturer's warranty when You purchased this Agreement), or a repairer's guarantee warranty regardless of their ability to pay. Further, Coverage under this Agreement is similarly limited in the event of a Breakdown if the manufacturer has announced its responsibility through any means, such as a recall.**

**Technical Service Bulletins and Factory Service Bulletins, whereby the manufacturer has declared a known defect or recurring issue with Your Vehicle, shall also be expressly excluded from coverage under this Agreement. This shall apply even if the manufacturer has elected not to pay for repairs through a recall or other method.**

**Any covered repair not authorized in advance by Us, except those Emergency Repairs, as outlined in this Contract, in section "III. Contract Holder's Responsibilities".**

**Damage caused by continued operation of an impaired vehicle.**

**Any aftermarket part or component that was installed in the Vehicle to replace an original manufacturer's part or component that is salvaged or was not replaced in accordance with the manufacturer's recommended specifications.**

**Overloading the Vehicle beyond the manufacturer's recommended capacity. Breakdowns that have occurred due to Wear and Tear.**

**Repairs when Your Vehicle's odometer reading does not reflect the true mileage the vehicle has been driven for whatever reason.**

**EXHIBIT A**

Any breakdowns caused by any modifications, alterations, and/or additions to Your Vehicle, or if any modifications, alterations, and/or additions have been made to Your Vehicle You are using or have used Your Vehicle in a manner not recommended by the Manufacturer, including but not limited to, the failure of any custom or add on/aftermarket part regardless if supplied by a franchised dealer or not, all frame or suspension modifications, lift kits (unless the lift kit option is marked on the Application Page and not to exceed 6 inch of combined lift), oversized/undersized tires or wheels not recommended by the original manufacturer (unless lift kit option is marked on the Application Page and not to exceed 6 inches greater than the Manufacturer's specifications), trailer hitches.

Also not covered are any emissions and/or exhaust systems modifications, engine modifications, transmissions modifications, and/or drive axle modifications, which includes any performance modifications.

Any breakdowns caused by any use of Your Vehicle not recommended by the manufacturer, or if Your Vehicle is used for towing (unless your Vehicle is equipped with a factory installed or factory authorized tow package), or is used for Commercial Use (unless the Commercial Use option is selected on the Application Page and only as defined under the Commercial Use Add On Options section of this Agreement), or is used for snow removal (unless the Snow Plow option is selected on the Application Page of this Contract), rental, taxi, limousine, livery, or shuttle, towing/wrecker service, road repair, construction, dumping (dump beds), cherry pickers, lifting or hoisting, police or emergency service, off-road use, pre-arranged or organized racing, or competitive driving.

A Breakdown caused by or related to towing a trailer or another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose OR "Commercial Use" is selected as a surcharge on the Application Page of this Contract.

Vehicle used commercially except if the commercial usage surcharge is selected on the application for those eligible usage as defined in Section 1. This contract and the commercial use surcharge is not eligible for vehicles used for rental, taxi, limousine or shuttle, towing/wrecker service, dumping, cherry pickers, lifting or hoisting, police or emergency service, off-road use, snow-plows, prearranged or organized racing, or competitive driving.

Repairs made outside of the United States and Canada.

Repairs required because of technician negligence, detonation, sludge or carbon deposits caused by negligence, contamination, rust and corrosion caused by negligence, and/or operation without the proper lubrication levels or fluid type.

Damage caused by pre-ignition detonation, pinging, improper/contaminated fuel including fuels containing more than ten-percent (10%) ethanol if the engine was not manufacturer for this mixture, excessive fuel conditions, lean fuel conditions, clogged fuel injectors, improper lubricants, or improper engine adjustments. Any mechanical Breakdown caused by failure to maintain proper levels of lubrication, lubricant blockage, coolant blockage, lack of lubrication, or carbon buildup in cylinders.

EXHIBIT A

Repairs required because You did not properly maintain Your Vehicle, as outlined in this Contract in "III. Contract Holder's Responsibilities".

Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, road hazards, off-road racing or use, vandalism, riot, theft, fire, war, acts of God, or the loss that is normally covered by Casualty and/or Collision insurance. Loss, damage, or expense resulting directly or indirectly from any intentional, dishonest, fraudulent, criminal or illegal act committed by You, Your employee or agent, or occurring due to confiscation or repossession.

Repairs that are covered under a repairer's guarantee or another Service Agreement Provider's coverage, and/or repairs that are covered under an insurance policy, or a manufacturer and/or dealer customer assistance program or service agreement.

For any of the following parts: hoses, brake pads, brake linings/shoes, wiper blades, belts, thermostat housing, shock absorbers, carburetor, air springs and air struts, headlight assemblies, taillamp assemblies, blind spot sensors, heated steering wheels, coolant reservoir tanks, fuse boxes (including SAM Modules and Total Integrated Power Modules), Oxygen (O2) sensors, vacuum pumps, battery and battery cable/harness, standard transmission clutch assembly, friction clutch disc and pressure plate, distributor cap and rotor, safety restraint systems (including air bags), glass, lenses, sealed beams, light bulbs, LED lighting, fuses, circuit breakers, cellular phones, personal computers, pre-heated car systems, game systems, radar detection devices, brake rotors and drums, all exhaust components, and the following emission components: EGR purge valve/ solenoids/sensors, vacuum canister, vapor return canister, vapor return lines/ valves, air pump/ lines/valves, catalytic converter/filtering/sensors, gas cap/filler neck, weather strips, trim, moldings, bright metal chrome, upholstery and carpet, paint, outside ornamentation, bumpers, body sheet metal and panels, frame and structural body parts, vinyl and convertible tops, any convertible top assemblies, door handles, lift gate handles, tailgate handles, door bushings/bearings, hardware or linkage, tires, tire pressure sensors, wheel/rims, programming, reprogramming, or updating or maintaining a component that has not mechanically failed. Any equipment not installed by the manufacturer. External nuts, bolts, and fasteners are not covered unless they need to be replaced in connection with a Covered Repair. Engine block and cylinder heads are not covered if damage is caused by external overheating, freezing, or warping or any other part not listed in the coverage section.

The Costs of teardown, disassembly, or assembly when a Breakdown is not covered by this Agreement.

Any regular maintenance services as described and/or recommended by Your manufacturer.

For any safety related maintenance events required by Your state or the manufacturer of Your Vehicle or a Breakdown caused by the continued operation of the Vehicle in an overheated condition irrespective of thermostat failure or the lack of proper and necessary amounts of coolants or lubricants.

EXHIBIT A

For any repair or replacement of any Covered Part if a Breakdown has not occurred or if the wear on that part has not exceeded the field tolerances allowed by the manufacturer under normal operating conditions.

Any repair that has been misdiagnosed by the Authorized Repair Facility and/ or any cause of failure that cannot be verified as accurate or is found to be inaccurate.

Any and all emissions and/or exhaust components are excluded from coverage.

### SECTION VI. ADDITIONAL BENEFITS OF COVERAGE

**All Coverage plans include the following benefits:**

In the event **Your Vehicle** is disabled, **We** will dispatch a service vehicle to **Your** location to assist **You**. In the event **Your Vehicle** is unable to continue under its own power **Your Vehicle** may be towed to a location of **Your** choosing. **You** will receive 25 miles of towing at no cost, any additional mileage will be **Your** responsibility and payment will be expected at the time service is rendered. When calling for towing or road service **You** must call **1-844-286-4577**. **You** will be required to give the representative assisting **You** the following information: **Producer Code-45547, Your Member Number (which is your contract number on the top right of your contract) and Your plan letter which is U.**

**Roadside Assistance Coverage**: **You** are entitled to one (1) service per 72-hours. Services available to **You** at no cost are: a tow up to 25 miles; battery jumpstart; flat tire change; fuel delivery (You are responsible for the actual cost of the delivered materials); lockout assistance (entry to passenger compartment only).

**Reimbursement for Roadside Assistance:** In the event Your Vehicle is disabled and **You** contracted for any of the above covered services on Your own, You will be able to submit Your original receipted road service expenses for reimbursement consideration. Maximum for any covered services is strictly limited to $50.

You must send your original receipted roadside bills along with a completed claim form to:

Nation Motor Club, LLC. dba Nation Safe Drivers,
**ATTN**: Claims
800 Yamato Rd STE 100, Boca Raton, Florida, 33076

Claim forms may be obtained online at www.nsdclaims.com or by calling toll-free 1-800-338-2680.

**Trip Interruption:** In the event of a mechanical breakdown of a covered component or part, Administrator will **Reimburse** Agreement Holder a maximum of seventy five ($75.00) dollars per day, not to exceed a total of two hundred twenty five ($225.00) dollars up to three days (3), for expenses incurred by Agreement Holder for meals and/ or lodging, provided: Agreement Holder cannot operate Agreement Holder's Vehicle due to a mechanical breakdown covered by this Agreement and are more than 100 miles away from home, and expenses are incurred between the time of breakdown and the time repairs are completed. (The date of breakdown shall be considered the first day.) One day's trip interruption expense shall be allowed for each eight hours, or portion

**EXHIBIT A**

thereof, of required manual flat-rate labor time. A detailed receipt must be submitted to Administrator before reimbursement will be made. **You** must also include a copy of the dealership **Repair Order** showing that a repair was made and the repair was covered by **CarGuard Administration, INC;** and any other documentation reasonably requested by the Administrator.

**RENTAL: In the event of a Breakdown of a covered part, You will be reimbursed for actual expenses incurred for a rental vehicle at the maximum daily rate of $35.00 per day, for five (5) days, not to exceed $175.00 per occurrence. After the first day of rental, each additional day of rental requires the covered repairs to exceed 4.0 labor hours per additional day as defined in the current year's manufacturers or nationally recognized labor time standards manual. In the event that the vehicle is not drivable due to the covered breakdown, we will cover one day of rental for every four (4) labor hours applicable to the covered repair. Under no circumstances will we provide rental coverage for any repair hours that exceed the operation time for the covered repair as defined in a nationally recognized labor time standards manual (current year's edition). Rental time due to parts backorder or component failure inspection may be considered at the discretion of the Administrator. Rental coverage shall not continue beyond the day on which covered repairs are completed. The substitute vehicle must be rented from a licensed and nationally recognized rental agency. To receive reimbursement, You must present the following items within 60 days of the repair completion date: a rental agreement from a licensed and nationally recognized car rental company signed by You; proof of payment receipt; a copy of the repair order showing that the repair was covered by CarGuard Administration, INC; and any other documentation reasonably requested by the Administrator.**

**Reimbursement Instructions for Trip Interruption and Rental Car Reimbursement:** You must submit your receipts, repair orders, and any other documents for reimbursement, as described in the Trip Interruption and/or Rental provisions contained herein by submitting the documents to the following address:

Nation Motor Club, LLC. dba Nation Safe Drivers,
**ATTN:** Claims
800 Yamato Rd STE 100, Boca Raton, Florida, 33076

You must reference your **member number** and the **producer code (45547)** in your request.

**All 24-Hour Roadside Assistance Services and Benefits are administered through Nation Motor Club, LLC. administrative offices at 800 Yamato Road, Suite 100, Boca Raton, FL 33431.**

*For Alabama, Arizona, Arkansas, Hawaii, Louisiana, Massachusetts, Nevada, Tennessee, Texas and Washington* members, services are provided by Nation Motor Club, LLC. dba Nation Safe Drivers. *For California* members, services are provided by Nation Motor Club, LLC. California Motor Club Permit Number 5157-3.

CGA-Exclusionary PT Hybrid WIC          Page 13                    Rev. 040120
Form Number 10-1102 WIC

**EXHIBIT A**

## SECTION VII. ADD-ON COVERAGE OPTIONS

The following options are add-on options and apply **ONLY** if they have been selected by **You** as indicated on the Application Page:

**Commercial Use Option:** If You have selected the **Commercial Use** Coverage Option as indicated on the **Application Page** of this Contract, See the **Commercial Use Definition** for specific eligible uses. This surcharge is mandatory as it applies. Uses that are defined as eligible commercial uses under the definitions section of this **Contract** shall negate any provisions in this **Contract** that exclude Coverage for Commercial Use. Uses not defined as eligible for **Commercial Use** under the definitions section of this contract shall not be eligible for **Coverage**.

**HYBRID VEHICLE OPTION (Mandatory as It Applies):** If **You** have selected the Hybrid Vehicle Option as indicated on the Application Page, **You** have **Coverage** in accordance with the applicable terms of this **Contract** for any electric motor, power controller, inverter assembly, generator(s), electronic air conditioning compressor, electronic power or steering pump.

**LIFT KIT OPTION (Mandatory as It Applies):** If the **Application Page** shows that the **Lift Kit** option was selected, **Coverage** will be provided for **Your Vehicle** if it has oversized/undersized tires (not to exceed 6 inches greater than manufacturer's specifications), body lifts, and suspension lifts (maximum 6-inch combined lift) that are installed by the **Dealer** or Authorized dealer facility at the time of the **Vehicle** sale. **Coverage** will be provided in accordance with the terms and provisions of this **Vehicle Service Contract.** The **Odometer** must be re-calibrated to register accurate readings in order for **Your Vehicle** to be eligible for this **Coverage**. The oversized/undersized tires, body lifts, suspension lifts, and any and all modifications, alterations, or additions are specifically excluded from **Coverage**, and any failures caused by those oversized/undersized tires, body lifts, suspension lifts, and any and all modifications, alterations, or additions shall not be covered under this **Contract**.

**SNOW PLOW OPTION (Mandatory as It Applies):** If the **Application Page** shows that the **Snow Plow** option was selected, this **Contract** will provide **Coverage** if **Your Vehicle** is used for snow removal, provided Your Vehicle is properly equipped for such use and it is not used commercially (unless the Commercial Use option is selected on the **Application Page** of this **Contract**). The snow plow itself, and any and all other systems related to snow removal is specifically excluded from coverage under this **Contract**.

If Your Vehicle **is found to be equipped with 4 X 4 / AWD, Diesel engine, Turbo/ Supercharger, Hybrid, Snow Plow, or Lift Kit, and the corresponding Option is not checked on the Administrator copy of the Application Page of this Contract, then no Coverage will be provided for Failures related to that Option during the term of this Contract.**

**EXHIBIT A**

## SECTION VIII. INELIGIBLE VEHICLES

The following **Vehicles** are ineligible for coverage under this **Contract:**

**All Commercial Use Vehicles,** unless the Commercial Use surcharge option is selected on the Application Page. If the surcharge is selected, then only those commercial usages listed under the definitions section of this Contract are eligible for Coverage.

Any **Vehicle** used for towing (unless Your **Vehicle** is equipped with factory installed or factory authorized tow package), or used as a commercial unit (unless appropriate surcharge is marked on the Application Page and is defined in the "Add On Coverage" section of this Contract), or used for rental, taxi, limousine or shuttle, towing/wrecker service, dumping, cherry pickers, lifting or hoisting, police or emergency service, off-road use, prearranged or organized racing, or competitive driving.

Any **Vehicle** that has been issued a restricted title, including but not limited to: gray market, total loss, salvage/refundable, salvage theft, assembled, dismantled, scrap, fire, flood, physical damage, saltwater, frame change, motor change, body exchange, junk or parts only.

## SECTION IX. GUARANTY

**Our obligations and the performance to You under this Contract are guaranteed and insured by a policy issued by Wesco Insurance Company, 59 Maiden Lane, 43rd Floor, New York, NY 10038. The telephone number for Wesco Insurance Company is (866) 505-4048. If any covered claim or refund is not paid within sixty (60) days (thirty [30] days for Alaska and Arizona residents), or if the provider becomes insolvent or otherwise financially impaired, after proof of loss has been filed, You may file a claim directly with the Insurance Company by contacting the Insurance Company at the number provided above.**

## SECTION X. CANCELLATIONS

**If You cancel this Contract** within the first 30 days from the Purchase Date **of this Contract** you shall be entitled to a full refund of all monies collected on your account. This refund shall be paid to you by the **Selling Agent.** You may cancel this contract within the first thirty (30) days by contacting the seller at the telephone number listed on the Application Page, or in writing. After thirty days, you must send any requests to cancel this **Contact** to us in writing.

**You** may cancel this **Contract** at any time, including instances when the **Vehicle** is sold, lost, stolen, or destroyed by notifying **Us in writing and by submitting a request to Cancel the contract with notarized Letter of Cancellation stating the reason for cancellation,** and the date of cancellation. This letter must be submitted to the **Selling Agent or Us.** We will consider the date of cancellation to be the date the **We or the Selling Agent** receive the Letter of Cancellation. **In the event this Contract is cancelled outside of the first thirty (30) days from the purchase date of this Contract, you will be charged a one-hundred ($100.00) cancellation fee to be deducted from any refund due (except where state statute or regulation requires a**

**EXHIBIT A**

lesser amount).

**In the event this Contract is cancelled after the first thirty days from the purchase date** and the contract is not cancelled due to non-payment by the **finance agent** (if applicable), a pro-rated refund will be due. The pro-rated refund shall be calculated according to the pro-rata method reflecting the greater of the days in force or the mileage elapsed based on the term of the Contract, **less a service charge of one-hundred dollars ($100), except where state law or regulation requires a lesser amount. After 30 days, paid claims shall also be deducted from any pro-rated refund due, except where prohibited by state law or regulation.**

In the event this contract is financed through a **payment plan or finance agent,** the payment plan provider or finance agent shall place a lien against this **Contract.** Any and all refunds due from a cancellation shall be due to the payment plan provider or finance agent as long as a balance is due by **You** to the payment plan provider or finance agent.

In the event this contract is cancelled due to non-payment by the **payment plan provider, finance agent, or Selling Agent** you will forfeit any and all refunds due to **You.**

## SECTION XI. TRANSFERABILITY

This **Contract,** while in-force, may be transferred by the ORIGINAL **Contract Holder** to the subsequent owner of the **Vehicle** for a fee of fifty ($50) dollars payable to **Us,** the **Administrator.** The subsequent owner must also transfer the manufacturer's warranty, if applicable. Written evidence of all required maintenance may be requested by **Us** upon transfer. All terms and conditions of the original **Contract** will apply to the transferee. Approval of transfers is at the discretion of **Us,** the **Administrator** and may be denied for any reason. Submission of a Transfer Request must be completed within thirty (30) days of the sale or transfer of the **Vehicle.**

In the event this **Contract** is transferred to a Dealer Entity, the contract will remain in a suspended status, whereby all claims will be rejected until the contract is transferred back to an individual owner. Both the individual who sells the contract to the Dealer Entity, and the Dealer Entity itself must pay the transfer fee to transfer it back to the new individual owner. **If this process is not followed properly, we reserve the right to void this contract** and any refund rights will be forfeited.

**Please send any and all transfer requests, as well as a check payable to CarGuard Administration, INC** to the following address:

> **CarGuard Administration, INC**
> ATTN: Transfers
> 4901 W. 136th Street
> Leawood, KS 66224

**Please reference the contract number, the name of the old contract holder and the name of the new contract holder in your correspondence.**

**EXHIBIT A**

## SECTION XII. GENERAL PROVISIONS

**Resolution of Disputes:** Should a dispute, controversy, or claim arise out of or relating to this Contract, the dispute, controversy, or claim arising out of or relating to this Contract, or a breach hereof, may be settled by non-binding Mediation. Either party may make a written request to any nationally recognized organization that performs consumer related Mediation services. If both parties agree to Mediate in writing, the parties shall then agree to abide by the consumer related protocol established by the chosen Mediation organization and the laws of the state where the purchaser resides as well as federal law. Otherwise, any dispute, controversy, or claim arising out of or relating to this Contract shall be settled in a court of competent jurisdiction, according to the laws of the state where the Contract Purchaser resides at the time the dispute, claim, or controversy arose, and federal law.

**Payment Plan** or **Finance Agent** Agreements: If this **Contract** was purchased on a Payment Plan or through a Finance Agent, the failure to make monthly payments in a timely fashion will result in cancellation of this **Contract**, unless State Law mandates otherwise. Unpaid late fees will be posted to **Your** balance due by your **Payment Plan Provider** or **Finance Agent**. The **Payment Plan Provider** or **Finance Agent** shall be entitled to any refund resulting from cancellation for any reason until the contract has been Paid In Full with the **Payment Plan Provider** or **Finance Agent**.

**Reinstatement:** If this **Contract** is cancelled, **We** reserve the right to grant or deny any request for reinstatement. If this **Agreement** is reinstated by **Us**, **We** will not be responsible for liable for any **Breakdowns** to **Your Vehicle** during the period this **Contract** was cancelled, and for the first thirty (30) days from the effective date of reinstatement. If this **Contract** is cancelled due to non-payment, the **Contract** may be reinstated if the entire balance due is received within thirty (30) days of the cancellation, or unless **We** elect to make a special exception.

**Renewability:** You may purchase a **Contract** for additional time/mileage provided the request is made within thirty (30) days and one thousand (1,000) miles prior to the expiration of the original **Contract**. At that time, contact the **Administrator** for the terms, **Coverage** and **Deductible** options available, which may not match the original **Contract Coverage** or be available at all.

**EXHIBIT A**

## SECTION XIII. PRIVACY POLICY

The trust of the customers of CarGuard Administration is our most valuable asset. **We** safeguard that trust by keeping nonpublic personal information about customers in a secure environment and using that information in accordance with this Privacy Policy.

Below is **Our** privacy pledge to our Customers:

**Information We May Collect:**

- **CarGuard Administration** may collect nonpublic personal information about you from the following sources:Information we receive from you (or is provided to us on your behalf) on applications and other forms, such as your name, address, telephone number, employer and income;
- Information about your transactions with CarGuard Administration, the **Selling Agent,** and the **Payment Plan Provider** and/or **Finance Agent** that includes your name, address, telephone number, age, insurance coverage, transaction history, claims history, and premium information;
- Information you provide to us on applications from health care providers, such as doctors and hospitals, to determine your past or present health condition. Health information will be collected as we deem appropriate to deem eligibility for coverage, to process claims, to prevent fraud, and to determine extenuating refunds, as authorized by you, or otherwise permitted or required by law.

**Information We May Disclose and To Whom We May Disclose Information:** The nonpublic personal information CarGuard Administration may collect as described above may be disclosed in order to deliver products and services to you, provide customer service, and/or administer your account with us.

**Disclosures permitted by law:** CarGuard Administration may disclose all of the nonpublic personal information described above, as permitted by law. We may used affiliated and non-affiliated parties to perform services for us, such as providing customer assistance, handling claims, protection against fraud, and maintaining software for us. We may also disclose information in response to requests from law enforcement agencies or State insurance authorities.

**Information Regarding Former Consumers:** CarGuard Administration does not disclose nonpublic personal information about former customers with inactive accounts, except in accordance with this Privacy Policy.

**Our Security Procedures:** CarGuard Administration restricts access to nonpublic personal information about you to those employees with whom we determine have a legitimate business purpose to access such information in connection with the offering of products or services to you. We employ security techniques designed to protect our customer data. We provide training and communications programs to educate employees about the meaning and requirements of our strict standards for data security and confidentiality.

**EXHIBIT A**

Hasler

FIRST-CLASS MAIL

09/08/2020

$00.000

ZIP 30024
011D11638917

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C5D9F8F684EAD
CASE NUMBER: 2021CV30074

193 - DMGL2-CARGUARD- - CGPLTD -
Auto Renewal Center
6789 Quail Hill Pkwy, Suite 605
Irvine, CA  92618

JANE KEENER-QUIAT
470 WOODEN DEER RD
CARBONDALE  CO   81623-8837

your protection plan is enclosed

POM210

EXHIBIT
8

EXHIBIT A



peace of mind
for that next bump in the road...

**EXHIBIT A**

  

# Care Free Driving is Ahead…

Separate the attached ID cards and key tags from the carrier. You can dispose of the carrier. Your contract document should be stored in a safe place. An ID card and/or key tag can travel with you so that you can easily contact your provider to

## Auto Renewal Center

p e a c e   o f   m i n d
for that next bump in the road…



Jane Keener Qu

Contract #: CGC244
VIN: 1G1RD6E45EU
Exp: 10/03/2025
Ded:$ 100

Coverage: Platinum Deluxe
Claims: 888-907-0870
Roadside: 844-286-4577

## Auto Renewal Center

p e a c e   o f   m i n d
for that next bump in the road…



Jane Keener Qui

Contract #: CGC244
VIN: 1G1RD6E45EU
Exp: 10/03/2025
Ded:$ 100

### Jane Keener Quiat

p e a c e   o f   m i n d
for that next bump in the road…

**EXHIBIT A**



EXHIBIT A

### In the Event of a Breakdown:

1 Insure your safety and that of your passengers; protect your vehicle from further damage.
2 Deliver your vehicle to a licensed repair facility.
3 Give the repair facility permission to determine the cause of the breakdown, the required repairs, and the cost of such repairs.
   *(NOTE: This may include diagnosis and teardown)*
4 Instruct the repair facility to call the claims authorization number shown in your contract prior to starting any repairs.
5 The contract administrator may provide a corporate credit card to pay for covered repairs.

* Refer to your contract for complete instructions & details



### In the Event of a Breakdown:

1 Insure your safety and that of your passengers; protect your vehicle from further damage.
2 Deliver your vehicle to a licensed repair facility.
3 Give the repair facility permission to determine the cause of the breakdown, the required repairs, and the cost of such repairs.
   *(NOTE: This may include diagnosis and teardown)*
4 Instruct the repair facility to call the claims authorization number shown in your contract prior to starting any repairs.
5 The contract administrator may provide a corporate credit card to pay for covered repairs.

* Refer to your contract for complete instructions & details



## Tips and Reminders

Proper vehicle maintenance can go a long way towards keeping you safely on the road. Further, it is a condition of your breakdown protection agreement. You should always follow your vehicle manufacturer's recommended maintenance for your driving habits.

## Jane Keener Quiat, You're Protected

193

## Congratulations on Your Smart Choice!



Contract # CGC24413034
Deductible: $100
Claims: 888-907-0870
Roadside: 844-286-4577

Contract # CGC24413034
Deductible: $100
Claims: 888-907-0870
Roadside: 844-286-4577

**EXHIBIT A**



peace of mind
for that next bump in the road...

## Auto Renewal Center
6789 Quail Hill Pkwy, Suite 605
Irvine, CA  92618
844-273-9727

Jane Keener Quiat
470 Wooden Deer Rd
Carbondale, CO 81623-8837

Congratulations!  Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet.  Please look it over and call with any questions you may have.  Thank you for your purchase; we look forward to servicing your protection needs.  Please call us for a quote on any other vehicle in your household.  Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown.  Proper maintenance of your vehicle will contribute to a trouble free driving experience.  You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle.  This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

**THANK YOU AGAIN!**

*Vashti Salazar*

Protection Specialist

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-907-0870

Roadside: 844-286-4577

# platinum deluxe service contract
## application page

### contract holder information
contract holder 1 name   Jane Keener Quiat

contract holder 2 name

phone   970-309-9334

alternate phone

email address

mailing address   470 Wooden Deer Rd

city / state / zip   Carbondale, CO 81623-8837

### seller information
seller name   Auto Renewal Center

phone   844-273-9727          salesperson  Vashti Salazar

web site

mailing address   6789 Quail Hill Pkwy, Suite 605

city / state / zip   Irvine, CA  92618

### covered vehicle information

| vin number (17 numbers) | vehicle class |
|---|---|
| 1G1RD6E45EU133310 | 3 |

| current odometer reading | options |
|---|---|
| 94,877 | MNT |

year
2014

make
CHEVROLET

model
VOLT

### service contract information

| contract number | waiting period | effective date |
|---|---|---|
| CGC24413034 | 30 Days and 1,000 Miles | 09/04/2020 |

| contract purchase price | contract term in months (additional) |
|---|---|
| $3775.00 | 60 |

| contract term in miles | |
|---|---|
| | 50,000 |

| contract expiration date | contract expiration miles |
|---|---|
| 10/03/2025 | 145,877 |

deductible
$ 100

* A  30  day and  1,000  mile waiting period will apply from the effective date and current odometer reading. Claims may not be filed until this waiting period is satisfied. If any information is incorrect, please contact us immediately.

Administrator/Obligor: CarGuard Administration, INC
4742. N. 24th St. Suite 300, Phoenix, AZ 85016
(888) 907-0870

**EXHIBIT A**

WSTD01

The purchaser acknowledges that the Application Page, containing the Purchaser Information, Seller Information, Vehicle Information, Payment Plan Information, and Service Contract Information; the Coverage/Contract Identification Card; and the Terms and Conditions contained herein constitute the entire **Vehicle Service Contract** between CarGuard Administration, herein "the Company" and the Customer. The components, parts, and exclusions listed under the Terms and Conditions and Coverage Details section constitute the entire Terms and Conditions of this contract, and shall be used in adjudicating any and all claims arising under this contract. **The customer agrees** to maintain the **Vehicle** in accordance with the Terms and Conditions, The Required Maintenance Section contained in the Terms and Conditions of the Vehicle Service Contract, and follow all of the manufacturer's recommended maintenance requirements.

**In the event of a breakdown and/or repair, the customer <u>must obtain prior authorization of the Company</u>** by following the instructions listed in the "Filing a Claim" section of Terms and Conditions of the Vehicle Service Contract.

This **Contract** is neither an insurance policy nor a seller's warranty. This **Contract** may run concurrently with and is secondary to any manufacturer's warranty still active on the vehicle.

After thirty days from the date of purchase of this Service Contract as stated on the Application Page, if the Customer has not contacted the Company or the Selling Agent to cancel this Vehicle Service Contract, the customer hereby agrees to all of the terms and conditions of this Vehicle Service Contract. The Customer agrees that they have reviewed and understand all of the time and mileage limitations, coverage, exclusions, and that the repair of non-covered components are excluded from **Coverage** under the Vehicle Service Contract. All of the "add-on" options as marked on the Application Page are clearly marked above. The customer agrees that he or she has read and understand the **Platinum Deluxe Service Contract** in its entirety, and fully understands all of the terms and conditions therein. Further, the customer agrees that they have read the "Responsibilities of this Contract" section of the Terms and Conditions. The customer further agrees that he, she, or they have received this contract, and all of the information contained on the Application Page is correct. The Customer understands it is his, her, or their responsibility to contact the Company to update or correct any inaccurate information contained on the Application Page. **THE CUSTOMER UNDERSTANDS AND HEREBY AGREES TO ALL OF THE ABOVE, AND THAT THIS CONTRACT WILL BE BY AND BETWEEN THE ADMINISTRATOR (CARGUARD ADMINISTRATION, INC)** and the Applicant.

# Platinum Deluxe Service Contract

## SECTION I. DEFINITIONS

The following definitions apply to words frequently used in this contract:

**Agreement, Service Agreement, Service Contract, Vehicle Service Contract, or Contract** means this **Platinum Deluxe Service Contract** that is by and between **You and Us.**

Administrator means **CarGuard Administration, INC,** whose principal place of business is **4742 N. 24th St. Suite 300, Phoenix, AZ 85016 ,** which is the entity that is obligated to perform hereunder.

**Authorized Repair Facility** means any dealership, local mechanic repair facility, or other vehicle repair facility that is certified to perform mechanical repairs on motor vehicles from the National Institute for Automotive Service Excellence (ASE) located in the United States or Canada.

**Breakdown** and/or **Mechanical Failure** means the failure of an original or replacement part covered by this **Agreement** to perform its function as it was originally designed to work in normal service with required maintenance due to material failures, mechanical failures, or defects outside the manufacturer's tolerance.

**Commercial Use** means **Vehicles** used for farming, ranching, route work, job-site activities, service or repair work, and delivery of goods. Usage must not exceed the manufacturer's ratings and/or limitations. **In order for** commercial use vehicles to be covered under this contract, **the Commercial Use surcharge** box must be checked on the original **Application Page.** If this is not checked, it is your responsibility to contact us to add the surcharge.

**Coverage** means the component protection **You** selected as shown in this **Contract** and on your **Identification Card.**

**Covered Part(s)** or **Covered Repairs** means the parts listed under "Section IV. Coverage" of this Contract and any parts listed on section "VII. Add On Coverage Options" of this Contract if those "add ons" are selected on the Application Page of this Contract.

**Deductible** means the amount of money **You** are required to pay as selected on the Application Page for covered **Breakdown** claims. The **deductible** will be due and owing each visit to a repair facility for covered **Breakdown** claims. Once a Covered part is repaired or replaced under the terms of this **Contract,** there will be no **Deductible** for future repairs to that part.

**Dealership** means the original venue where **Your** car was purchased.

**Effective Date and Mileage** means the date **You** purchased **Your Contract** and the odometer mileage on **Your** vehicle at the time **You** purchased this **Contract.** This is indicated as the Effective Date and Contract Expiration Mileage on the Application Page of this Contract.

**Expiration Date and Mileage** means the date and/or mileage when **Your Contract** is no longer in force. **Your Contract Expires** once the **Contract Expiration Date or Contract Expiration Miles** are reached as defined **on the Application Page of this Contract.** Once either of these two conditions are met, this Contract shall no longer be in force.

**Finance Agent** or **Payment Plan Provider** means the company that is providing the payment plan or financing for this **Contract.** The Finance Agent or Payment Plan Provider places a lien against any refunds due on this contract until they have been repaid by **You** in full.

**Identification Card** means the card that was sent to you, which becomes part of this **Contract.** It gives information about **You, Your Vehicle, Coverage** chosen and other significant information, including your **Contract Number.**

**Contract Number** is the number **We** use to identify this **Contract** on **Your Vehicle.**

**Pre-Existing Condition** means a condition, breakdown, or mechanical issue that within all probability occurred before **Your** purchase of this **Service Contract.**

**Selling Agent,** or **Seller** means the company that sold this **Contract** to **You.** The identity of the selling agent is listed on the Application Page.

**Vehicle** means the **Vehicle** which is listed on the Application Page.

**Waiting Period** means the period of time and mileage that must transpire before a claim may be filed hereunder. Unless otherwise indicated on the Application Page of this Contract, the waiting period is equal to thirty days **of the Effective Date** and **one-thousand (1,000)** miles from the **Effective Mileage** of this Contract. If a different Waiting Period is indicated on the **Application Page** of this Contract, then the period of time and mileage as indicated on the Application Page of this contract must transpire from the **Effective Date and Effective Mileage** of this Service Contract before a claim may be filed. **The waiting period time and mileage shall be added to the end of the contract term.**

**We, Us, Our** means the entity who is obligated to perform under this **Contract** ("the obligor"). The obligor of this **Contract** is CarGuard Administration, INC at **4742 N. 24th St. Suite 300, Phoenix, AZ 85016 .**

**Wear and Tear** means the gradual reduction of performance of a part beyond the manufacturer's specified tolerances that occur naturally under normal operating conditions, which ultimately results in the failure of that part.

**You, Your** means the **Contract** Purchaser (or purchasers) shown on the Application Page, **or the person or persons** to whom this **Contract** is transferred in accordance with the Terms and Conditions of this Contract.

## SECTION II. TERMS AND CONDITIONS

**Nature of Agreement:** This is a Vehicle Service Contract between **You** (Contract Holder) and **Us. You** agree and understand that this **Contract** is a Vehicle Service Contract and not an insurance policy.

**Entire Agreement:** This **Contract,** including the Application Page, Terms and Conditions, Identification Card, limitations, exclusions, exceptions, and definitions, together with any endorsements, if any, constitute the entire **Contract.** No one other than the parties hereto, by mutual agreement, may change this **Contract** or waive any of its provisions. This **Contract** gives the Contract Holder specific rights. **You** may have other contract rights, which may vary from state to state in the United States, or between province to province in Canada. Please see the" State-Specific Requirements" of this contract for specific information pertaining to your individual state or province.

This **Contract** covers mechanical **Breakdowns** that are expressly covered under this Contract, and is for the sole benefit of the Contract Holder named herein, and only applies with respect to the **Vehicle** described on the Application Page.

**This Contract shall be invalidated** if there has been a tampering, inaccuracy, or alteration to the odometer mileage of the **Vehicle** so that the **Vehicle's true and actual mileage** is not shown on the odometer and cannot be determined. **In the event the odometer becomes inoperable during the term of this Contract, You must immediately contact Us within thirty (30) days of the odometer becoming inoperable** and provide us with documentation to show the odometer has been repaired properly. Failure to notify us or provide this documentation may result in us cancelling this Vehicle Service Contract.

This Vehicle Service Contract provides benefits for **Breakdown** of **Covered Parts** installed by the **Vehicle** manufacturer, as those terms are defined above.

**Coverage Period: Coverage** under this **Contract** begins upon expiration of the **Waiting Period** and will expire on the **Expiration Date or Mileage** measured from the **Effective Date and Mileage,** whichever occurs first, as shown on this Application Page, and/or when the **Limits of Liability** have been reached.

**Breakdown**: In the event of a **Breakdown** of any of the **Covered Repair(s)** listed below for Coverage, that are covered under this **Contract, We** will pay directly to **the Authorized Repair Facility** any pre-authorized reasonable expenses incurred for the repair or replacements of the part(s), less any Deductible, as stated in this Contract. Reasonable expenses shall include, but not be limited to, the parts, components, or units, which are not to exceed the manufacturer's suggested retail price (MSRP), which are necessary to repair or replace the failed covered part; the repair facility's labor rates, which are not to exceed the average market value for labor rates in the area that the **Authorized Repair Facility** is located in (area shall be defined as a fifty-mile [50] radius), which shall be multiplied by the amount of reasonable time in hours or sections of hours it may take to repair the part and/or vehicle (reasonable time shall be determined by data in the national labor time guide); and any reasonable tear-down or diagnostic expenses to investigate the cause of failure in the event the repair is a Covered Repair (reasonable tear-down or diagnostic expenses shall be determined by the market rates within the area within a fifty-mile [50] radius). Replacement of **Covered Parts** that have experienced a **Breakdown** may be made with original equipment manufacturer parts, non-original equipment manufacturer parts, re-manufactured parts, or used parts at the **Administrator's** discretion.

**Deductible:** In the event of a **Breakdown** of any **Covered Part(s)** listed below, **You** may be required to pay a **Deductible.** The amount stated in the **Application Page** of this **Contract** shall be the deductible that will be paid by **You** upon each visit to the **Authorized Repair Facility,** for **Covered Repairs.** If that amount is equal to zero ("0"), **you will not be required to pay a deductible on any Covered Repair(s)** as long as this contract is active. Should a covered **Breakdown** require more than one visit to repair, **You** will only have to pay the deductible once for the **Breakdown.**

**Limit of Liability:** The aggregate limit of liability will be the greater of the average trade-in value of the Vehicle as provided by the NADA Guidelines as of the date of a filed claim, or $12,500.00. Once the maximum limit of liability has been reached, as defined above, this contract, its transfer and cancellation rights terminate.

**Labor Rates and Parts: We shall only be required to pay the prevailing labor rate for all repairs. Further in the event of a covered repair, We shall only be required to repair the Vehicle with parts and/or components that we select, including the use of used, remanufactured, refurbished, or reconditioned parts and/or components. At the administrator's request the vehicle may be moved to another repair facility.**

**Incidental and Consequential Damage Limit of Liability: Our liability of incidental and consequential damages including, but not limited to, personal injury, physical damage, property damage, loss of use of Your Vehicle, loss of time, loss of wages, inconvenience, and commercial loss resulting from the operation, maintenance, or use of Your Vehicle is expressly excluded.**

### SECTION III. CONTRACT HOLDER'S RESPONSIBILITIES

**Contract Holder's Maintenance Requirements: You** must have **Your Vehicle** checked and serviced in accordance with the manufacturer's recommendations, as outlined in the Owner's Manual. **Your Vehicle's Owner Manual** lists different servicing recommendations based on **Your** individual driving habits and climate conditions. **You** are required to follow the maintenance schedule that applies to **Your** driving habits and climate conditions. Failure to follow these recommendations may result in the denial of claims.

**Oil Changes and Verifiable Receipts:** In the event of a **Breakdown, We** may request oil change and/or service records to verify that maintenance has been properly done. If **You perform your own maintenance and/or service, You** must retain all receipts that show the purchase of materials used in the **Vehicle** maintenance process.

**Filing a Breakdown Claim:** If **Your Vehicle** incurs a **Breakdown, You** must take the following steps to file a claim:

1. **Prevent Further Damage-** Immediately take action to prevent further damage to **Your Vehicle.** The operator of the **Vehicle** is responsible for observing **Vehicle** warning lights, gauges, and sensory items that indicate a potential **Breakdown.** Upon this observation, you must immediately arrange for the vehicle to be diagnosed. **Failure to properly** take this action may result in the denial of claims.

2. Take your vehicle to the Authorized Repair Facility- If Your Vehicle incurs a **Breakdown,** take **Your Vehicle** to any **Authorized Repair Facility.** As stated in the "Definitions" section of **this Contract,** an **Authorized Repair Facility** is any dealership, repair facility, or other business that is certified to repair motor vehicles by the National Institute for Automotive Service Excellence (ASE) in the United States or Canada.

3. **Obtain Authorization from the Administrator.** Once **You** have taken **Your** vehicle to the **Authorized Repair Facility,** give them your **Contract Number.** **The Authorized Repair Facility must then contact Us at (888) 907-0870 and obtain authorization to proceed with the claim.** Any claim for repairs **without prior authorization from Us may** be denied, with the exception of **Emergency Repairs** as defined in this section of **the Contract.** The amount authorized by **Us** will be the maximum amount that will be paid for repairs covered under the terms of this **Contract.** Any additional amount must obtain **additional approval from Us** by contacting the same number as stated above.

4. **If applicable, Authorize Tear-Down and/or Inspection-** In some cases, You may need to authorize the licensed repair facility to inspect and/or tear down **Your Vehicle** in order to determine the cause of failure and cost of the repair. **We will pay this fee, up to the maximum market rate amount;** if the breakdown is a **Covered Repair.** The repair facility **must get prior authorization to begin the teardown by calling the claims number as stated above.**

5. **Review Coverage-** After **We** have been contacted, review with the service manager what will be covered under this **Contract.**

6. **Pay any Deductible (If Applicable)- You** must pay to the **Authorized Repair Facility** any required **Deductible,** as stated in "Terms and Conditions" section of this **Contract.** As stated in the "Terms and Conditions" section of this **Contract,** we will pay for the amount of the **Breakdown** on a **Covered Repair** less the deductible. In the event there is no deductible as stated on the Application Page, **you will not be required to pay a deductible.** All repair orders, requested documentation, and invoices from the **Authorized Repair Facility** must be submitted to **Us** within thirty (30) days (three hundred sixty- five [365] days in Wisconsin) to be eligible for payment.

**Emergency Repairs:** Should an emergency occur which requires a repair of a **Breakdown** to be made at a time when **Our** office is closed, **and failure to repair the Breakdown immediately will either 1) render Your Vehicle unsafe to drive, 2) result in further damage to Your Vehicle or, 3) cause other components on Your Vehicle to fail,** follow the claim procedures above without authorization, **and We** will make reimbursement to **You** or the **Authorized Repair Facility** in accordance with the provisions of this **Contract** if the **Breakdown** is a **Covered Repair.** You must contact **Us** within three (3) business days from the date of repair to determine if the repair is a **Covered Repair. No Emergency Repairs will be reimbursed without authorization in excess of $500.00 per occurrence.**

**For claims assistance, please contact Us, the Administrator, CarGuard Administration, INC at (888) 907-0870, NO CLAIMS WILL BE PAID UNLESS THE STEPS ABOVE ARE FOLLOWED.**

**EXHIBIT A**

Administered by: CarGuard Administration, INC, 4742 N. 24th St. Suite 300, Phoenix, AZ 85016 , (888) 907-0870.

## SECTION IV. COVERAGE

**Platinum Deluxe Coverage** provides for the payment or reimbursement of costs authorized by **Us, the Administrator,** to repair or replace a **Breakdown** of **ALL OF YOUR VEHICLE'S PART(S) OR COMPONENTS,** including seals and gaskets, except those parts, components, and conditions listed in the section of **this Contract labelled "V. Exclusions- What is Not Covered",** in accordance with all terms and conditions of this **Contract** until your **Vehicle** has an odometer reading of 125,000 miles.

Once Your Vehicle surpasses 125,000 total miles on Your Vehicle's odometer, **We will provide for the payment or reimbursement of costs authorized by Us, the Administrator,** to repair or replace a **Breakdown** of the following parts from the time Your vehicle surpasses 125,000 total miles on Your Vehicle's odometer until this coverage expires:

**ENGINE (GAS/DIESEL)**– The following parts are covered: pistons, piston rings, crankshaft and main bearings, connecting rods and rod bearings, camshaft and camshaft bearings, timing chain and timing gears, intake and exhaust valves, valve springs, oil pump, push rods, rocker arms, hydraulic lifters, rocker arm shafts and water pump. The engine block and/or cylinder heads are also covered if the above-listed parts cause a Breakdown of the engine block and/or cylinder heads.

**TURBO/SUPERCHARGER**: (Factory installed only): All internally lubricated parts of the factory installed turbocharger/supercharger. The turbocharger/ supercharger housing is covered if the internally lubricated parts cause a Breakdown of the turbocharger/supercharger housing.

**TRANSMISSION/TRANSAXLE**: All internally lubricated parts of Manual or Automatic Transmissions, including oil pump, drums, planetaries, sun gear and shell, shafts, bearings, side gears, carrier pinion gear, ring gear, shift rail, forks, synchronizers, and Torque Converter. Breakdown of the Transmission/ Transaxle case is covered only if caused by the failure of an internally lubricated covered part.

**DRIVE AXLE**: All internally lubricated parts. Drive axle housing is also covered if damage is caused by Breakdown of an internally lubricated part.

**TRANSFER CASE**: All internally lubricated parts of the 4 x 4 Transfer Case. Breakdown of the Transfer Case is covered if caused by the failure of an internally lubricated part.

**SEALS & GASKETS**: Seals and gaskets are only covered when required in connection with the replacement or repair of a covered part.

Once Your Vehicle surpasses 125,000 total miles on Your Vehicle's odometer, any parts not listed in this section for coverage are not covered by this Contract, with the exception of "Add On" parts as selected on the Application Page of this Contract and defined in "Section VII. Add On Coverage Options".

## SECTION V. EXCLUSIONS – WHAT IS NOT COVERED

**Coverage** is not provided under this **Contract** for any of the following **Exclusions:**

**Pre-Existing Condition(s): Any Vehicle found not to be in good mechanical order at the time this Contract is placed on the Vehicle, or any failure that occurred prior to the purchase of this Contract. Any breakdown and/or failure, whereby the cause of failure occurred due to a condition that pre-dated the purchase of this Contract shall also be expressly excluded from coverage.**

**Any Breakdown that occurs during waiting period of this Contract.**

**For damage to a covered part caused by the failure of a part that is not listed as covered under this Agreement.**

**When the responsibility for the repair is covered by an insurance policy, or any warranty from the manufacturer, such as extended drive train, major component or full coverage warranties (regardless of the remaining manufacturer's warranty when You purchased this Agreement), or a repairer's guarantee warranty regardless of their ability to pay. Further, Coverage under this Agreement is similarly limited in the event of a Breakdown if the manufacturer has announced its responsibility through any means, such as a recall.**

**Technical Service Bulletins and Factory Service Bulletins, whereby the manufacturer has declared a known defect or recurring issue with Your Vehicle, shall also be expressly excluded from coverage under this Agreement. This shall apply even if the manufacturer has elected not to pay for repairs through a recall or other method.**

**Any covered repair not authorized in advance by Us, except those Emergency Repairs, as outlined in this Contract, in section "III. Contract Holder's Responsibilities".**

**Damage caused by continued operation of an impaired vehicle.**

**Any aftermarket part or component that was installed in the Vehicle to replace an original manufacturer's part or component that is salvaged or was not replaced in accordance with the manufacturer's recommended specifications.**

**Overloading the Vehicle beyond the manufacturer's recommended capacity. Breakdowns that have occurred due to Wear and Tear.**

**Repairs when Your Vehicle's odometer reading does not reflect the true mileage the vehicle has been driven for whatever reason.**

Any breakdowns caused by any modifications, alterations, and/or additions to Your Vehicle, or if any modifications, alterations, and/or additions have been made to Your Vehicle You are using or have used Your Vehicle in a manner not recommended by the Manufacturer, including but not limited to, the failure of any custom or add on/aftermarket part regardless if supplied by a franchised dealer or not, all frame or suspension modifications, lift kits (unless the lift kit option is marked on the Application Page and not to exceed 6 inch of combined lift), oversized/undersized tires or wheels not recommended by the original manufacturer (unless lift kit option is marked on the Application Page and not to exceed 6 inches greater than the Manufacturer's specifications), trailer hitches.

Also not covered are any emissions and/or exhaust systems modifications, engine modifications, transmissions modifications, and/or drive axle modifications, which includes any performance modifications.

Any breakdowns caused by any use of Your Vehicle not recommended by the manufacturer, or if Your Vehicle is used for towing (unless your Vehicle is equipped with a factory installed or factory authorized tow package), or is used for Commercial Use (unless the Commercial Use option is selected on the Application Page and only as defined under the Commercial Use Add On Options section of this Agreement), or is used for snow removal (unless the Snow Plow option is selected on the Application Page of this Contract), rental, taxi, limousine, livery, or shuttle, towing/wrecker service, road repair, construction, dumping (dump beds), cherry pickers, lifting or hoisting, police or emergency service, off-road use, pre-arranged or organized racing, or competitive driving.

A Breakdown caused by or related to towing a trailer or another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose OR "Commercial Use" is selected as a surcharge on the Application Page of this Contract.

Vehicle used commercially except if the commercial usage surcharge is selected on the application for those eligible usage as defined in Section 1. This contract and the commercial use surcharge is not eligible for vehicles used for rental, taxi, limousine or shuttle, towing/wrecker service, dumping, cherry pickers, lifting or hoisting, police or emergency service, off-road use, snow-plows, prearranged or organized racing, or competitive driving.

Repairs made outside of the United States and Canada.

Repairs required because of technician negligence, detonation, sludge or carbon deposits caused by negligence, contamination, rust and corrosion caused by negligence, and/or operation without the proper lubrication levels or fluid type.

Damage caused by pre-ignition detonation, pinging, improper/contaminated fuel including fuels containing more than ten-percent (10%) ethanol if the engine was not manufacturer for this mixture, excessive fuel conditions, lean fuel conditions, clogged fuel injectors, improper lubricants, or improper engine adjustments. Any mechanical Breakdown caused by failure to maintain proper levels of lubrication, lubricant blockage, coolant blockage, lack of lubrication, or carbon buildup in cylinders.

Repairs required because You did not properly maintain Your Vehicle, as outlined in this Contract in "III. Contract Holder's Responsibilities".

Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, road hazards, off-road racing or use, vandalism, riot, theft, fire, war, acts of God, or the loss that is normally covered by Casualty and/or Collision insurance. Loss, damage, or expense resulting directly or indirectly from any intentional, dishonest, fraudulent, criminal or illegal act committed by You, Your employee or agent, or occurring due to confiscation or repossession.

Repairs that are covered under a repairer's guarantee or another Service Agreement Provider's coverage, and/or repairs that are covered under an insurance policy, or a manufacturer and/or dealer customer assistance program or service agreement.

For any of the following parts: hoses, brake pads, brake linings/shoes, wiper blades, belts, thermostat housing, shock absorbers, carburetor, air springs and air struts, headlight assemblies, taillamp assemblies, blind spot sensors, heated steering wheels, coolant reservoir tanks, fuse boxes (including SAM Modules and Total Integrated Power Modules), Oxygen (O2) sensors, vacuum pumps, battery and battery cable/harness, standard transmission clutch assembly, friction clutch disc and pressure plate, distributor cap and rotor, safety restraint systems (including air bags), glass, lenses, sealed beams, light bulbs, LED lighting, fuses, circuit breakers, cellular phones, personal computers, pre-heated car systems, game systems, radar detection devices, brake rotors and drums, all exhaust components, and the following emission components: EGR purge valve/ solenoids/sensors, vacuum canister, vapor return canister, vapor return lines/ valves, air pump/ lines/valves, catalytic converter/filtering/sensors, gas cap/filler neck, weather strips, trim, moldings, bright metal chrome, upholstery and carpet, paint, outside ornamentation, bumpers, body sheet metal and panels, frame and structural body parts, vinyl and convertible tops, any convertible top assemblies, door handles, lift gate handles, tailgate handles, door bushings/bearings, hardware or linkage, tires, tire pressure sensors, wheel/rims, programming, reprogramming, or updating or maintaining a component that has not mechanically failed. Any equipment not installed by the manufacturer. External nuts, bolts, and fasteners are not covered unless they need to be replaced in connection with a Covered Repair. Engine block and cylinder heads are not covered if damage is caused by external overheating, freezing, or warping or any other part not listed in the coverage section.

The Costs of teardown, disassembly, or assembly when a Breakdown is not covered by this Agreement.

Any regular maintenance services as described and/or recommended by Your manufacturer.

For any safety related maintenance events required by Your state or the manufacturer of Your Vehicle or a Breakdown caused by the continued operation of the Vehicle in an overheated condition irrespective of thermostat failure or the lack of proper and necessary amounts of coolants or lubricants.

**EXHIBIT A**

**For any repair or replacement of any Covered Part if a Breakdown has not occurred or if the wear on that part has not exceeded the field tolerances allowed by the manufacturer under normal operating conditions.**

**Any repair that has been misdiagnosed by the Authorized Repair Facility and/ or any cause of failure that cannot be verified as accurate or is found to be inaccurate.**

**Any and all emissions and/or exhaust components are excluded from coverage.**

## SECTION VI. ADDITIONAL BENEFITS OF COVERAGE

**All Coverage plans include the following benefits:**

In the event **Your Vehicle** is disabled, **We** will dispatch a service vehicle to **Your** location to assist **You**. In the event **Your Vehicle** is unable to continue under its own power **Your Vehicle** may be towed to a location of **Your** choosing. **You** will receive 25 miles of towing at no cost, any additional mileage will be **Your** responsibility and payment will be expected at the time service is rendered. When calling for towing or road service **You** must call **1-844-286-4577**. **You** will be required to give the representative assisting **You** the following information: **Producer Code-45547, Your Member Number (which is your contract number on the top right of your contract) and Your plan letter which is U.**

**Roadside Assistance Coverage**: You are entitled to one (1) service per 72-hours. Services available to **You** at no cost are: a tow up to 25 miles; battery jumpstart; flat tire change; fuel delivery (You are responsible for the actual cost of the delivered materials); lockout assistance (entry to passenger compartment only).

**Reimbursement for Roadside Assistance:** In the event Your Vehicle is disabled and **You** contracted for any of the above covered services on Your own, You will be able to submit Your original receipted road service expenses for reimbursement consideration. Maximum for any covered services is strictly limited to $50.

You must send your original receipted roadside bills along with a completed claim form to:

Nation Motor Club, LLC. dba Nation Safe Drivers,
**ATTN**: Claims
800 Yamato Rd STE 100, Boca Raton, Florida, 33076

Claim forms may be obtained online at www.nsdclaims.com or by calling toll-free 1-800-338-2680.

**Trip Interruption:** In the event of a mechanical breakdown of a covered component or part, Administrator will **Reimburse** Agreement Holder a maximum of seventy five ($75.00) dollars per day, not to exceed a total of two hundred twenty five ($225.00) dollars up to three days (3), for expenses incurred by Agreement Holder for meals and/ or lodging, provided: Agreement Holder cannot operate Agreement Holder's Vehicle due to a mechanical breakdown covered by this Agreement and are more than 100 miles away from home, and expenses are incurred between the time of breakdown and the time repairs are completed. (The date of breakdown shall be considered the first day.) One day's trip interruption expense shall be allowed for each eight hours, or portion

thereof, of required manual flat-rate labor time. A detailed receipt must be submitted to Administrator before reimbursement will be made. **You** must also include a copy of the dealership **Repair Order** showing that a repair was made and the repair was covered by **CarGuard Administration, INC;** and any other documentation reasonably requested by the Administrator.

**RENTAL: In the event of a Breakdown of a covered part, You will be reimbursed for actual expenses incurred for a rental vehicle at the maximum daily rate of $35.00 per day, for five (5) days, not to exceed $175.00 per occurrence. After the first day of rental, each additional day of rental requires the covered repairs to exceed 4.0 labor hours per additional day as defined in the current year's manufacturers or nationally recognized labor time standards manual. In the event that the vehicle is not drivable due to the covered breakdown, we will cover one day of rental for every four (4) labor hours applicable to the covered repair. Under no circumstances will we provide rental coverage for any repair hours that exceed the operation time for the covered repair as defined in a nationally recognized labor time standards manual (current year's edition). Rental time due to parts backorder or component failure inspection may be considered at the discretion of the Administrator. Rental coverage shall not continue beyond the day on which covered repairs are completed. The substitute vehicle must be rented from a licensed and nationally recognized rental agency. To receive reimbursement, You must present the following items within 60 days of the repair completion date: a rental agreement from a licensed and nationally recognized car rental company signed by You; proof of payment receipt; a copy of the repair order showing that the repair was covered by CarGuard Administration, INC; and any other documentation reasonably requested by the Administrator.**

**Reimbursement Instructions for Trip Interruption and Rental Car Reimbursement:** You must submit your receipts, repair orders, and any other documents for reimbursement, as described in the Trip Interruption and/or Rental provisions contained herein by submitting the documents to the following address:

Nation Motor Club, LLC. dba Nation Safe Drivers,
**ATTN**: Claims
800 Yamato Rd STE 100, Boca Raton, Florida, 33076

You must reference your **member number** and **the producer code (45547)** in your request.

**All 24-Hour Roadside Assistance Services and Benefits are administered through Nation Motor Club, LLC. administrative offices at 800 Yamato Road, Suite 100, Boca Raton, FL 33431.**

*For Alabama, Arizona, Arkansas, Hawaii, Louisiana, Massachusetts, Nevada, Tennessee, Texas and Washington* members, services are provided by Nation Motor Club, LLC. dba Nation Safe Drivers. *For California* members, services are provided by Nation Motor Club, LLC. California Motor Club Permit Number 5157-3.

lesser amount).

In the event this **Contract** is cancelled after the first thirty days from the purchase date and the contract is not cancelled due to non-payment by the **finance agent** (if applicable), a pro-rated refund will be due. The pro-rated refund shall be calculated according to the pro-rata method reflecting the greater of the days in force or the mileage elapsed based on the term of the Contract, **less a service charge of one-hundred dollars ($100), except where state law or regulation requires a lesser amount. After 30 days, paid claims shall also be deducted from any pro-rated refund due, except where prohibited by state law or regulation.**

In the event this contract is financed through a **payment plan or finance agent,** the payment plan provider or finance agent shall place a lien against this **Contract.** Any and all refunds due from a cancellation shall be due to the payment plan provider or finance agent as long as a balance is due by **You** to the payment plan provider or finance agent.

In the event this contract is cancelled due to non-payment by the **payment plan provider, finance agent, or Selling Agent** you will forfeit any and all refunds due to **You.**

## SECTION XI. TRANSFERABILITY

This **Contract**, while in-force, may be transferred by the ORIGINAL **Contract Holder** to the subsequent owner of the **Vehicle** for a fee of fifty ($50) dollars payable to **Us,** the **Administrator.** The subsequent owner must also transfer the manufacturer's warranty, if applicable. Written evidence of all required maintenance may be requested by **Us** upon transfer. All terms and conditions of the original **Contract** will apply to the transferee. Approval of transfers is at the discretion of **Us,** the **Administrator** and may be denied for any reason. Submission of a Transfer Request must be completed within thirty (30) days of the sale or transfer of the **Vehicle.**

In the event this **Contract** is transferred to a Dealer Entity, the contract will remain in a suspended status, whereby all claims will be rejected until the contract is transferred back to an individual owner. Both the individual who sells the contract to the Dealer Entity, and the Dealer Entity itself must pay the transfer fee to transfer it back to the new individual owner. **If this process is not followed properly, we reserve the right to void this contract** and any refund rights will be forfeited.

**Please send any and all transfer requests, as well as a check payable to CarGuard Administration, INC** to the following address:

> **CarGuard Administration, INC**
> ATTN: Transfers
> 4901 W. 136th Street
> Leawood, KS 66224

**Please reference the contract number, the name of the old contract holder and the name of the new contract holder in your correspondence.**

## SECTION XII. GENERAL PROVISIONS

**Resolution of Disputes:** Should a dispute, controversy, or claim arise out of or relating to this Contract, the dispute, controversy, or claim arising out of or relating to this Contract, or a breach hereof, may be settled by non-binding Mediation. Either party may make a written request to any nationally recognized organization that performs consumer related Mediation services. If both parties agree to Mediate in writing, the parties shall then agree to abide by the consumer related protocol established by the chosen Mediation organization and the laws of the state where the purchaser resides as well as federal law. Otherwise, any dispute, controversy, or claim arising out of or relating to this Contract shall be settled in a court of competent jurisdiction, according to the laws of the state where the Contract Purchaser resides at the time the dispute, claim, or controversy arose, and federal law.

**Payment Plan** or **Finance Agent** Agreements: If this **Contract** was purchased on a Payment Plan or through a Finance Agent, the failure to make monthly payments in a timely fashion will result in cancellation of this **Contract,** unless State Law mandates otherwise. Unpaid late fees will be posted to **Your** balance due by your **Payment Plan Provider** or **Finance Agent.** The **Payment Plan Provider** or **Finance Agent** shall be entitled to any refund resulting from cancellation for any reason until the contract has been Paid In Full with the **Payment Plan Provider** or **Finance Agent.**

**Reinstatement:** If this **Contract** is cancelled, **We** reserve the right to grant or deny any request for reinstatement. If this **Agreement** is reinstated by **Us, We** will not be responsible for liable for any **Breakdowns** to **Your Vehicle** during the period this **Contract** was cancelled, and for the first thirty (30) days from the effective date of reinstatement. If this **Contract** is cancelled due to non-payment, the **Contract** may be reinstated if the entire balance due is received within thirty (30) days of the cancellation, or unless **We** elect to make a special exception.

**Renewability:** You may purchase a **Contract** for additional time/mileage provided the request is made within thirty (30) days and one thousand (1,000) miles prior to the expiration of the original **Contract.** At that time, contact the **Administrator** for the terms, **Coverage** and **Deductible** options available, which may not match the original **Contract Coverage** or be available at all.

**EXHIBIT A**

## SECTION XIII. PRIVACY POLICY

The trust of the customers of CarGuard Administration is our most valuable asset. **We** safeguard that trust by keeping nonpublic personal information about customers in a secure environment and using that information in accordance with this Privacy Policy.

Below is **Our** privacy pledge to our Customers:

**Information We May Collect:**

- **CarGuard Administration** may collect nonpublic personal information about you from the following sources:Information we receive from you (or is provided to us on your behalf) on applications and other forms, such as your name, address, telephone number, employer and income;

- Information about your transactions with CarGuard Administration, the **Selling Agent,** and the **Payment Plan Provider** and/or **Finance Agent** that includes your name, address, telephone number, age, insurance coverage, transaction history, claims history, and premium information;

- Information you provide to us on applications from health care providers, such as doctors and hospitals, to determine your past or present health condition. Health information will be collected as we deem appropriate to deem eligibility for coverage, to process claims, to prevent fraud, and to determine extenuating refunds, as authorized by you, or otherwise permitted or required by law.

**Information We May Disclose and To Whom We May Disclose Information:** The nonpublic personal information CarGuard Administration may collect as described above may be disclosed in order to deliver products and services to you, provide customer service, and/or administer your account with us.

**Disclosures permitted by law:** CarGuard Administration may disclose all of the nonpublic personal information described above, as permitted by law. We may used affiliated and non-affiliated parties to perform services for us, such as providing customer assistance, handling claims, protection against fraud, and maintaining software for us. We may also disclose information in response to requests from law enforcement agencies or State insurance authorities.

**Information Regarding Former Consumers:** CarGuard Administration does not disclose nonpublic personal information about former customers with inactive accounts, except in accordance with this Privacy Policy.

**Our Security Procedures:** CarGuard Administration restricts access to nonpublic personal information about you to those employees with whom we determine have a legitimate business purpose to access such information in connection with the offering of products or services to you. We employ security techniques designed to protect our customer data. We provide training and communications programs to educate employees about the meaning and requirements of our strict standards for data security and confidentiality.

## SPECIAL STATE PROVISIONS AND NOTICE TO CONSUMERS

**If You purchased this Service Contract in any of the following states, the provision and/or provisions in this Addendum shall supersede, replace, and override any language in the Agreement to the Contrary, where it applies for the State in which You purchased your Vehicle:**

**Notice to Consumers: 1) This is not an insurance policy, it is a Service Contract.**

**Purchase of this agreement is not required to purchase or finance a Vehicle. The benefits provided may duplicate a manufacturer or seller's warranties that come automatically with every sale. You may be required by the Selling Agent of this coverage to pursue those warranties, which are available to You without this Contract. 2) The terms of this Written Agreement control the entire Contract between us. No change or modification to the written terms is valid. 3) The Contract is based upon information you provided to Us on the Application Page. This contract will be automatically extended while this Contract is in custody of an Authorized Repair facility in all states.**

**Claims will not be deducted from your net pro-rated refund due in the following states:** Arizona, Arkansas, Idaho, Louisiana, Mississippi, Missouri, and Nevada. **Claims will be deducted from your pro-rated refund due in all other states. If the claim amount exceeds the refund due, you will not be liable for any amount.**

**The cancellation fee shall not exceed the lesser of 10% of the unearned Contract Pro-Rata Purchase Price, as stated on the Application Page or $50.00** in the following states: Illinois, Iowa, Maine, Mississippi, Missouri, New Mexico, North Carolina, Oklahoma, and Wyoming. **The cancellation fee shall not exceed $50.00 in the following states:** Louisiana, New Mexico, and Texas. **The cancellation fee shall not exceed 10% of the amount paid in Arizona and Iowa.**

**Refunds will be credited within 30 days upon the processing of your Cancellation Form or Letter of Cancellation, and we shall owe a ten-percent (10%) penalty per month that a refund is not issued to You in the following states:** Alabama, District of Columbia, Louisiana, Maine, Maryland, Mississippi, Nevada, New Mexico, New York, South Carolina, Texas, Wisconsin, and Wyoming.

**We will mail you a written notice of Cancellation prior to 30 days of the date of cancellation of this Contract** in Alabama, Connecticut, Iowa, Missouri, Mississippi, Maryland, Nevada, New Mexico, Oregon, Texas, Wisconsin, and Wyoming. **In all other states, a notice shall be mailed upon cancellation. The notice of cancellation shall state the effective date and the reason for cancellation in all states.**

**The Arbitration clause shall be stricken in its entirety in the following states: Arkansas, Georgia, Maryland, Mississippi, Nebraska, Oregon, Wisconsin, and Wyoming. In these states, the following language shall apply to the resolution of any disputes arising under this Contract: Should a dispute, controversy, or claim arise out of or relating to this Contract, the dispute, controversy, or claim arising out of or relating to this Contract, or a breach hereof, may be settled by non-binding Mediation. Either party may make a written request to any**

nationally recognized organization that performs consumer related Mediation services. If both parties agree to Mediate in writing, the parties shall then agree to abide by the consumer related protocol established by the chosen Mediation organization and the laws of the state where the purchaser resides as well as federal law.

Otherwise, any dispute, controversy, or claim arising out of or relating to this Contract shall be settled in a court of competent jurisdiction, according to the laws of the state where the Contract Purchaser resides at the time the dispute, claim, or controversy arose, and federal law.

This contract may only be cancelled by us due to fraud by You, material misrepresentation by You affecting the contract, or non-payment of the provider fee in the following states: Arizona, Iowa, Minnesota, New Mexico, Vermont, Wisconsin, and Wyoming.

In Alabama, the cancellation fee shall not exceed $25.00. In Alabama, consequential damages are excluded from coverage under this Contract.

In Alaska, We will retain a cancellation fee of seven and one half percent (7.5%) of the unearned pro rata Agreement Purchase Price, not to exceed twenty-five dollars ($25); to be based on the days in force, as related to Your Agreement's term. In Alaska, if a refund not credited within thirty (30) days upon the processing of Your Letter of Cancellation We shall owe a penalty of ten percent (10%) of the provider fee paid for each thirty (30) day period that the refund is not issued to You.

In Arizona, This Contract shall not be cancelled or voided due to acts or omissions of the service company, its assignees, or subcontractors for their failure to provide correct information of their failure to perform the services or repairs provided in a timely, competent, and workmanlike manner. Parts or components repaired or replaced under the service contract shall not be excluded from coverage. This contract cannot be cancelled or voided by the service company or its representatives for pre-existing conditions, prior use or unlawful acts relating to the product, misrepresentation by either the service company or its subcontractors, or ineligibility for the program including gray market, high performance, and GM diesel autos. The service company may only cancel this Contract for Vehicle in which the odometer has been tampered with, disconnected, or altered in anyway by the Contract Holder. In Arizona, pre-existing conditions that were known or that reasonably should have been known by the Seller or Us shall not be excluded from Coverage.

In Arkansas, the cancellation fee shall not exceed $50.00.

In Colorado, the policy number for Our Contractual Liability Insurance Policy, as described in the Guaranty section of This Agreement is WIC-CGA-SCRI-051515.

In Connecticut, if this Contract is for less than one year, this Contract will be automatically extended while the Vehicle is in the custody of the Authorized Repair Facility. In Connecticut, in the event a dispute or complaint arises out of this Contract, you may file a complaint with the Connecticut Insurance Department by mail at: State of Connecticut, Insurance Department, P.O. Box 816, Hartford, CT 06142-0816, Attn. Consumer Affairs. There is no in-home service under this Contract. In accordance with

the cancellation provisions contained in this Contract, You may cancel this Contract at any time if the product is returned, lost, stolen, or destroyed. In Connecticut the "Arbitration" section only applies after both parties have attempted to mediate any and all disputes arising out of this Contract. Connecticut law shall apply in all mediation and subsequent Arbitration.

In Hawaii, a ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after the return of the service contract to the provider.

In Idaho, Coverage afforded under this motor vehicle service contract is not guaranteed by the Idaho Insurance Guarantee Association.

In Illinois, normal wear and tear is not covered.

In Iowa, if you have questions regarding your service contract, you may address them to the Iowa Insurance Commissioner at the following address: Iowa Insurance Division, 601 Locust Street, 4th Floor, Des Moines, IA 50309-3738; phone (515) 281-5705.

Upon our receipt of Your request to cancel this service contract, we will provide notice to You within fifteen (15) days of cancellation. If you cancel this service contract, a 10% penalty per month shall be added to a refund that is not paid within thirty (30) days of return of this service contract.

In Indiana, this Agreement is not insurance and is not subject to Indiana insurance law.

In Louisiana, a motor vehicle service contract is not insurance and is not regulated by the Department of Insurance. Any concerns or complaints may be directed to the attorney general.

In Maine, any refund during the full refund period will include any sales tax refund, pursuant to law.

In Maryland, a service contract is extended automatically when the provider fails to perform the services under the service contract. The service contract does not terminate until the services are provided in accordance with the terms of the service contract. In Maryland, the refund penalty shall be 10% of the purchase price per month that a refund is not paid. In Maryland, we will not deny a claim due to wear and tear. In Maryland, the failure of covered components due to wear and tear shall not be excluded from coverage.

In Massachusetts, the Provider is the selling dealer identified on the Application Page of this Contract.

In Minnesota, in the case of fraud, We will provide to You a written notice of cancellation 15 days prior to the contract being cancelled. In the case of material misrepresentation and/or non-payment, We will provide to You a written notice of cancellation 5 days prior to the contract being cancelled. The notice provided hereunder will include the effective date and reason for cancellation. A ten percent (10%) penalty per month must be added to a refund that is not paid or credited within forty-five (45) days after return of the service contract to the

provider.

In Mississippi, Cancellation by the Service Contract Provider shall only occur in instances of nonpayment of the provider fee, a material misrepresentation by the Service Contract Holder to the Service Contract Provider, or a substantial breach of duties by the Service Contract Holder relating to the covered product or its use. In Mississippi, only Vehicle Service Contracts on motor vehicles are regulated by the Mississippi Department of Insurance.

In Missouri, if We cancel the Agreement, notice of such cancellation will be delivered to You by registered mail fifteen (15) days prior to cancellation. The applicable free-look time period on this Agreement shall only apply to the original Agreement purchaser. A ten percent (10%) penalty of the amount outstanding per month shall be added to a refund that is not made within forty-five (45) days of return of this Agreement to Us.

**In New Hampshire,** arbitration under this Contract shall comply with RSA 542. If You have any questions regarding this Agreement, You may contact Us by mail or by phone. Refer to the front of this Agreement for Our address and toll-free number. In the event You do not receive satisfaction under this Agreement, You may contact the New Hampshire Insurance Department at the following address: 21 Fruit Street, Suite 14, Concord, New Hampshire, 03301.

In New Jersey, if You request cancellation of this Contract within sixty (60) days of the purchase date of the Contract and the refund is not paid or credited within forty-five (45) days after Your cancellation request to Us, a penalty of ten percent (10%) of the purchase price penalty will be added to the refund for every thirty (30) days the refund is not paid. If We cancel this Contract, We shall mail a written notice to You at Your last known address at least five (5) days before cancellation.

The notice shall state the effective date of the cancellation and the reason for the cancellation. Written notice is not required if canceled due to nonpayment by You of the provider fee; a material misrepresentation by You to the provider; or substantial breach of duties by You relating to the covered product or its use.

In New Mexico, this Contract cannot be renewed. We will mail you a written notice of cancellation fifteen (15) days prior to cancellation. In New Mexico, if a refund not credited within 30 days upon the processing of Your Letter of Cancellation, We shall owe a penalty of ten percent (10%) of the purchase price for each thirty-day period that the refund is not issued to You. In New Mexico, no Agreement that has been in effect for at least seventy (70) days may be cancelled by Us before the expiration of the agreed term of one (1) year after the Agreement Purchase Date, whichever occurs first, except for the following reasons: (1) Your failure to pay an amount when due, (2) Your conviction of a crime that results in an increase in the service required under the Agreement, (3) Discovery of fraud or material misrepresentation by You in obtaining this Agreement, (4) Discovery of either of the following if it occurred after the Agreement Purchase Date and substantially and materially increased the service required under this Agreement - a) An act or omission by You, or b) Your

violation of any condition of this Agreement. In New Mexico, right to void this Agreement is not transferable and applies only to the original Agreement holder.

In Oregon, We, the Obligor are covered by a reimbursement insurance policy issued by Wesco Insurance Company for all of the obligations and liabilities in this Service Contract including additional roadside assistance benefits, as defined in the "Additional Benefits of Coverage" section of this Contract.

**In South Carolina**, in the event of a dispute with the provider of this Contract, you may contact the South Carolina Department of Insurance, Capitol Center 1201 Main Street, Suite 1000, Columbia, South Carolina 29201 or (800) 768-3467. This agreement is not an insurance contract.

In Texas, this contract is regulated by the Texas Department of Licensing and Regulation. If you have a complaint arising from this contract, you may contact them at (512) 463-6599 or in writing at 920 Colorado Street, Austin, TX 78701. A refund will be processed upon Our receipt of a cancellation notice by You. A 10% per month penalty will be due on any amounts outstanding for refunds that are not paid before the 46th day after date of the receipt of the letter of cancellation. In Texas, you may contact the Insurer listed in "Section VIII. Guaranty" if a refund is not paid before the 46th day after the date on which the Contract is cancelled. In the event the We cancel this Contract for any reason, there shall be no cancellation fee. In Texas, the service contract provider license number for CarGuard Administration, INC is 687.

In Virginia, If any promise made in the contract has been denied or has not been honored within 60 days after your request, you may contact the Virginia Department of Agriculture and Consumer Services, Office of Charitable and Regulatory Programs at www.vdacs.virginia.gov/food-extended-service-contract-providers.shtml to file a complaint.

**In Wisconsin,** the cancellation fee shall not exceed 10% of the provider fee. **In Wisconsin,** outside of the first thirty days, if this Contract is cancelled by Us for a reason other than non-payment of the provider fee, You shall be entitled to 100% of the unearned pro-rata fee less any claims paid. **In Wisconsin,** in situations involving subrogation, the contract holder must be made whole before the company may retain amounts it has recovered. In the event of a total loss of property covered by a service contract that is not covered by a replacement of the property pursuant to the terms of the contract, a service contract holder shall be entitled to cancel the service contract and receive a pro rata refund of any unearned provider fee, less any claims paid. **In Wisconsin, THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE. If You do not receive satisfaction under this Agreement, You may contact the Office of the Commissioner of Insurance at the following address: P.O. Box 7873, Madison, WI 53707-7873.**

**EXHIBIT A**

## Prepaid Maintenance Benefit Addendum

Purchaser Name: __Jane Keener Quiat__

Effective Date: __10/04/2020__    Effective Years (term): __1__

Expiration Date: __10/04/2021__    Contract Number: __CGC24413034__

This Contract shall be by and between the above Purchaser and Us, the Obligor, CarGuard Administration, INC, located at 4742 N. 24th St. Suite 300, Phoenix, AZ 85016, with telephone number (888) 907-0870.

The Purchaser shall receive these benefits with **Coverage** beginning Thirty (30) days after the **Effective Date** shown on this page of this Contract. These benefits shall expire on the **Expiration Date**, which shall also be known as the **benefit term:**

**Oil Changes: We** will reimburse **You**, during the benefit term, **for a maximum of three**

**(3) oil changes per Year** for up to **$40.00 for non-synthetic oil,** and for up to **$55.00 for synthetic, blends for diesels, and larger V-8 engines;**

**Brake Pads/Shoes: We** will reimburse **You**, during the benefit term, **one time per Year** for up to **$100.00** for the **replacement of brake pads/shoes on your Vehicle;**

**Battery: We** will reimburse **You**, during the benefit term, one time per year for up to

**$100.00 for the replacement of a failed battery for your Vehicle;**

**Cooling System Maintenance & Lube: We** will reimburse **You,** during the benefit term, one time per year for up to 40.00 for the following services: Drain/refill, pressure check, inspect hoses, belts, clamps, and lube chassis.

If the Contract is cancelled in accordance with the terms and conditions of this cancellations section of this Contract, these benefits shall immediately terminate, and You will not be eligible for reimbursement if they have not been used.

### IMPORTANT DISCLOSURES

"Per Year" or "Year" shall be defined as twelve (12) calendar months from the effective date, until the expiration date. Benefits not used in one year CANNOT be carried over into the next year.

To receive reimbursement for these benefits during the benefit term, you must mail in a copy of your receipt showing the covered maintenance benefits were performed at a nationally recognized repair facility, or a licensed car dealership. You must also submit proof of payment showing that You paid for the benefits in order to be eligible for reimbursement. This information is to be mailed to the Administrator, at: CarGuard Administration, INC, ATTN: Maintenance Benefits Reimbursement, 4742 N. 24th St. Suite 300, Phoenix, AZ 85016.

Upon the expiration of the benefit term, these benefits shall immediately terminate and You will not be eligible for reimbursement even if they have not been used or redeemed at the time of termination.

**YOU MUST** submit your request for reimbursement within thirty (30) days of receipt of any of the above benefits. All requests must be postmarked within 30 days from the date of receipt of the benefit.

Any requests whereby the postmark is after thirty (30) days from the date of receipt of the benefit WILL BE DENIED.

Maintenance must be performed at either the selling dealer of this Agreement, a nationally recognized repair facility chain, or by a licensed or ASE certified mechanic. We WILL NOT provide reimbursement whereby the maintenance is self-performed or done by an unlicensed mechanic.

Upon receipt of your reimbursement request, we will disburse a check to you, at the address indicated on your request for reimbursement within thirty (30) days of the receipt of the reimbursement request.

### GUARANTY

Our obligations and the performance to You under this Contract are guaranteed and insured by a policy issued by Wesco Insurance Company, 59 Maiden Lane, 43rd Floor, New York, NY 10038. The telephone number for Wesco Insurance Company is (866) 505-4048. If any covered claim or refund is not paid within sixty (60) days (thirty [30] days for Alaska and Arizona residents), or if the provider becomes insolvent or otherwise financially impaired, after proof of loss has been filed, You may file a claim directly with the Insurance Company by contacting the Insurance Company at the number provided above.

7 - DMGL2-CARGUARD- - Print Date: 09/07/2020

193 - DMGL2-CARGUARD- - CGPLTD - 7
Auto Renewal Center
6789 Quail Hill Pkwy, Suite 605
Irvine, CA  92618

JANE KEENER-QUIAT
470 WOODEN DEER RD
CARBONDALE  CO    81623-8837

**EXHIBIT A**

your protection plan is enclosed

POM110

From: **Jane Keener-Quiat** keener.quiat@gmail.com
Subject: Notice of Cancellation of Contract #CGC24413034
Date: September 29, 2020 at 1:53 PM
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane keener.quiat@gmail.com



To Whom It May Concern:

DATE FILED: July 21, 2021 11:50 AM

I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please immediately refund this amount upon the card on
which I purchased this auto warranty contract. I have already left Notice of Cancellation for this service provider via its customer phone
number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from the purchase date, I am entitled to a full
refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat

**EXHIBIT
9**

**EXHIBIT A**

From: **Mail Delivery Subsystem** mailer-daemon@googlemail.com 
Subject: Delivery Status Notification (Failure)
Date: September 29, 2020 at 1:53 PM
To: keener.quiat@gmail.com

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074



## Message blocked

Your message to **cs@carguardadmin.com** has been blocked.
See technical details below for more information.

The response from the remote server was:

550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
[DM6NAM12FT040.eop-nam12.prod.protection.outlook.com]

Reporting-MTA: dns; googlemail.com
Received-From-MTA: dns; keener.quiat@gmail.com
Arrival-Date: Tue, 29 Sep 2020 12:53:19 -0700 (PDT)
X-Original-Message-ID: <C1778033-45FC-4E28-95FD-7F30F8FC2E2A@gmail.com>

Final-Recipient: rfc822; cs@carguardadmin.com
Action: failed
Status: 5.4.1
Remote-MTA: dns; carguardadmin-com.mail.protection.outlook.com.
(104.47.59.138, the server for the domain carguardadmin.com.)
Diagnostic-Code: smtp; 550 5.4.1 Recipient address rejected: Access denied. AS(201806281) [DM6NAM12FT040.eop-nam12.prod.protection.outlook.com]
Last-Attempt-Date: Tue, 29 Sep 2020 12:53:20 -0700 (PDT)

From: Jane Keener-Quiat <keener.quiat@gmail.com>
Subject: **Notice of Cancellation of Contract #CGC24413034**
Date: September 29, 2020 at 1:53:17 PM MDT
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane <keener.quiat@gmail.com>

To Whom It May Concern:
I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please immediately issue a credit upon the card on which I purchased this auto warranty contract. I have already left Notice of Cancellation for the Selling Agent Vashti Salazar at her phone number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from the purchase date, I am entitled to a full refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat



1  **September 29, 2020 – Recording of JKQ's call to Auto Renewal Center to cancel auto warranty**
2  **purchased on September 4, 2020:**

3  **VSC:** Good morning, Vehicle Service Center answering service. How can I help you?

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C5D9F8F684EAD
CASE NUMBER: 2021CV30074

4  **JKQ:** Uh…who am I speaking to?

5  **VSC:** Ahh…Vehicle Service Center answering service. How can I help you?

6  **JKQ:** Um. My name's Jane Keener-Quiat. I purchased a warranty…uh…September the 4th. I'm looking at
7  my contract…studying that… and I…it…it…it appears that this contract is with CarGuard Administrator,
8  but you're saying Vehicle Service. I'm confused about that.

9  **VSC:** There's no incoherence with that ma'am. Vehicle Service is the name of this company. (inaudible)
10  But the company that provides the warranty…CarGuard…there are other names…there are other
11  companies such as Matco, CarGuard and (inaudible). But yeah, there's no incoherence in that.

12  **JKQ:** Ok. Can you give me the phone number of CarGuard?

13  **VSC:** Well, ahh what exactly do you need? Because depending on what you need, I can ask them to call
14  you back.

15  **JKQ:** Well, I..I just think that if I have a contract with a company, I ought to be able to have their phone
16  number.

17  **VSC:** Ma'am, what exactly do you need?

18  **JKQ:** Well, right now, I just want to ask more questions and clarify some things. And also, this is an
19  expensive warranty, I…I think I ought to be able to…ah…know a lot about the company.

20  **VSC:** Ok, ma'am, let me explain you this because this is gonna be something you have to keep in mind.
21  You…you always have to go through us, the Vehicle Service Center, because (inaudible) we have an
22  alliance with CarGuard, so we are the link between them and you. So, umm…if you want to file a claim, if
23  you want to cancel the contract, if you want to make a payment, if you have questions, we ask to go
24  through us and we ask them to call you back. That's the process.

25  **JKQ:** Ok well, so what if I want to cancel?

26  **VSC:** You have to do that through us as well.

27  **JKQ:** Ok. Well, let's do so. Let'…let's cancel this.

28  **VSC:** So, you no longer have the questions? You just…you want to cancel?

29  **JKQ:** Right, now…now I just want to question…I want to cancel. Thank you.

30  **VSC:** Ok. Can I have your first and last name again please?

31  **JKQ:** Jane. J-A-N-E. And the last name is K-E-E-N-E-R. And then it's Quiat. Q-U-I-A-T. You have it as Jane
32  Keener-Quiat.

33  **VSC:** Thank you. And what's your call back number?

EXHIBIT
11

EXHIBIT A

34    **JKQ:** My phone number? Is 970-309-9334. And I can give you the contract number.

35    **VSC:** Yes, please.

36    **JKQ:** Contract number…CGC24413034

37    **VSC:** Thank you very much, Jane. Ah…now…let me explain to you how the process for cancellation
38    works. Ah….You leave the cancellation request with me. I will submit it right now. It will take between 1-
39    2 business days to complete the cancellation. So that means that after the…ah…2 business days or 1
40    business day, they will call back to confirm the cancellation with you and to proceed with your refund if
41    that's the case. Ok?

42    **JKQ:** Yes, so this is the day…ah the 29th, right? Of September that we're doing this.

43    **VSC:** I'm sorry what's the question

44    **JKQ:** So, we are cancelling this as of September 29th today.

45    **VSC:** Um…no. I mean, as soon as they will receive the message print out that I'm about to send and I
46    don't know exactly what time they will cancel it, but after 1 or 2 business days they will call you back to
47    confirm the cancellation.

48    **JKQ:** Ok. Alright.

49    **VSC:** Ok?

50    **JKQ:** Yes.

51    **VSC:** Great, then I'll send the message for now.

52    **JKQ:** And what is your name?

53    **VSC:** Ok. You have a nice day.

54    **JKQ:** What is your name?

55    (end of call)

**EXHIBIT A**

From: **Jane Keener-Quiat** keener.quiat@gmail.com
Subject: Notice of Cancellation of Contract #CGC24413034
Date: September 29, 2020 at 1:53 PM
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane keener.quiat@gmail.com



DATE FILED: July 21, 2021 11:50 AM
FILING ID: CAD9E8FC84E4D
CASE NUMBER: 2020CV30074

To Whom It May Concern:

I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please immediately refund upon the card on which I purchased this auto warranty contract. I have already left Notice of Cancellation for your company via a voicemail to your phone number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from the purchase date, I am entitled to a full refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat

**EXHIBIT 12**

EXHIBIT A



## Areas We Serve

View states and regions that CarGuard serves.



## Our Values

Learn about CarGuard's values.



## Our Story

A brief history on CarGuard.

## contact

**Office** | (888) 907-0870
**Fax** | (913) 904-3450
**Email | cs@carguardadmin.com**

## address

4901 W 136th Street
Leawood, KS 66224

## navigate

Home
Protection Plans
File a Claim
Our Story

**EXHIBIT A**

From: **Mail Delivery Subsystem** mailer-daemon@googlemail.com 
Subject: Delivery Status Notification (Failure)
Date: September 29, 2020 at 1:53 PM
To: keener.quiat@gmail.com



## **Message blocked**

Your message to **cs@carguardadmin.com** has been blocked.
See technical details below for more information.

The response from the remote server was:

550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
[DM6NAM12FT040.eop-nam12.prod.protection.outlook.com]

Reporting-MTA: dns; googlemail.com
Received-From-MTA: dns; keener.quiat@gmail.com
Arrival-Date: Tue, 29 Sep 2020 12:53:19 -0700 (PDT)
X-Original-Message-ID: <C1778033-45FC-4E28-95FD-7F30F8FC2E2A@gmail.com>

Final-Recipient: rfc822; cs@carguardadmin.com
Action: failed
Status: 5.4.1
Remote-MTA: dns; carguardadmin-com.mail.protection.outlook.com.
(104.47.59.138, the server for the domain carguardadmin.com.)
Diagnostic-Code: smtp; 550 5.4.1 Recipient address rejected: Access denied. AS(201806281) [DM6NAM12FT040.eop-
nam12.prod.protection.outlook.com]
Last-Attempt-Date: Tue, 29 Sep 2020 12:53:20 -0700 (PDT)

From: Jane Keener-Quiat <keener.quiat@gmail.com>
Subject: **Notice of Cancellation of Contract #CGC24413034**
Date: September 29, 2020 at 1:53:17 PM MDT
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane <keener.quiat@gmail.com>

To Whom It May Concern:
I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please immediately issue a credit
upon the card on which I purchased this auto warranty contract. I have already left Notice of Cancellation for the Selling Agent
Vashti Salazar at her phone number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from
the purchase date, I am entitled to a full refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat

**EXHIBIT A**

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

CarGuard Administration, Inc.
4901 W. 136th Street
Leawood, KS 66224

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*®.

**OFFICIAL USE**

| | |
|---|---|
| Certified Mail Fee | $ |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☐ Return Receipt (hardcopy) | $ |
| ☐ Return Receipt (electronic) | $ |
| ☐ Certified Mail Restricted Delivery | $ |
| ☐ Adult Signature Required | $ |
| ☐ Adult Signature Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

Postmark
Here

Sent To  CarGuard Administration, Inc.

Street and Apt. No., or PO Box No.  4901 W. 136th Street

City, State, ZIP+4®  Leawood, KS 66224

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 0700 0000 6897 9256

7019 0700 0000 6897 9256

### CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CarGuard Administration, Inc.
4901 W. 136th Street
Leawood, KS 66224

9590 9402 5069 9092 9257 47

2. Article Number (Transfer from service label)
7019 0700 0000 6897 9256

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**EXHIBIT A**

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

CarGuard Administration, Inc.
4901 W. 136th Street
Leawood, KS 66224

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee  $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage  $

Total Postage and Fees  $

Sent To  CAR Guard Administration, Inc.
Street and Apt. No., or PO Box No.  4901 W. 136th Street
City, State, ZIP+4®  Leawood, KS 66224

Postmark
Here

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 0700 0000 6489 9256
7019 0700 0000 6489 9256

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 5069 9092 9257 47

• Sender: Please print your name, address, and ZIP+4® in this box•

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

United States
Postal Service

**EXHIBIT A**







UNITED STATES
POSTAL SERVICE.

GLENWOOD SPRINGS
113 9TH ST
GLENWOOD SPRINGS, CO 81601-9998
(800)275-8777

09/30/2020                          01:23 PM

| Product | Qty | Unit Price | Price |
|---------|-----|------------|-------|
| First-Class Mail® Letter | 1 | | $0.55 |
| Phoenix, AZ 85016 | | | |
| Weight: 0 lb 0.80 oz | | | |
| Estimated Delivery Date | | | |
| Mon 10/05/2020 | | | |
| Certified Mail® | | | $3.55 |
| Tracking #: | | | |
| 70190700000068979263 | | | |
| Total | | | $4.10 |
| First-Class Mail® Letter | 1 | | $0.55 |
| Overland Park, KS 66224 | | | |
| Weight: 0 lb 0.80 oz | | | |
| Estimated Delivery Date | | | |
| Mon 10/05/2020 | | | |
| Certified Mail® | | | $3.55 |
| Tracking #: | | | |
| 70190700000068979256 | | | |
| Return Receipt | | | $2.85 |
| Tracking #: | | | |
| 9590 9402 5069 9092 9257 47 | | | |
| Total | | | $6.95 |

Grand Total :                       $11.05

Credit Card Remitted                $11.05
    Card Name: VISA
    Account #: XXXXXXXXXXXX
    Approval #: 024371
    Transaction #: 134
    AID: A0000000980840      Chip
    AL: US DEBIT
    PIN: Not Required

*******************************************
    Due to limited transportation
    availability as a result of
    nationwide COVID-19 impacts
    package delivery times may be
    extended. Priority Mail Express®
    service will not change.
*******************************************

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
            1-800-222-1811.

            Preview your Mail
            Track your Packages
            Sign up for FREE @
          www.informeddelivery.com

        NOW HIRING. Please visit
        www.usps.com/careers to apply.

    All sales final on stamps and postage.
    Refunds for guaranteed services only.
        Thank you for your business.

    Tell us about your experience.  **EXHIBIT A**
    Go to: https://postalexperience.com/Pos
        840-5800-0412-001-00043-66507-02



From: **Jane Keener-Quiat** keener.quiat@gmail.com
Subject: Notice of Cancellation of Contract #CGC24413034
Date: September 29, 2020 at 1:53 PM
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane keener.quiat@gmail.com

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C364E8CD48001B2AD
CASE NUMBER: 2021CV30074

To Whom It May Concern:

I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please credit the purchase back on the card on which I purchased this auto warranty contract. I have already left Notice of Cancellation for this contract at your service line phone number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from the purchase date, I am entitled to a full refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat

**EXHIBIT 13**
**EXHIBIT A**



## Areas We Serve

View states and regions that CarGuard serves.



## Our Values

Learn about CarGuard's values.



## Our Story

A brief history on CarGuard.

## contact

**Office** | (888) 907-0870
**Fax** | (913) 904-3450
**Email** | cs@carguardadmin.com

## address

4901 W 136th Street
Leawood, KS 66224

## navigate

Home
Protection Plans
File a Claim
Our Story

**EXHIBIT A**

From: **Mail Delivery Subsystem** mailer-daemon@googlemail.com 
Subject: Delivery Status Notification (Failure)
Date: September 29, 2020 at 1:53 PM
To: keener.quiat@gmail.com



## Message blocked

Your message to **cs@carguardadmin.com** has been blocked.
See technical details below for more information.

The response from the remote server was:

550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
[DM6NAM12FT040.eop-nam12.prod.protection.outlook.com]

Reporting-MTA: dns; googlemail.com
Received-From-MTA: dns; keener.quiat@gmail.com
Arrival-Date: Tue, 29 Sep 2020 12:53:19 -0700 (PDT)
X-Original-Message-ID: <C1778033-45FC-4E28-95FD-7F30F8FC2E2A@gmail.com>

Final-Recipient: rfc822; cs@carguardadmin.com
Action: failed
Status: 5.4.1
Remote-MTA: dns; carguardadmin-com.mail.protection.outlook.com.
(104.47.59.138, the server for the domain carguardadmin.com.)
Diagnostic-Code: smtp; 550 5.4.1 Recipient address rejected: Access denied. AS(201806281) [DM6NAM12FT040.eop-nam12.prod.protection.outlook.com]
Last-Attempt-Date: Tue, 29 Sep 2020 12:53:20 -0700 (PDT)

From: Jane Keener-Quiat <keener.quiat@gmail.com>
Subject: **Notice of Cancellation of Contract #CGC24413034**
Date: September 29, 2020 at 1:53:17 PM MDT
To: cs@carguardadmin.com
Cc: Keener-Quiat Jane <keener.quiat@gmail.com>

To Whom It May Concern:
I herewith cancel contract #CGC24413034, purchased on September 4, 2020 for $3,775.00. Please immediately issue a credit upon the card on which I purchased this auto warranty contract. I have already left Notice of Cancellation for the Selling Agent Vashti Salazar at her phone number of 844-273-9727, but I have heard nothing. As I am canceling within the first 30 days from the purchase date, I am entitled to a full refund.

Please confirm to me in writing your receipt of this email and your action upon it. Thank you.

Sincerely,
Jane Keener-Quiat

**EXHIBIT A**

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

CarGuard Administration, Inc.
4742 N. 24th Street Suite 300
Phoenix, AZ 85016



**EXHIBIT A**

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

CarGuard Administration, Inc.
4742 N. 24ᵗʰ Street Suite 300
Phoenix, AZ 85016

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

**OFFICIAL USE**

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Sent To  CarGuard Administration, Inc.
Street and Apt. No., or PO Box No. 4742 N. 24th Street   Suite 300
City, State, ZIP+4® Phoenix, AZ 85016

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions

Postmark
Here

7019 0700 0000 1687 9263
7019 0700 0000 1687 9263

**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Jane Keener-Quiat
470 Wooden Deer Road
Carbondale, CO 81623

USPS TRACKING #

9590 9402 5069 9092 9257 54

**United States**
**Postal Service**

CarGuard Admin- Notice of Cancellation

**EXHIBIT A**







UNITED STATES
POSTAL SERVICE.

GLENWOOD SPRINGS
113 9TH ST
GLENWOOD SPRINGS, CO 81601-9998
(800)275-8777

09/30/2020                          01:23 PM

Product              Qty    Unit      Price
                            Price

First-Class Mail®     1               $0.55
Letter
  Phoenix, AZ  85016
  Weight: 0 lb 0.80 oz
  Estimated Delivery Date
  Mon 10/05/2020
  Certified Mail®                     $3.55
    Tracking #:
    70190700000068979263
Total                                 $4.10

First-Class Mail®     1               $0.55
Letter
  Overland Park, KS  66224
  Weight: 0 lb 0.80 oz
  Estimated Delivery Date
  Mon 10/05/2020
  Certified Mail®                     $3.55
    Tracking #:
    70190700000068979256
  Return Receipt                      $2.85
    Tracking #:
    9590 9402 5069 9092 9257 47
Total                                 $6.95

Grand Total:                         $11.05

Credit Card Remitted                 $11.05
  Card Name: VISA
  Account #: XXXXXXXXXXXX
  Approval #: 024371
  Transaction #: 134
  AID: A0000000980840        Chip
  AL: US DEBIT
  PIN: Not Required


*******************************************
      Due to limited transportation
      availability as a result of
      nationwide COVID-19 impacts
      package delivery times may be
      extended. Priority Mail Express®
      service will not change.
*******************************************
   Text your tracking number to 28777 (2USPS)
   to get the latest status. Standard Message
   and Data rates may apply. You may also
   visit www.usps.com USPS Tracking or call
                1-800-222-1811.


               Preview your Mail
               Track your Packages
               Sign up for FREE @
               www.informeddelivery.com

          NOW HIRING. Please visit
       www.usps.com/careers to apply.

   All sales final on stamps and postage.
   Refunds for guaranteed services only.
         Thank you for your business.

   Tell us about your experience. **EXHIBIT A**
   Go to: https://postalexperience.com/Pos
       840-5800-0412-001-00043-66507-02

**USPS TRACKING #**

9590 9402 5069 9092 9257 54

DATE FILED: July 21, 2021 11:50 AM
FILING ID: CB2C0EB22FEAD
CASE NUMBER: 2021CV30474

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Jane Keenen-Qurat
470 Wooden Deer Road
Carbondale, CO 81623

9--883770   Carr Guidel Admin- Notice of Cancellation

**EXHIBIT**
**14**

**EXHIBIT A**

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Car Guard Administration, Inc*
*4742 N. 24th Street Suite 300*
*Phoenix, AZ 85016*

9590 9402 5069 9092 9257 54

2. Article Number *(Transfer from service label)*

7019 0700 0000 6897 9263

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

**EXHIBIT A**



USPS TRACKING #

9590 9402 5069 9092 9257 47

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Jane Reemer-Qurat
470 Wooden Deer Road
Carbondale, CO 81623

**EXHIBIT A**

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X *M M*    ☐ Agent ☐ Addressee<br>B. Received by *(Printed Name)*    C. Date of Delivery |
| 1. Article Addressed to:<br><br>Car Guard Administration, In<br>4901 W. 136th Street<br>, KS 66224 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 5069 9092 9257 47

| 3. Service Type | ☐ Priority Mail Express® |
|---|---|
| ☐ Adult Signature | ☐ Registered Mail™ |
| ☐ Adult Signature Restricted Delivery | ☐ Registered Mail Restricted Delivery |
| ☒ Certified Mail® | |
| ☐ Certified Mail Restricted Delivery | ☐ Return Receipt for Merchandise |
| ☐ Collect on Delivery | |
| ☐ Collect on Delivery Restricted Delivery | ☐ Signature Confirmation™ |
| ☐ ____ured Mail<br>☐ ____ured Mail Restricted Delivery (over $500) | ☐ Signature Confirmation Restricted Delivery |

2. Article Number *(Transfer from service label)*

7019 0700 0000 6897 9256

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

**EXHIBIT A**

**Violation Chart - Count I**

| Call No. | Date of Call | Phone Number | No. of Violations per Call | Amount of Statutory Damages per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 2 | 9/4/2020 | 949-538-5912 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 3 | 9/4/2020 | 303-649-9978 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 4 | 9/8/2020 | | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 5 | 9/25/2020 | 303-353-0879 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 6 | 9/28/2020 | 910-407-8590 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 7 | 10/12/2020 | 719-295-5539 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 8 | 10/22/2020 | 725-600-6129 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 9 | 11/16/2020 | 970-557-2675 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 10 | 11/25/2020 | 970-832-0388 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 11 | 12/8/2020 | 475-212-4746 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 12 | 12/16/2020 | 520-463-7091 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 13 | 1/8/2021 | 585-479-3752 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 14 | 1/8/2021 | 585-479-3752 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 15 | 1/21/2021 | 719-364-0844 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 16 | 1/28/2021 | 303-605-7518 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 17 | 2/17/2021 | 303-446-0461 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 18 | 2/25/2021 | 303-869-5768 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 19 | 3/10/2021 | 914-529-8139 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 20 | 4/2/2021 | 303-769-3056 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 21 | 4/7/2021 | 303-344-3572 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 22 | 4/12/2021 | 970-859-4670 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 25 | 4/15/2021 | 884-273-9727 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 26 | 4/29/2021 | 970-512-7284 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 27 | 5/28/2021 | 970-718-3681 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| **TOTALS:** | | | **54** | | **$27,000.00** | **$81,000.00** |

COUNT I: Violations of the Telephone Consumer Protection Act, Restrictions on Use of Automated Telephone Equipment, 47 U.S.C. § 227(b)(1)(iii), specifically: (1) initiated the telephone call without prior express written consent using an automatic dialing system or (2) an artificial or prerecorded voice.

a. Before COCCA/RICO treble damages and non-monetary relief;
b. Before Civil Theft treble damages;
c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;
d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

DATE FILED: July 21, 2021 11:50 AM
FILING ID: 9D669D9F8F684EAD
CASE NUMBER: 2021CV30074

**EXHIBIT 15**

**EXHIBIT A**

**Violation Chart - Count II**

| Call No. | Date of Call | Phone No. | Failure to Transmit Calling Party No. | AND | Failure to Transmit Name of Telemarketer | OR | Failure to Transmit Name of Seller | AND | Failure to Transmit Seller's Customer Service No. | PLUS | Number Provided Did Not Permit Do-Not-Call Requests During Regular Business | Caller ID Information was Blocked | Total Number of CID Violation | Total Monetary Amount of Statutory Damages Per Call | Total Monetary Amount of Treble Damages Per Call |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | X | | X | | X | | X | | | X | 5 | $2,500.00 | $7,500.00 |
| 2 | 9/4/2020 | 949-538-5912 | | | X | | X | | | | | X | 3 | $1,500.00 | $4,500.00 |
| 3 | 9/4/2020 | 303-649-9978 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 4 | 9/8/2020 | | | | | | | | | | | | | | |
| 5 | 9/25/2020 | 303-353-0879 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 6 | 9/28/2020 | 910-407-8590 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 7 | 10/12/2020 | 719-295-5539 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 8 | 10/22/2020 | 725-600-6129 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 9 | 11/16/2020 | 970-557-2675 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 10 | 11/25/2020 | 970-832-0388 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 11 | 12/8/2020 | 475-212-4746 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 12 | 12/16/2020 | 520-463-7091 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 13 | 1/8/2021 | 585-479-3752 | | | X | | X | | | | | X | 3 | $1,500.00 | $4,500.00 |
| 14 | 1/8/2021 | 585-479-3752 | | | X | | X | | | | | X | 3 | $1,500.00 | $4,500.00 |
| 15 | 1/21/2021 | 719-364-0844 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 16 | 1/28/2021 | 303-605-7518 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 17 | 2/17/2021 | 303-446-0461 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 18 | 2/25/2021 | 303-869-5768 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 19 | 3/10/2021 | 914-529-8139 | | | X | | X | | | | | X | 3 | $1,500.00 | $4,500.00 |
| 20 | 4/2/2021 | 303-769-3056 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 21 | 4/7/2021 | 303-344-3572 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 22 | 4/12/2021 | 970-859-4670 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 25 | 4/15/2021 | 884-273-9727 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 26 | 4/29/2021 | 970-512-7284 | X | | X | | X | | X | | X | X | 6 | $3,000.00 | $9,000.00 |
| 27 | 5/28/2021 | 970-718-3681 | | | X | | X | | | | | X | 3 | $1,500.00 | $4,500.00 |
| | | **TOTALS:** | | | | | | | | | | | 140 | $70,000.00 | $210,000.00 |

COUNT II: 47 C.F.R. 64.1601 (e)(1) and (2) provides the requirements of caller identification for those persons or entities engaged in telemarketing.

Each BLUE column above represents one (1) potential violation of the regulation.

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

Case 1:21-cv-02135-CMA   Document 6   Filed 08/06/21   USDC Colorado   Page 151 of 165

## Violation Chart - Count III

| Call No. | Date of Call | Phone Number | No. of Violations Per Call | Amount of Statutory Damages per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 1 | $500.00 | $500.00 | $1,500.00 |
| 2 | 9/4/2020 | 949-538-5912 | 1 | $500.00 | $500.00 | $1,500.00 |
| 3 | 9/4/2020 | 303-649-9978 | 1 | $500.00 | $500.00 | $1,500.00 |
| 4 | 9/8/2020 | | 1 | $500.00 | $500.00 | $1,500.00 |
| 5 | 9/25/2020 | 303-353-0879 | 1 | $500.00 | $500.00 | $1,500.00 |
| 6 | 9/28/2020 | 910-407-8590 | 1 | $500.00 | $500.00 | $1,500.00 |
| 7 | 10/12/2020 | 719-295-5539 | 1 | $500.00 | $500.00 | $1,500.00 |
| 8 | 10/22/2020 | 725-600-6129 | 1 | $500.00 | $500.00 | $1,500.00 |
| 9 | 11/16/2020 | 970-557-2675 | 1 | $500.00 | $500.00 | $1,500.00 |
| 10 | 11/25/2020 | 970-832-0388 | 1 | $500.00 | $500.00 | $1,500.00 |
| 11 | 12/8/2020 | 475-212-4746 | 1 | $500.00 | $500.00 | $1,500.00 |
| 12 | 12/16/2020 | 520-463-7091 | 1 | $500.00 | $500.00 | $1,500.00 |
| 13 | 1/8/2021 | 585-479-3752 | 1 | $500.00 | $500.00 | $1,500.00 |
| 14 | 1/8/2021 | 585-479-3752 | 1 | $500.00 | $500.00 | $1,500.00 |
| 15 | 1/21/2021 | 719-364-0844 | 1 | $500.00 | $500.00 | $1,500.00 |
| 16 | 1/28/2021 | 303-605-7518 | 1 | $500.00 | $500.00 | $1,500.00 |
| 17 | 2/17/2021 | 303-446-0461 | 1 | $500.00 | $500.00 | $1,500.00 |
| 18 | 2/25/2021 | 303-869-5768 | 1 | $500.00 | $500.00 | $1,500.00 |
| 19 | 3/10/2021 | 914-529-8139 | 1 | $500.00 | $500.00 | $1,500.00 |
| 20 | 4/2/2021 | 303-769-3056 | 1 | $500.00 | $500.00 | $1,500.00 |
| 21 | 4/7/2021 | 303-344-3572 | 1 | $500.00 | $500.00 | $1,500.00 |
| 22 | 4/12/2021 | 970-859-4670 | 1 | $500.00 | $500.00 | $1,500.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | 1 | $500.00 | $500.00 | $1,500.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | 1 | $500.00 | $500.00 | $1,500.00 |
| 25 | 4/15/2021 | 884-273-9727 | 1 | $500.00 | $500.00 | $1,500.00 |
| 26 | 4/29/2021 | 970-512-7284 | 1 | $500.00 | $500.00 | $1,500.00 |
| 27 | 5/28/2021 | 970-718-3681 | 1 | $500.00 | $500.00 | $1,500.00 |
| TOTALS: | | | 27 | | $13,500.00 | $40,500.00 |

Count III: Violations of the Telephone Consumer Protection Act, Protection of Subscriber Privacy Rights, 47 C.F.R. § 64.1200(c)(2) and 47 U.S.C. § 227(c): Initiating a Call for Telemarketing Purposes to a Telephone number Listed on the National Do-Not-Call Registry

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

**Violation Chart - Count IV**

| Call No. | Date of Call | Phone Number | No. of Violations Per Call | Amount of Statutory Damages per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 2 | 9/4/2020 | 949-538-5912 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 3 | 9/4/2020 | 303-649-9978 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 4 | 9/8/2020 | | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 5 | 9/25/2020 | 303-353-0879 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 6 | 9/28/2020 | 910-407-8590 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 7 | 10/12/2020 | 719-295-5539 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 8 | 10/22/2020 | 725-600-6129 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 9 | 11/16/2020 | 970-557-2675 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 10 | 11/25/2020 | 970-832-0388 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 11 | 12/8/2020 | 475-212-4746 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 12 | 12/16/2020 | 520-463-7091 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 13 | 1/8/2021 | 585-479-3752 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 14 | 1/8/2021 | 585-479-3752 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 15 | 1/21/2021 | 719-364-0844 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 16 | 1/28/2021 | 303-605-7518 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 17 | 2/17/2021 | 303-446-0461 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 18 | 2/25/2021 | 303-869-5768 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 19 | 3/10/2021 | 914-529-8139 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 20 | 4/2/2021 | 303-769-3056 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 21 | 4/7/2021 | 303-344-3572 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 22 | 4/12/2021 | 970-859-4670 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 25 | 4/15/2021 | 884-273-9727 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 26 | 4/29/2021 | 970-512-7284 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| 27 | 5/28/2021 | 970-718-3681 | 2 | $500.00 | $1,000.00 | $3,000.00 |
| **TOTALS:** | | | 54 | | $27,000.00 | $81,000.00 |

**Count IV: Violations of the Telephone Consumer Protection Act ("TCPA"), Protection of Subscriber Privacy Rights, 47 U.S.C. § 227 (c) and 47 C.F.R. § 64.1200(d)(1) and (2): No person or entity shall initiate a telemarketing call unless they have instituted proceedures for maintaining a list of persons who do not want to received calls by or on behalf of the person or entity. The proceedures must meet certain minimum standards, specifically:**

**(1) Telemarketers must have a written policy, available upon demand, for maintaining a do-not-call list.**

**(2) Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.**

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

**Violaton Chart - Count V**

| Call No. | Date of Call | Phone Number | No. of Violations Per Call | Amount of Statutory Damages Per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 2 | 9/4/2020 | 949-538-5912 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 3 | 9/4/2020 | 303-649-9978 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 4 | 9/8/2020 | | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 5 | 9/25/2020 | 303-353-0879 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 6 | 9/28/2020 | 910-407-8590 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 7 | 10/12/2020 | 719-295-5539 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 8 | 10/22/2020 | 725-600-6129 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 9 | 11/16/2020 | 970-557-2675 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 10 | 11/25/2020 | 970-832-0388 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 11 | 12/8/2020 | 475-212-4746 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 12 | 12/16/2020 | 520-463-7091 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 13 | 1/8/2021 | 585-479-3752 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 14 | 1/8/2021 | 585-479-3752 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 15 | 1/21/2021 | 719-364-0844 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 16 | 1/28/2021 | 303-605-7518 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 17 | 2/17/2021 | 303-446-0461 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 18 | 2/25/2021 | 303-869-5768 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 19 | 3/10/2021 | 914-529-8139 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 20 | 4/2/2021 | 303-769-3056 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 21 | 4/7/2021 | 303-344-3572 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 22 | 4/12/2021 | 970-859-4670 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 23 | 4/13/2021 (call at 1:04 p.m.) | 478-394-8844 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 24 | 4/13/2021 (call at 1:45 p.m.) | 478-394-8844 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 25 | 4/15/2021 | 884-273-9727 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 26 | 4/29/2021 | 970-512-7284 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| 27 | 5/28/2021 | 970-718-3681 | 3 | $500.00 | $1,500.00 | $4,500.00 |
| **TOTALS:** | | | **81** | | **$40,500.00** | **$121,500.00** |

**Count V: Violations of the TCPA, Protection of Suscriber Privacy Rights, 47 U.S.C. § 227 (c)(1) and (2) and 47 C.F.R. § 64.1200 (b) All artificial or prerecorded voice telephone messages shall:**

**47 C.F.R § 64.1200(b)(1):** At the beginning of the message, state clearly the identity of the business, or individual, or other entity that is responsible for inititaling the call. If it is a business, they must provide the name under which the entity is registered to conduct business with the state.

**47 C.F.R § 64.1200(b)(2):** State clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual.

**47 C.F.R § 64.1200(b)(3)** In every case where the artificial or prerecorded vocie telephone message includes or introduces an advertisement or constitutes telemarketing it should provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief expanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification required in (b)(1).

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

**Violation Chart - Count VI**

| Call No. | Date of Call | Phone Number | No. of Violations Per Call | Amount of Statutory Damage w/ Penalty (C.R.S. 6-1-305(1)(c)) per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 2 | 9/4/2020 | 949-538-5912 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 3 | 9/4/2020 | 303-649-9978 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 4 | 9/8/2020 | | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 5 | 9/25/2020 | 303-353-0879 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 6 | 9/28/2020 | 910-407-8590 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 7 | 10/12/2020 | 719-295-5539 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 8 | 10/22/2020 | 725-600-6129 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 9 | 11/16/2020 | 970-557-2675 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 10 | 11/25/2020 | 970-832-0388 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 11 | 12/8/2020 | 475-212-4746 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 12 | 12/16/2020 | 520-463-7091 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 13 | 1/8/2021 | 585-479-3752 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 14 | 1/8/2021 | 585-479-3752 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 15 | 1/21/2021 | 719-364-0844 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 16 | 1/28/2021 | 303-605-7518 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 17 | 2/17/2021 | 303-446-0461 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 18 | 2/25/2021 | 303-869-5768 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 19 | 3/10/2021 | 914-529-8139 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 20 | 4/2/2021 | 303-769-3056 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 21 | 4/7/2021 | 303-344-3572 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 22 | 4/12/2021 | 970-859-4670 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 25 | 4/15/2021 | 884-273-9727 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 26 | 4/29/2021 | 970-512-7284 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| 27 | 5/28/2021 | 970-718-3681 | 2 | $2,500.00 | $2,500.00 | $7,500.00 |
| **TOTALS:** | | | 54 | | $67,500.00 | $202,500.00 |

Count VI: Violations of the CCPA, Prevention of Telemarketing Fraud, C.R.S. § 6-1-304 and C.R.S. § 6-1-305(1)(c), Unlawful Telemarketing Practices, specifically;

(1) C.R.S. 6-1-304(1)(a): Conducts business as a commercial telephone seller without having registered with the attorney general;

(2) C.R.S. 6-1-304(1)(h): Engages in any deceptive trade practice defined in section 6-1-105 or part 7 of this article.

(3) C.R.S. 6-1-305(1)(c): A person who engages in any unlawful telemarketing practice as defined in section 6-1-304 (4) shall be liable in a private civil action to the owner of the cellular telephone for consequential damages, court costs, attorney fees, and a penalty in the amount of at lease three hundred dollars and not more than five hundred dollars for a first offense and at lease five hundred dollars and not more than one thousand dollars for a second or subsequent offense.

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

## Violation Chart - Count VII

| Call No. | Date of Call | Phone Number | No. of Violations Per Call | Amount of Statutory Damages per Violation | Total Damages per Violation for Each Call | Treble Damages per Call |
|---|---|---|---|---|---|---|
| 1 | 9/5/2020 | | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 2 | 9/4/2020 | 949-538-5912 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 3 | 9/4/2020 | 303-649-9978 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 4 | 9/8/2020 | | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 5 | 9/25/2020 | 303-353-0879 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 6 | 9/28/2020 | 910-407-8590 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 7 | 10/12/2020 | 719-295-5539 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 8 | 10/22/2020 | 725-600-6129 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 9 | 11/16/2020 | 970-557-2675 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 10 | 11/25/2020 | 970-832-0388 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 11 | 12/8/2020 | 475-212-4746 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 12 | 12/16/2020 | 520-463-7091 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 13 | 1/8/2021 | 585-479-3752 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 14 | 1/8/2021 | 585-479-3752 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 15 | 1/21/2021 | 719-364-0844 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 16 | 1/28/2021 | 303-605-7518 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 17 | 2/17/2021 | 303-446-0461 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 18 | 2/25/2021 | 303-869-5768 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 19 | 3/10/2021 | 914-529-8139 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 20 | 4/2/2021 | 303-769-3056 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 21 | 4/7/2021 | 303-344-3572 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 22 | 4/12/2021 | 970-859-4670 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 23 | 4/13/2021 | 478-394-8844 (call at 1:04 p.m.) | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 24 | 4/13/2021 | 478-394-8844 (call at 1:45 p.m.) | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 25 | 4/15/2021 | 884-273-9727 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 26 | 4/29/2021 | 970-512-7284 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| 27 | 5/28/2021 | 970-718-3681 | 5 | $500.00 | $2,500.00 | $7,500.00 |
| TOTALS: | | | 135 | | $67,500.00 | $202,500.00 |

Count VII: Violations of Colorado Consumer Protection Act - Deceptive Trade Practices C.R.S. § 6-1-105:

(1) C.R.S. § 6-1-105(1)(a): Either knowlingly or recklessly passes off goods, services, or property as those of another;

(2) C.R.S. § 6-1-105(1)(b): Either knowlingly or recklessly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;

(3) C.R.S. § 6-1-105(1)(c): Either knowlingly or recklessly makes a false representation as to its affiliation, connection, or association with or certification by another;

(4) C.R.S. § 6-1-105(1)(d): Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) C.R.S. § 6-1-105(1)(cc): Engages in any commercial telephone solicitation which constitutes an unlawful telemarketing practice as defined in C.R.S. § 6-1-304.

a. Before COCCA/RICO treble damages and non-monetary relief;

b. Before Civil Theft treble damages;

c. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection;

d. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest.

**EXHIBIT A**

## Violation Totals

| Count | Total No. of Violations Per Count | Total Damages Per Count | Treble Damages Per Count |
|---|---|---|---|
| I | 54 | $27,000.00 | $81,000.00 |
| II | 140 | $70,000.00 | $210,000.00 |
| III | 27 | $13,500.00 | $40,500.00 |
| IV | 54 | $27,000.00 | $81,000.00 |
| V | 81 | $40,500.00 | $121,500.00 |
| VI | 54 | $67,500.00 | $202,500.00 |
| VII | 135 | $67,500.00 | $202,500.00 |
| **Subtotal Before COCCA Treble Damages** | **545** | **$313,000.00** | **$939,000.00** |
| **Subtotal With COCCA Treble Damages** | | | **$2,817,000.00** |
| **Total with Civil Theft Treble Damages** | | | **$8,451,000.00** |
| a. Before pre-judgment attorneys fees, post-judgment attorneys fees, and all costs of collection; b. Before pre-judgment interest and post-judgment interest, as provided by Colorado law, including moratory interest. | | | |

**EXHIBIT A**

# Exhibit 16

## Screenshots

DATE FILED: July 21, 2021 11:50 AM
FILING ID: C3D9F8F684EAD
CASE NUMBER: 2021CV30074

This is a compilation of screenshots of auto warranty robocalls received by Plaintiffs JKQ and ALQ on their cell phones between September 4, 2020 and May 28, 2021 as referenced in the Complaint, ¶¶ 68-91.

1. **Call #2, Complaint ¶ 68:**



2. **Call #3, Complaint ¶ 69:**



**EXHIBIT A**

3. **Call #5, Complaint ¶ 71:**



4. **Call #6, Complaint ¶ 72:**



**EXHIBIT A**

5. **Call #8, Complaint ¶ 74:**



6. **Call #11, Complaint ¶ 77:**



**EXHIBIT A**

7. **Call #12, Complaint ¶ 78:**



8. **Calls #13 and #14, Complaint ¶ 79:**



4

**EXHIBIT A**

9. **Call #17, Complaint ¶ 82:**



10. **Call #19, Complaint ¶ 84:**



**EXHIBIT A**

11. **Call #21, Complaint ¶ 86:**



12. **Call #22, Complaint ¶ 87:**



**EXHIBIT A**

13. **Calls #23 and #24, Complaint ¶ 88:**

**Call #23:**



**Call #24:**



7

14. **Call #25, Complaint ¶ 89:**



15. **Call #26, Complaint ¶ 90:**



8

**EXHIBIT A**



16. **Call #27, Complaint ¶ 91:**

